B104 (FORM 104) (08/07)

| **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br><br>Ace Motor Acceptance Corporation | **DEFENDANTS**<br><br>McCoy Motors, LLC, McCoy Motors, LLC d/b/a Ride Fast, Robert McCoy, Jr. and Misty McCoy |
|---|---|

| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br><br>James H. Henderson, 1201 Harding Place, Charlotte<br>North Carolina 28204, 704.333.3444 | **ATTORNEYS** (If Known)<br><br>David Badger |
|---|---|

| **PARTY** (Check One Box Only)<br>☑ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor    ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Preliminary Injunction, Recovery of money/property

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☑ 11-Recovery of money/property - §542 turnover of property
- ☑ 12-Recovery of money/property - §547 preference
- ☑ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☑ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Ace Motor Acceptance Corporation | BANKRUPTCY CASE NO.<br>18-30426 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Western District of NC | DIVISION OFFICE<br>Charlotte | NAME OF JUDGE<br>Whitley |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>06/18/2018 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>James H. Henderson | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet. CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

In Re:

|  |  |  |
|---|---|---|
| ACE MOTOR ACCEPTANCE CORPORATION | ) ) ) | Case No. 18-30426 |
| Debtor. | ) ) ) | Chapter 11 |
| _____ | ) ) | |
| ACE MOTOR ACCEPTANCE CORPORATION | ) ) ) | |
| Plaintiff, | ) ) | Adversary Proceeding No. _____ |
| v | ) ) | |
| MCCOY MOTORS, LLC; MCCOY MOTORS, LLC d/b/a RIDE FAST; ROBERT MCCOY, JR.; and MISTY MCCOY | ) ) ) ) ) | |
| Defendants. | ) ) | |

## VERIFIED COMPLAINT

COMES NOW, Plaintiff Ace Motor Acceptance Corporation ("Debtor", "Ace" or "AMAC") and for its Complaint against Defendants McCoy Motors, LLC a/k/a McCoy Motors, LLC d/b/a Ride Fast ("McCoy LLC"), Robert McCoy, Jr. ("McCoy") and Misty McCoy ("Misty McCoy") (or collectively "Defendants") states as follows:

## PARTIES

1.      Plaintiff Debtor is a North Carolina corporation and a Debtor in Possession in a Chapter 11 proceeding pending before this Court.

2.      Defendant McCoy LLC a/k/a McCoy Motors, LLC d/b/a Ride Fast is a limited liability company organized under the laws of the State of South Carolina.

3.      Defendant McCoy is an individual who, upon information and belief, is over the age of 18 and resides in Mecklenburg County, North Carolina. McCoy is an owner, employee and agent of McCoy LLC.

4.      Defendant Misty McCoy is an individual who, upon information and belief, is over the

age of 18 and resides in Mecklenburg County, North Carolina. Misty McCoy is an employee and agent of McCoy LLC.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and pursuant to the Order entered by the Judges of the United States District Court for the Western District of North Carolina on July 30, 1984 (the Referral Order), which Order was entered in accordance with the Bankruptcy Amendments and Federal Judgeship Act of 1984.

6.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.      Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1409.

8.      The statutory predicates for relief are 11 U.S.C. §§ 105, 362, 365, 522, 541, 542, 1106 and 1115 of Title 11, and 18 U.S.C. Sections 152 and 157; Rules 7001, 7065, 9013, 9014 and 9020 of the Rules of Bankruptcy Procedure; North Carolina General Statute Sections 14-114 and 1-440.3; and Rules 9013-1 of the Local Rules of Practice for the United States Bankruptcy Court for the Western District of North Carolina.

## FACTUAL ALLEGATIONS

9.      Ace is in the business of providing financing to automobile dealerships in various states throughout the nation. The automobile dealerships use the Debtor's financing to facilitate the sale of motor vehicles to consumers ("Vehicle Buyers"). As of the filing of the Chapter 11, the Debtor had financing relationships with approximately 186 dealerships. The Defendants operate two of these automobile dealerships in the State of South Carolina. The Defendants owe the greatest amount of debt to the Debtor of all the dealerships. The Defendants are to date an anomaly, in that they are the only dealership refusing to comply with their obligations to the Debtor.

10.      As of May 30, 2018, the total indebtedness owed to the Debtor by the Defendants was $1,207,915.53, not including accrued interest, default interest at the annual rate of eighteen percent (18%), costs, penalties, legal fees or other charges allowed by law.  The Debtor has accelerated the entire balance due from the Defendants. The Defendants are in serious default of their obligations and are committing bankruptcy crimes, by among other things collecting payments from Vehicle Buyers which are property of the bankruptcy estate.

### A.   The Agreements

11.      On or about January 28, 2018, Ace and the Defendants entered into a BHPH[1] Purchasing and Performance Agreement ("PPA") (Exhibit A), Agreement for Line of Credit ("Floorplan")(Exhibit B); BHPH Contract Servicing Agreement ("Servicing Agreement")(Exhibit C), BHPH Purchasing and Performance Agreement Addendum ("PPA Addendum")(Exhibit D) and a

---

[1] Buy Here Pay Here

BHPH Contract Servicing Agreement Addendum ("Servicing Addendum")(Exhibit E)(together, the PPA, Flooplan, Servicing Agreement, Floorplan, PPA Addendum and Servicing Addendum are referred to herein as "the Agreements")[2].

12.     On January 29, 2018, McCoy executed an Unconditional Guaranty of Payment and Performance of the Agreements in favor of the Debtor (see Exhibit A, pp 26-29) (the "McCoy Guarantee").

13.     On January 29, 2018, Misty McCoy executed an Unconditional Guaranty of Payment and Performance of the Agreements in favor of the Debtor (see Exhibit A, pp 30-33) (the "Misty McCoy Guarantee").

14.     The guarantees of McCoy and Misty McCoy are further provided for in paragraph 29 of the PPA.

15.     The Agreements include, *inter alia*, provisions that, in connection with the Defendant's sales of automobiles to Vehicle Buyers, the Debtor will purchase from the Defendants certain receivables from the financing of such sales (the "Receivables") which are evidenced by notes, automobile sales contracts, installment sales contracts or similar instruments (the "Evidence of Indebtedness"). A Receivable together with its corresponding Evidence of Indebtedness is referred to as a "Contract" in the Agreements and in this Complaint.

16.     The Agreements provide that, upon the purchase of each Contract by the Debtor, the Defendants

> **....shall assign, transfer, convey and deliver to [the Debtor]..., all of [the Defendant's] right, title and interest in and to the Contract including, but not limited to, any and all of the following related to the Contract: credit or installment sales applications, account cards, records, forms, papers, security agreements, financing statements, the Evidences of Indebtedness, certificates of title and other forms of security for such Contract (collectively the "Security Documents") held by [the Defendants].**

17.     The Agreements also include, inter alia, provisions that the Debtor will make available a line of credit for the Defendants to purchase certain motor vehicles (the Floorplan). In tum, the Defendants granted the Debtor a security interest in certain collateral including. inter alia, **all of the Defendants' assets "... including, without limitation, any and all: vehicle inventory, vehicle titles; parts and accessories inventory...**", and the like. (*See, e.g.*, Floorplan, Exhibit B, Paragraph 4)(**emphasis added**).

18.     The Agreements, Contracts, Security Documents and other collateral for the Defendants' liability to the Debtor serve as collateral for a November 1, 2016 Promissory Note in the

---

[2] Similar agreements were executed on June 17, 2016, however 2018 agreements were negotiated and executed after the Defendants requested additional funding from the Debtor.

amount of $14,500,000.00 executed by the Debtor in favor of Hamilton State Bank.

19.      An itemized list of the vehicles on which the Debtor provided Floorplan financing, or for which a Contract was purchased from the Defendants, is attached hereto as Exhibit F. The Debtor does not have a current list of the Defendants' other inventory, to which the Debtor's security interest attaches. The Debtor is requesting the entry of an attachment order as to all of the Defendants' assets.

20.      The Debtor's security interest in the collateral of McCoy Motors is perfected through the filing of that certain UCC-1 Financing Statement with the South Carolina Secretary of State on June 17, 2016, as Filing No. 160617-1508542, a true and correct copy of which is attached hereto as Exhibit G.

21.      The guarantees of McCoy and Misty McCoy grant the Debtor a security interest in certain assets which are owned by McCoy and Misty McCoy.

22.      The Debtor's security interest in the collateral of McCoy and Misty McCoy is perfected through the filing of that certain UCC-1 Financing Statement with the North Carolina Secretary of State on June 17, 2016, as Filing No. 20160062015E, a true and correct copy of which is attached hereto as Exhibit H.

23.      The PPA and Servicing Agreement include provisions that allowed the Defendants to collect amounts due from Vehicle Buyers under the Contracts (a/k/a "servicing") on behalf of the Debtor (which owns the Contracts). These servicing rights, **which have been terminated for cause by the Debtor**, require the Defendants to remit to the **Debtor "100% of any and all payments received by [the Defendants] which relate to amount due pursuant to any Contract…"**. *See, e.g.,* PPA, Exhibit A, paragraph 2.3; Servicing Agreement, Exhibit C, Paragraph 2).

24.      In order to facilitate payments from Vehicle Buyers to the Debtor, in Section 2 of the Servicing Agreement the Defendants agreed to:

> **…provide to the [Debtor], and shall at all times during the term of this Agreement maintain, a signed and active AMAC ACH Authorization Form which authorizes [the Debtor] to make withdrawals from and deposits to [the Defendants'] bank accounts used in connection with [the Defendants'] business, the Contracts, the PPA, the Floorplan and this Agreement (collectively the "Accounts"). [The Defendants] hereby authorizes [the Debtor], on or after twenty-four (24) hours advance notice to [the Defendants], to remove from the Accounts any portion or all of the total amounts owed by [the Defendants] to [the Debtor] including, but not limited to, any amounts due pursuant to the PPA, the Floorplan, this Agreement, any other agreement or understanding between [the Defendants] and [the Debtor] and any amounts paid to [the Defendants] with regard to any Contracts.**

25.      The Defendants, in breach of the Agreements, have denied the Debtor access to the

4

Accounts.

26.    The Debtor is unaware of where the Defendants are depositing the funds which are property of the Debtor. The Defendants are secreting and disposing of, or about to dispose of, the funds.

27.    The Defendants are improperly collecting funds from Vehicle Buyers, pursuant to Contracts that belong to the Debtor, and refusing to pay those funds to the Debtor.

28.    With regard to defaults and remedies, the Floorplan (Exhibit B) provides as follows:

**18. Default**: in addition to the other events set forth in the Agreement as an "Event of Default," the occurrence of any one or more of the following events shall also constitute an Event of Default": (a) the failure of [McCoy Motors LLC] or any Guarantor to comply with any provision of this Agreement or the then-current Policies and Procedures (as the same may be modified from time to time in accordance with this Agreement); (b) the failure of [McCoy LLC] or any Guarantor to make any payment pursuant to this Agreement on the date on which such payment is due; (c) the filing of any petition for relief under any provision of Title 11 of the United States Code (entitled "Bankruptcy"), as amended, or under any similar federal or state statute by or against [McCoy LLC] or any Guarantor; (d) the application for the appointment of a receiver or custodian for, the making of assignment for the benefit of creditors by, or the insolvency of [McCoy LLC] or any Guarantor; (e) the default by [McCoy LLC] or any Guarantor under any agreement with [the Debtor] affiliates; (f) the revocation of any guaranty by a Guarantor; (g) the death, termination of existence, or dissolution of [McCoy LLC] or any guarantor; (h) the failure of any representation or warranty of [McCoy LLC] or Guarantor to remain true, correct, complete and accurate at all times during the term of this Agreement; (i) the entry of a judgment for the payment of money against [McCoy LLC] or any Guarantor which remains unsatisfied, in whole or in part, for a period of more than ten (10) days; (j) the impairment of [McCoy LLC's] or any Guarantor's ability to repay amounts owed to [the Debtor] as the same become due, determined in [the Debtor's] sole discretion; (k) [the Debtor] not having a first priority security interest in any of the Collateral; (l) [McCoy LLC] ceases to do business as an automobile dealer for any or no reason; or (m) the occurrence of any other event or circumstance which causes [the Debtor] to deem itself or the Collateral insecure or at risk.

**19. Remedies:** Upon the happening of any Event of Default, [the Debtor] shall provide [McCoy LLC] written notice of the Event of Default. [McCoy LLC] shall have ten (10) calendar days from the date of receipt of [the Debtor's] notice to cure such default. If [McCoy LLC] fails to cure such default within such ten (10) day period or such default is not able to be cured, then immediately upon the expiration of such ten (10) day period or at any time thereafter, (a) [the Debtor] may accelerate any or all liabilities and obligations of [McCoy Motors] to [the Debtor], including, but not limited

5

to, any Advance Fees or Advances, so that such liabilities and obligations become immediately due and payable; (b) at the option of [the Debtor], all future Advances shall cease; (c) **[the Debtor] shall have and may exercise all of the rights and remedies granted to a secured party under the UCC as adopted by the State of North Carolina and all of the rights and remedies under any other applicable law;** (d) [the Debtor] shall have the right, immediately and without notice or other action, to set off amounts owed by [the Debtor] to [McCoy LLC] against any of [McCoy LLC's] liabilities to [the Debtor], whether or not due; **(e) [the Debtor] may proceed with or without judicial process or notice to [McCoy LLC] to take possession of all or any part of the Collateral not already in the possession of [the Debtor], and [McCoy LLC] shall do everything necessary to make the Collateral available to [the Debtor] (including without limitation assembling the Collateral and making it available to [the Debtor] at a place designated by [the Debtor] which is reasonably convenient to [McCoy LLC] and [the Debtor];** (f) at the option of [the Debtor], [McCoy LLC] shall assign, transfer, and deliver to [the Debtor], at [McCoy LLC's] expense, all or any portion of the Collateral; (g) [the Debtor] may sell the Collateral at public or private sale, in bulk or in parcels and with or without having the Collateral at the sale or other disposition, and [McCoy LLC] agrees that in case of sale or other disposition of Collateral, or any portion thereof, [the Debtor] shall apply all proceeds from such sale first to all costs and expenses of such sale, including attorney's fees, and then to the obligations of [McCoy LLC] to [the Debtor]; (h) [the Debtor] may, in its sole discretion, retain the Collateral or any part thereof in satisfaction of any or all sums due from [McCoy LLC] to [the Debtor] upon notice of such proposed election to [McCoy LLC] and any other party as may be required by applicable law. In the event [the Debtor] retains any vehicles in satisfaction of sums due from [McCoy LLC], the value of such Collateral retained by [the Debtor] shall be determined by [the Debtor] [...]

Upon the occurrence of an Event of Default, all outstanding Advances, all accrued Advance Fees, and all other sums due from [McCoy LLC] to [the Debtor] shall bear interest until paid at the rate equal to the lesser of (i) 18% per annum or (ii) the maximum interest rate permitted pursuant to applicable law.

29.    With regard to default and remedies, the PPA (Exhibit A) provides as follows:

**5. Default and Remedies.** In addition to the other events set forth in this Agreement as an "Event of Default, "default" or "breach," the occurrence of any one or more of the following events shall constitute an "Event of Default": **(a) the failure of [the Defendants] or any Guarantor to comply with any provision of this Agreement; (b) the failure of [the Defendants] or any Guarantor to make any payment on the date on which such payment is due;** (c) the inability of [the Defendants] or any Guarantor to pay its debts as they become due; (d) the filing of any petition for relief under any provision of Title 11 of the United States Code (entitled "Bankruptcy"), as amended, or under any similar federal or state statute by or

6

against [the Defendants] or any Guarantor; (e) the application for the appointment of a receiver or custodian for, the making of a general assignment for the benefit of creditors by, or the insolvency of [the Defendants] or any Guarantor; (f) the default by any Guarantor under any agreement with [the Debtor]; (h) the death, termination of existence, or dissolution of [the Defendants] or any Guarantor; (i) the failure of any representation or warranty of [the Defendants] or Guarantor to remain true, correct, complete and accurate at all times during the term of this Agreement which failure is not cured, if curable, within ten (10) days of the receipt of written notice from [the Debtor]; (j) the entry of a judgment for the payment of money against [the Defendants] or any Guarantor which remains unsatisfied, in whole or in part, for a period of more than ten (10) days from the date of entry; (k) the impairment of [the Defendants'] or any Guarantor's ability to repay amounts owed to [the Debtor] as the same become due, determined in [the Debtor's] sole discretion; and **(l) the occurrence of any other event or circumstance which causes [the Debtor] to deem itself or the collateral for the Contracts or [the Defendants'] obligations hereunder insecure or at risk.** In the event of any Event of Default, Purchaser shall have any and all remedies available to it at law or in equity, as well as those remedies set forth in this Agreement and the Servicing Agreement.

In addition to those remedies available to it at law or in equity or as otherwise set forth in this Agreement, [the Debtor] shall have the following remedies upon an Event of Default:

(a) [the Debtor] may designate the affected Contract(s) as Non-Performing Contract (and upon such designation by [the Debtor], each such Contract shall be deemed to be a Non-Performing Contract) and require the same to be purchased by [the Defendants] in accordance with Section 3 hereof.

(b) [the Debtor] may designate any or all Contract(s) as a Non-Performing Contract (and upon such designation by Purchaser, each such Contract shall be deemed to be a Non-Performing Contract) and require the same to be repurchased by Seller in accordance with Section 3.4 hereof.

(c) Upon [Debtor] demand, [Defendants] shall pay to [the Debtor] an amount equal to all losses and expenses incurred by [the Debtor] as a result of the Event of Default including, but not limited to, [the Debtor's] costs of enforcement of this Agreement.

(d) The Debtor shall no longer be required at its sole discretion to accrue or pay any performance compensation to [the Defendants].

**Any Event of Default hereunder shall constitute a breach and default of each and every other agreement to which [the Defendants] and [the Debtor] are parties, including, without limitation, any Line of Credit Agreement, Floorplan**

7

**or Servicing Agreement. (emphasis added)**.

30.     With regard to default and remedies, the Servicing Agreement (Exhibit C) provides as follows:

**5. Events of Default.** In addition to the other events set forth in this Agreement, the Floorplan and the PPA as an "Event of Default," "default" or "breach," the occurrence of any one or more of the following events shall constitute an "Event of Default": (a) the failure of [the Defendants] or any Guarantor to comply with any provision of this Agreement, Floorplan or the PPA; (b) the failure of [the Defendants] or any Guarantor to make any payment pursuant to this Agreement, the Floorplan or the PPA on the date on which such payment is due; (c) the inability of [the Defendants] or any Guarantor to pay its debts as they become due; (d) the filing of any petition for relief under any provision of Title 11 of the United States Code (entitled "Bankruptcy"), as amended, or under any similar federal or state statute by or against [the Defendants] or any Guarantor; (e) the application for the appointment of a receiver or custodian for, the making of a general assignment for the benefit of creditors or the insolvency of [the Defendants] or any Guarantor; (f) the default by any Guarantor under any agreement with [the Debtor] or its affiliates; (g) the default by [the Defendants] under any other agreement with [the Debtor] or its affiliates; (h) the death, termination of existence, or dissolution of [the Defendants] or any Guarantor; (i) the failure of any representation or warranty of Seller or Guarantor to remain true, correct, complete and accurate at all times during the term of this Agreement; or (j) the entry of a judgment for the payment of money against [the Defendants] which remains unsatisfied, in whole or in part, for a period of more than ten (10) days from the date of entry. In the event of any Event of Default, [the Debtor] shall have any and all remedies available to it at law or in equity, as well as those remedies set forth in this Agreement.

**6. Remedies.** In addition to those remedies available to it at law or in equity or as otherwise set forth in this Agreement, [the Debtor] shall have the following remedies upon an Event of Default:

**(a) [the Debtor] may, in its sole discretion, at any time upon written or e-mail notice to [the Defendants], take over all servicing rights of [the Defendants] to all Contracts;**

(b) [the Debtor] may, at its sole discretion, terminate this Agreement; provided, however, that no termination of this Agreement shall relieve or release [the Defendants] or any Guarantor from any obligation or liability hereunder, under the PPA, under the Floorplan or under any other agreement between [the Defendants] and [the Debtor].

In the event [the Debtor] reclaims from [the Defendants] the servicing rights to the

8

Contracts pursuant to subsection (a) above, within seven (7) calendar days of the written or e-mail notice to [the Defendants] described in (a), **[the Defendants] shall notify all Vehicle Buyers in writing that such Vehicle Buyer must make payment of all amounts owed pursuant to their respective Contracts directly to [the Debtor]. [The Defendants] shall provide to [the Debtor] a copy of each such notification sent to Vehicle Buyers at the same time [the Defendants] provides such notification to the Vehicle Buyers.**

Exercise of any remedies pursuant to this Agreement, including, without limitation, termination of [the Defendants'] rights and Servicing Compensation pursuant to this Agreement shall not relieve any of [Defendants'] obligations or liabilities pursuant to this Agreement, the PPA, the Floorplan or any other agreements with [the Debtor] including, without limitation, the Floorplan. All remedies of [the Debtor] provided in this Agreement, or at law or in equity, shall be deemed to be cumulative and not exclusive, and the exercise or [the Debtor's] remedies may be exercised singularly, cumulatively, and/or successively.  (emphasis added).

31.     The Agreement is to be interpreted under North Carolina law. *See* PPA, Exhibit A, paragraph 31.

## B.     *The effect of the Chapter 11 filing on the Agreements*

32.     Defendants have had knowledge and notice of the Debtor's bankruptcy case since at least March 23, 2018.

33.     The Agreements are executory contracts, subject to the provisions of Sections 362 and 365 of the Bankruptcy Code.

34.     The Defendants are obligated to perform all of their obligations under the Agreements pending assumption, assignment or rejection of the Agreements by the Debtor.

35.     The Agreements, Contracts, Evidences of Indebtedness and all claims of the Debtor against the Defendants are property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. Section 541.

36.     The Contracts are assets of the Debtor which have significant value.

37.     Pursuant to 11 U.S.C. Section 1106 and the common law, the Debtor has a duty to maximize the value of the bankruptcy estate for the benefit of creditors.

38.     This is a liquidating Chapter 11 wherein the Debtor is attempting to sell, with the approval of this Court, assets including the Contracts which have been purchased from the Defendants as well as other automobile dealers.

9

39.     The value of the Contracts purchased from the Defendants have been diminished because timely payments have not been paid to the Debtor by the Defendants.

40.     The actions of the Defendants at all times relevant hereto have the effect of reducing the value of the bankruptcy estate, which is detrimental to the creditors of the bankruptcy estate.

## C.     *The Debtor's efforts to resolve issues with the Defendants informally*

41.     As of March 23, 2018, the Defendants' contract balance was approximately $2,275,724.00. Approximately $66,907.00 was due to the Defendant under the Floor Plan. The payment default of the Defendants at that time was $40,368.45. The Defendants had not provided the Debtor with all vehicle titles, had not turned over all payments made to the Defendants by Vehicle Buyers.

42.     By email dated March 26, 2018, counsel for the Debtor gave notice to counsel for McCoy LLC of the following defaults: i) Contract balance of $2,275,724 plus Floorplan balance of $66,907; ii) the Defendants had refused to pay the weekly settlement of $40,368.45; the Defendants had 35 outstanding vehicle titles for which liens in favor of the Debtor had not been processed; iii) the Defendants had titled two vehicles on Contract); and iv) the Defendants were refusing to turn over any payments collected on the Contracts. The Debtor demanded that the Defendants comply with the terms of the Agreements, and advised that the Agreements provide that the Defendants have a fiduciary duty to the Debtor.

43.     On March 26, 2018, attorney David Badger ("Badger") filed a Notice of Appearance on behalf of Defendant McCoy LLC.

44.     The Debtor has been advised since the filing of this case that it should strictly enforce the terms of the executory contracts with dealers in the ordinary course of business. To do otherwise would not be in compliance with Bankruptcy Rule 9019, and any compromise would not be enforceable. The Debtor was also advised that it would need some legal basis to request Bankruptcy Court approval for the amendment of any of the dealer agreements. As a practical matter, the Debtor and its employees have to have consistent guidelines so that they can handle issues with dealers in a uniform manner.

45.     The undersigned and Badger met on April 3, 2018 to discuss the issues between the Debtor and the Defendants. It was agreed that a representative of the Debtor and the Defendants should meet to discuss possible a possible resolution of any issues. Both the Debtor and the Defendants were told by their attorneys that they could not make any binding settlement. The client representatives were to have a conversation about options, discuss any proposal with their attorneys, and a decision would be made about where to go from there, i.e. filing a motion with the Court asking for the approval of a settlement.

46.     McCoy and Algood met on April 4, 2018 to discuss financial issues and the possible terms of a settlement between the Defendants and the Debtor.

47.    At the meeting, the following proposed resolution was discussed: i) the Defendants would wait six months before trying to sell all of the Defendants Contracts[3], and ii) during that six-month period, the Defendants would stay current on all of their obligations under the Contracts.

48.    In an email sent on April 4, 2018 (Exhibit I), McCoy stated:

**As a businessman I see an opportunity here, I think [Algood[4]] wants to get the hell out of dodge before the legal fees from the lawsuit in Maryland break him, I will use this to my advantage to string this out as long as I can so he continues to face that lawsuit, again unless he wants to make a deal now[5].**

49.    Shortly after the meeting, before any Court approval could be sought, and due to the Defendants' failure to pay the Debtor money the Defendants were collecting from Vehicle Buyers, several of the financed automobiles were automatically disabled by their GPS systems.

50.    The Defendants thereafter continued their intentional failure to comply with the Agreements, and no Court approval was ever sought for the proposal that was discussed.

51.    The Debtor has no legal duty or obligation to provide the Defendants with a six month period of time before their Contracts are sold.

52.    The Debtor's right to sell Contracts and Agreements with the Defendants in provided for in Paragraph 3.5 of the PPA (Exhibit A), which states that ***"[the Debtor] shall have the right to sell or assign any and all Contracts to any third party, in its sole discretion, at any time upon fourteen (14) days prior notice by [the Debtor] to [Defendants]."***

53.    The Debtor's right to sell any and all of Defendants' Contracts, set forth in Paragraph 3.5 of the PPA, has not been modified. In addition to the fact that the discussions between Algood and McCoy did not result in any binding contract modification, and there was a clear agreement of counsel that any modification of the Agreements would require approval of this Court, Paragraph 21 of the PPA provides in part that:

**21. Waivers. No waiver of any provision of this Agreement, in part or in whole**

---

[3] The Debtor is not required to wait six months to sell the Contracts. Section 3.5 of the PPA provides that the Contracts may be sold at any time.

[4] Russ Algood, the President of the Debtor ("Algood").

[5] This is one of several statements and actions by McCoy which demonstrate that i) he does not fully grasp the legal implications of this bankruptcy proceeding, and ii) he will attempt to seek advantage based on the most spurious grounds. The "lawsuit in Maryland" being referred to by McCoy has been stayed by the Debtor's bankruptcy filing, there are no legal fees being incurred by the Debtor or Algood in connection with that lawsuit. The Defendant's strategy to "string this out" is in bad faith. McCoy's goal has been in part to figure out an angle which would allow him to reduce the amount the Defendants would have to pay to repurchase the Contracts from the Debtor.

**shall be effective unless in writing, addressed and delivered to the other party and duly signed on behalf of the party against whom the waiver is sought to be enforced.**

54.    McCoy communicated to John Donaldson, a former employee of the Debtor, that McCoy was going to cause the filing of a Motion to Appoint a Chapter 11 Trustee, and that his motivation in doing so was his belief that i) a Chapter 11 Trustee would sell the Defendant's Contracts at a discount and ii) this sale would reduce the liability owed to the Debtor by the Defendants.

**D.    The Defendants' numerous defaults under the Agreements**

55.    As set forth above, the Agreements give the Debtor certain rights upon default by the Defendants, including rights to immediate possession of the collateral as well as the rights to have payments from the Debtor's customers made directly to the Debtor. (*See, e.g.*, Floorplan, Exhibit B, paragraphs 4, 18, & 19; PPA, Exhibit A, paragraph 5; Servicing Agreement, Exhibit C, paragraphs 5 & 6). Defendants have defaulted in multiple ways under the PPA, Servicing Agreement, and Floorplan, including:

(a) Defendants' failure to make payments on their due dates (as of May 22 ,2018, the Defendants were in default by $155,940.61, representing funds collected from Vehicle Buyers which belong to the Debtor);

(b) Defendants' failure to remit to the Debtor 100% of payments from the Vehicle Buyers;

(c) Defendants' failure to pay debts as they become due;

(d) the Defendants' failure to advise the Debtor when it has repossessed automobiles from the Debtor's customers;

(e) the Defendants' failure to have the Debtor's lien noted on the titles to all automobiles which is has sold; (Paragraph 2.6 of the PPA provides that within 30 days of date of sale of Contract, Seller much provide "original vehicle title"...denoting purchaser as the first lien holder on each and every Vehicle where Purchaser has acquired the Contract related to such Vehicle"; Section 3.1 of the PPA provided the Defendants "...shall payoff and satisfy in full any Liens or other obligations on the Vehicle(s) which are the subject of any Contract transferred to [the Debtor])".[6]

---

[6] On or about March 6, 2018, the Debtor purchased a Contract from the Defendants related to the sale of a 2008 Lexus automobile, VIN JTHBK262485073019 (the "Lexus"). On or about March 6, 2018, the Debtor purchased a Contract from the Defendants related to the sale of a 2013 Chrysler 200, VIN 1C3CCBBB4DN525249 (the "Chrysler").On or about March 13, 2018, the Debtor purchased a Contract from the Defendants related to the sale of a 2005 Chevrolet Trailblazer, VIN 1GNES16SO56170241 (the "Trailblazer"). On or about March 13, 2018, the Debtor purchased a Contract from the Defendants related to the sale of a 2012 Ford, VIN 3FAHPOHA1CR401451 (the "Ford"). On or about March 13, 2018, the Debtor purchased a Contract from the Defendants related to the sale of a 20111 Chevrolet Cruze, VIN 1G1PC5SH1B7174684 (the "Cruze").

12

(f) the Defendants' failure to advise the Debtor's customers that all payments under the Contracts are to be made to the Debtor;

(g) The Defendants' failure to purchase Non-Performing Contracts as required by Section 3.3 of the PPA Addendum. Paragraph 13 of the PPA provides that "[i]f Seller fails to purchase any Non-Performing Contract within ten (10) calendar days after Purchaser provides notification of such failure, Seller shall pay the full amount due by the Vehicle Buyer pursuant to such Contract to the Purchaser immediately and with no exceptions." Attached hereto as Exhibit J is a schedule of "Unprocessed Buybacks", which are Non-Performing Contracts for which the Defendants owe payment to the Debtor.

(h) The Defendants' failure to provide the Debtor with written notices of Contracts becoming Non-Performing Contracts, as required by the PPA Addendum;

(i) the Debtor is justifiably concerned that its collateral, including Defendants' vehicle inventory, is at risk.

**E.     *The Debtor's Notices of Default to the Defendants and failure to cure***

56.     The Debtor is not required to provide the Defendants with any notice of default under the Agreements. PPA paragraph 5 provides in part that **"Seller waives any rights to notice of or presentment of any instances of default."** However, the Debtor did provide the Defendants with several written notices of default.

57.     On May 16, 2018, the Defendants' past due payments totaled $67,294.85. The Debtor sent a Notice of Default (Exhibit K), advising the Defendants that they were in breach of:

Section 2.4 (Weekly Settlement Sheet) of the PPA, "In the event Seller blocks, refuses or otherwise interferes with such ACH or electronic withdrawal or transfer or should such electronic withdrawal or transfer not be honored by Seller's bank or otherwise fail, in whole or part, for any reason including, but not limited to, insufficient funds, such event shall be an "Event of Default" and Purchaser shall be entitled to exercise any remedy made available to Purchaser pursuant to this Agreement.";

Section 2.6 (Delivery of Certain Other Documents) of the PPA, "Seller shall also provide Purchaser, within thirty (30) calendar days of the date of sale of such Contract to Purchaser, an original vehicle title or "Electronic Lien Title Transfer" document, satisfactory to Purchaser, denoting Purchaser as the first lien holder on

--------

The records of the South Carolina Department of Motor Vehicles show that the Defendants have not given the Debtor a first lien position on the Lexus, Chrysler, Trailblazer, Ford or the Cruze.

13

each and every Vehicle where Purchaser has acquired the Contract related to such Vehicle.";

Section 3.3 (Repurchase of Contracts with Non-Performing Receivables) of the PPA, "Non-Performing Contracts shall be repurchased via the Weekly Settlement Sheet immediately upon the Contract becoming a Non-Performing Contract.";

Section 11 (Duty to Remit Payments) of the PPA, "In the event that Seller shall come into possession of any payments received with respect to any Contract or payment under any insurance policies related to any Contract or collateral securing any Contract, it shall within three (3) business days of receipt of the same post to Purchaser's electronic "Contract Receivable System" or otherwise turn over, remit and deliver to Purchaser all of such funds received without deduction or offset.";

Section 2 (Collection and Posting of Payments) of the Servicing Agreement, "The Seller shall proceed diligently in accordance with all applicable law to collect all payments due under the terms of each such Contract and shall post any and all such payments received by Seller (including, without limitation, the full amount(100%) of all principal, interest, late charges, insurance and other specified funds received by Seller) to Purchaser's electronic "Contract Receivable System" within  three (3) business days of Seller's receipt of the same";

Section 18(b) (Default) of the Floorplan, "the failure of Borrower or any Guarantor to make any payment pursuant to this Agreement on the date on which such payment is due".

58.    The May 16, 2018 notice demanded that the Defendants cure all Event(s) of Default within ten (10) days of the date of the notice;

59.    The May 16, 2018 notice advised the Defendants, pursuant to Section 6(a) (Remedies) of the Servicing Agreement, that the Debtor was taking over all servicing rights of the Defendants to all Contracts; and that the Defendants were NO LONGER be authorized to collect amounts due pursuant to Contacts which have been purchased by the Debtor pursuant to the terms of the PPA.

60.    On or about June 7, 2018, the Debtor sent a Notice of Default (Exhibit L), advising that the Defendants remained in breach of the Agreements as set forth in the May 16 notice, and further that:

61.    Pursuant to Section 6(a) of the Servicing Agreement, because the Debtor had reclaimed the Contract servicing rights, the Defendants are required to notify customers in writing that all payments are to be made to the Debtor. The Defendants are to provide the Debtor with a copy of each such notification.

62.    Pursuant to Section 5(b) of the PPA, the Debtor designated all Contracts as Non-

Performing Contracts, and demanded payment by the Defendants on all Contracts pursuant to Section 3.4 of the PPA;

63.    Pursuant to Section 19 of the Floorplan (Exhibit B), the Debtor accelerated all liabilities and obligations of the Defendants to the Debtor.

64.    Section 5(d) of the PPA importantly provides that upon an Event of Default, "[the Debtor] shall no longer be required at its sole discretion to accrue or pay any performance compensation to [the Defendants].

65.    Section 3.2 of the PPA Addendum (Exhibit D) provides in part that "[n]o Performance Compensation shall be paid to the Seller with regard to payments received related to any "Non-Performing Contract" (as defined in Section 3.3)…".

66.    Section 3.2 of the PPA Addendum (Exhibit D) defines "performance compensation" as the percentage that the Debtor would pay the Defendants (absent default) "…of the actual principal, interest and late fees owed to, paid to and received by [the Debtor], in good funds, from Receivables related to Contracts (the "Performance Compensation")".

67.    Because all Contracts have been declared as Non-Performing, as a result of the Defendants' multiple (and intentional) defaults, the Defendants have no claim against the Debtor for any Performance Compensation.

68.    On June 8, 2018, Notice of Default and Demand for Payment was sent to McCoy, individually. See Exhibit M.

69.    On June 8, 2018, Notice of Default and Demand for Payment was sent to Misty McCoy, individually. See Exhibit N.

**F.    *The Debtor has terminated the Defendants' Contract Servicing Rights (they may no longer collect payments from Vehicle Buyers)***

70.    Due to the Defendants' defaults, and in accordance with Section 6(a) of the Servicing Agreement, the Debtor determined that in order to preserve assets of the bankruptcy estate it needed to take over all of the servicing rights of the Defendants to all Contracts.

71.    The Defendants were given written notice that servicing rights to the Contracts were terminated.

72.    Defendant McCoy and his counsel was also given notice by email dated May 16, 2018 (see Exhibit O attached) that the Defendants' servicing rights were terminated, and that pursuant to Paragraph 6 of the Servicing Agreement the Defendants were required to give notice to all Vehicle Buyers that all payments had to be made to the Debtor.

73.    Defendant McCoy responded to the Debtor by email on May 21, 2018 as follows:

**Because of the contract you made verbally on 5/9/18 and put into our "weekly statement" in email on 5/16/18 at 11:34 a.m. but then breached the contract on 5/16/18 at 1:35 pm in the "revised weekly statement" we will wait until someone with legal authority can make a decision on how to proceed because your breach has put us in a position of both not trusting your fiduciary obligations or financially agreeing with Ace. Ace is in a position of the Automatic Stay so we do not see this happening in the near future.**

**Any further breaches or communication with us our or [sic] customers will be considered Harassment and Substantial emotional distress.**

**The only exemption to this is if we sell a car that Ace holds title to, we feel it's in the best interest of the customer to pay Ace off, as to not hinder the customer**

74.    As set forth above, the Debtor has not made any "verbal" contract, or "verbal" modification to any Agreements, at any time. There have been no communications, agreements or course of dealing which would have modified the rights of the parties to the Agreements.

75.    Paragraph 21 of the PPA (Exhibit A) provides in part that "[n]o waiver of any provision of this Agreement, in part or in whole shall be effective unless in writing, addressed and delivered to the other party and duly signed on behalf of the party against whom the waiver is sought to be enforced."

76.    Paragraph 30 of the Floorplan (Exhibit B) provides in part that "[a]ny waiver by any party or consent by any party to any variation from any provision of this Agreement shall be valid only if in writing…".

77.    The Defendants have no legal basis for unilaterally deciding that they should "wait", while they continue to collect and withhold funds which belong to the Debtor's bankruptcy estate.

78.    Upon notice to the Defendants that their right to service the Contracts was terminated, the Defendants had no authority to collect payments from the Vehicle Buyers.

79.    Defendant McCoy was advised by the Debtor on May 21, 2018 that the Debtor owned the Contracts with the Vehicle Buyers, that according to the previously weekly statement the Defendants had collected $49,748.20 which they refused to pay to the Debtor, and that *the Defendant's overall default (not the total balance due) to the Debtor was $142,433.04*.

80.    The Debtor gave notice to the Vehicle Buyers that the Defendants' serving rights had been terminated and that all future payments were to be made to the Debtor.

81.    The right to collect payments from the Vehicle Buyers under the Contracts is property

of the Debtor's bankruptcy estate, as are the payments themselves.

82.     After having been notified the Defendants that they were no longer authorized to collect payments under the Contracts, the Defendants sent a text message (Exhibit P) to one or more of the Defendants' customers which stated:

> **Good morning, you may have recently received information from AMAC asking you to make your payments to them. We here at the payment center feel it's only fair that you know that AMAC has recently filed for chapter 11 bankruptcy protection. To make sure you get full credit for your payments we highly suggest you continue to make your payments to McCoy Motors or Ride Fast, please feel free to call us with any questions at 803-992-9559.**

**G.     The Debtor's right to control GPS/Starter Interruption units**

83.     The Debtor uses GPS/Starter Interruption units ("GPS units") on financed vehicles to reduce the risks associated with providing financing to sub-prime consumers, and to improve contract performance.

84.     The Defendants are attempting to interfere with the Debtor's ability to use the GPS units.

85.     McCoy has stated that the Debtor "… blocked our access to GPS units that we paid for." The GPS units are attached to the Repossessed Vehicles, much like an after-market CD player would be. The GPS units are part of the vehicles which are the Debtor's collateral. The Debtor has a "master account" with the GPS servicer, and the Defendants have only a subaccount. The Debtor is within its rights to block the Defendant's access to GPS units on the Repossessed Vehicles.

86.     Paragraph 10 of the Servicing Agreement (Exhibit C) provides:

> **10. GPS/Starter Interrupter Program. [The Defendants] shall allow [the Debtor] full and complete access, both in person and remotely, to any GPS/Starter Interrupter programs (i.e. Passtime, Goldstar, etc.) utilized by [the Defendants]. In the event [the Debtor] takes over all servicing of any Contracts, [the Defendants] hereby grant(s) [the Debtor] full access to and authorization to use, both in person and remotely, any and all items related to such programs including, but not limited to, reports, user ID's and passwords.**

87.     Paragraph 2.7 of the PPA (Exhibit A) provides in part:

> **2.7 Starter Interruption Devices. …[the Defendants] will provide to [the Debtor]...any and all documents, forms or other items needed to transfer, upon an Event of Default by [the Defendants] pursuant to this Agreement or default or breach by [the Defendants] of any other agreement with [the Debtor], all**

**rights, ownership and ability to control...such starter interruption device, GPS unit or similar unit to [the Debtor].**

## H.     The Defendants' continue to collect and retain payments from Vehicle Buyers under the Contracts, which are property of the bankruptcy estate

88.     Multiple sources have indicated to the Debtor that since the termination of the Defendants' servicing rights, the Defendants are improperly attempting to collect and accepting payments directly from Vehicle Buyers.

89.     The Defendants are informing the Vehicle Buyers that they should not talk to the Debtor's representatives.

90.     The Defendants are advising Vehicle Buyers that they should make payments directly to the Defendants instead of making payments to the Debtor as required under the Agreements Contracts.

91.     The misapplication and retention of the Debtor's payments are also shown in the Debtor's electronic Contract Receivable System. Multiple sources have also informed the Debtor that Defendants are attempting to hide, sequester, or otherwise improperly dispose of the automobiles that constitute collateral under the Agreements.

92.     The Debtor has repeatedly demanded that the Defendants comply with the terms of the Agreements between them, including turning over the subject automobiles to the Debtor and ordering that payments from Vehicle Buyers be made directly to the Debtor; but, the Defendants have refused to do so. (*See* Notices of Default, attached hereto as Exhibits K, L, M, N and O).

93.     A current list of customers whose payments must be directed to the Debtor pursuant to the terms of the Agreements and the Contracts is attached hereto as Exhibit Q.

94.     The Defendants are demanding payments from Vehicle Buyers, although the Defendants have no legal right to do so.

95.     The Defendants are demanding payments from some Vehicle Buyers who have already made payment to the Debtor.

96.     On April 13, 2018, Counsel for the Debtor sent approximately 125 letters to Vehicle Buyers who had financed cars through the Defendants. The letters advised the Vehicle Buyers that all payments should be made to the Debtor, and that the Defendants were not authorized to take payments.

97.     Counsel has subsequently received at least ten telephone calls from Vehicle Buyers expressing confusion over whether payments should be made to the Defendants or to the Debtor.

98.      On Friday, June 15, 2018, Counsel for the Debtor received the following email:

**Hi Mr Henderson, I received your letter today and I need for you to contact me because McCoy motors told me this is a scam to get money from me. So could someone contact me at (803)899-3756 my name is Johnnikki Thompson.**

**Thanks**

99.      On that same date, Counsel for the Debtor also received the following email:

**Hi Mr. Henderson,**

**I think there may be some confusion about who is authorized to handle my account. I did get all the mail from AMAC regarding the loan but I still also have McCoy motors calling repeatedly for nonpayment and they even repossessed the car for non payment. So, your telling me not to pay them and they are harassing me to pay them or I will be without a vehicle. I really think that needs to be cleared up between AMAC and McCoy Motors about who I am supposed to pay because there's definitely some confusion. And also how do I make my payments to AMAC I'm only making cash payments I do not have a bank account that can be drafted? I would really appreciate it if you get back to me on this matter.**

**Thanks, LaPresha Barber**

100.     These communications from Vehicle Buyers demonstrate the effect of the Defendants' business practices on the average consumer, with is determinative as to whether a representation is deceptive.

101.     These communications from Vehicle Buyers demonstrate the impact the Defendants' business practices have in the marketplace, which is determinative as to whether a particular act is unfair or deceptive.

102.     The conduct of the Defendants amounts to an inequitable assertion of its power and position.

103.     The conduct of the Defendants towards the Vehicle Buyers has the tendency and capacity to mislead and is deceptive.

104.     The Defendants have made intentional false and deceptive statements to Vehicle Buyers, upon which one or more of the Vehicle Buyers has reasonably relied on.

105.     Upon information and belief, the Defendants are in default of agreements with one or

more other automobile finance companies, and the Defendants are engaging in similar conduct with respect to their contracts with those other companies.

106.    The Defendant's business practices also are substantially injurious to consumer Vehicle Buyers who are i) misled into making payments to the Defendants, ii) not getting credit for payments by the Debtor, as owner of the Contracts; and iii) causing the consumer Vehicle Buyers to default on the Contracts and risk the repossession of their vehicles.

107.    The Defendants business practices as outlined herein offends established public policy and are immoral, unethical, oppressive, and unscrupulous.

108.    North Carolina's unfair and deceptive trade practices statute provides the Debtor the right to recover treble its reasonably calculated damages.

**I.     GAP protection and the Defendants' spurious reason for failing to turnover property of the bankruptcy estate**

109.    The Debtor, in the ordinary course of its business, offers to sell its Dealers (including Defendants) "Guaranteed Asset Protection" or "GAP protection" ("GAP") through third party providers. GAP protection is to pay the difference between a car's insurable value and the balance of the debt owed on the automobile.

110.    The Debtor in the past has used two companies which provide GAP, Comprehensive Auto Resources Company ("Carco") and OwnerGUARD Corporation ("OwnerGUARD"). Attached hereto as Exhibit R is the Lender Agreement between the Debtor and Carco. Attached hereto as Exhibit S an example of a Carco consumer GAP contract. Attached hereto as Exhibit T is an unsigned copy of the Administration Agreement between Ownerguard and the Debtor.

111.    The Debtor marks up the GAP products it sells to dealers, in order to make a profit.

112.    The Debtor makes dealers aware that the GAP products are not provided to dealers at the Debtor's cost.

113.    The Dealers, in turn, make a profit by marking up the GAP products when sold to consumers as part of an automobile financing transaction. In paragraph 4.24 of the PPA the Defendants warrant that:

> **The purchase price of vehicle accessories, service contracts, warranties, GAP protection and similar related services and products is the fair market value of such goods and services, is not overstated or inflated in any way, and (except for GAP protection) represents the price for such goods and services received by Seller in all other sales of such goods or services.**

114.    At all times relevant to this Complaint, the Defendants were aware that the Debtor

20

marks up GAP products.

115.   When the Debtor purchases a Contract from dealers, including the Defendants, that Contract includes all rights under the GAP contract.

116.   Paragraph 2.2 of the PPA (Exhibit A) provides that "…upon purchaser's request, Seller will transfer ownership of any of the Insurance Policies to Purchaser or Purchaser's designee."

117.   Among the rights of the owner of a GAP contract includes the right, in certain cases and under certain conditions, to receive premium refunds in the event the contract is terminated early.

118.   The Defendants incorrectly contend that the Debtor is required to pay the Defendants the disputed GAP protection refunds as a condition to the Defendants performing under the Agreements.

119.   The Debtor does not automatically cancel Gap protection when a contract with a dealer becomes Non-Performing, and the dealer then repurchases that contract from the Debtor. This is because many contracts are repurchased due to issues other than repossession i.e. delinquency and titling issues. Even in the case of a repossession many dealers will allow the customer to redeem the contract. If GAP protection was to be canceled by the Debtor without a request from the customer, and the vehicle was later totaled, the GAP protection would not be available for the consumer.

120.   Once a dealer repurchases a contract from the Debtor, it is the dealer which has the right to cancel the GAP product. Carco or Ownerguard, if either owed a premium refund, it would be owed to whatever entity owned the GAP contract at the time of GAP cancellation.

121.   Upon information and belief, the Defendants are seeking GAP protection refunds from the Debtor related to Contracts that the Defendants have repurchased from the Debtor. The Debtor is not liable to the Defendants for such refunds.

122.   To the extent the Defendants repurchased a Non-Performing Contract from the Debtor, the Defendant (and not the Debtor) is the proper party in interest to cancel any related GAP protection.

123.   The Debtor had no duty or contractual obligation to the Defendants to cancel any GAP protection.

124.   Even if the Defendants were entitled to be paid GAP protection refunds by the Debtor, the Defendants' calculations are wrong. The customer refund would reduce the customer payoff by a pro-rata amount in connection with Carco Gap, whereas Ownerguard Gap is refunded by rule of 78's where permitted.

125.   The Defendants have falsely represented to the Debtor that, when a Contract was repurchased by the Defendants, the Defendants were unable to cancel GAP contracts and obtain

premium refunds.

126.    Contrary to their representations to the Debtor, the Defendants have applied for GAP premium refunds.

127.    The Defendants have demanded that the Debtor credit their account with GAP premium refunds on Contracts which the Defendants have repurchased.

128.    The Debtor never agreed, and could not agree (without Court approval), to pay the Defendants any disputed GAP protection refunds.

129.    Defendant McCoy sent an email to the Debtor on May 17, 2018 which stated in part that "...you made me pay 100% of the premium and gave me $0 credit for the pro-rata amount due back. That's just plain theft in my opinion. But again, I'd be more than happy to let a trustee decide."

130.    On June 12, 2018, McCoy sent an email to Algood (responding to yet another demand by the to forward all payments that have been made) stating **"...you are aware you breached the contract by changing the GAP insurance promise & you don't have that authority only a judge does".**

131.    The Defendants have alleged that the Debtor "gave us credit for the GAP reimbursement of $50,000.00 then took it right back".

132.    The Debtor never gave the Defendants any credit for GAP reimbursement, nor are the Defendants entitled to such reimbursement.

133.    There is and never has been any "GAP insurance promise" made by the Debtor.

134.    The Debtor sent the Defendants a statement showing that the alleged reimbursement was a "disputed amount" pending the Debtor researching whether it or the Defendants were the proper party to receive any reimbursements.

135.    The Debtor thereafter determined that the Defendants, as owners of the GAP contracts related to Repurchased Contracts, were the proper parties to determine whether such GAP coverage should be cancelled, and to receive any refunds as a result of such cancellation.

136.    The Debtor further, as a show of good faith, was willing to show the alleged GAP reimbursement as a "Carryover Balance" (a/k/a a disputed amount), with the understanding that the Defendants would comply with the remaining obligations under the Agreements, i.e. the payment of undisputed amounts. None of the Defendants were ever told that the "Carryover Balance" was determined to be a credit towards the Defendants account balance.

137.    McCoy has further mischaracterized the "disputed amount" as a "promise" by the Debtor to issue a credit. By virtue of the conversation with the Defendant's attorney, David Badger,

22

McCoy is or should be aware that any compromises or settlements concerning the Agreements or claims against the Debtor were subject to approval by this Court.

138.    The Defendants are improperly using the Debtor's failure to pay disputed GAP refund premiums as a reason not to perform under the Agreements.

139.    In a May 17, 2018 email to McCoy, Algood stated:

**I offered to discuss it with you today, which you have refused. In addition you have not paid any amounts related to customer payments collected by McCoy Motors on accounts owned by AMAC, amounts owed for buybacks, since May 1st, amounts owed on floor plan etc.. Even with a reduction of what is due today of $50,000 related to the disputed GAP amount, McCoy Motors still owes $92,433.04.**

140.    Defendant McCoy sent an email reply to Algood on the same date, stating in part that "Unless you wanna bring me a certified check for the $50k then we can talk. Those 2 emails and verbal agreement you sent I believe constitutes a contract, which you violated yesterday."

141.    McCoy stated in a June 8, 2018 email that "[the Debtor's] breach [of the alleged promise to credit GAP refunds] caused us not to be able to trust you or fulfill our side of the obligation".

142.    The Defendants have no right to offset the alleged GAP refund against funds owed to the Debtor under the Agreements.

143.    The Agreements specifically provide in numerous places that the Defendants have no right to offset any claims they may have against the Debtor, including GAP refund claims. Paragraph 4.12 of the PPA (Exhibit A) provides:

**4.12 No Contract shall be subject to any offset, discount, counterclaim, dispute or any other defense including, without limitation, usury, <u>unrecorded credits,</u> lack of consideration, fraud, violations of Truth-in-Lending or any other Federal, state, or local laws applicable to such Contract**...(emphasis added).

144.    Section 27 of the PPA (Exhibit C) allows the Debtor to offset amounts owed by the Defendants against any amount owed by the Debtor to the Defendants:

**[The Defendants] agrees that [the Debtor] may offset any amounts owed by [the Debtor] to [the Defendants] against any amounts owed by [the Defendants] to [the Debtor], regardless of whether the amounts owed by [the Debtor] to [the Defendants] or by [the Defendants] to [the Debtor] are owed pursuant to this Agreement or any other agreement between [the Debtor] and [the Defendants], including, without limitation, any Floorplan or Servicing**

23

**Agreement.**

145.     Section 3.3 of the PPA Addendum (Exhibit D) provides in part that:

**In the event of any failure of [the Defendants] to purchase any such Non-Performing Contract from [the Debtor] as set forth in this Section 3.3, [the Debtor], at its sole discretion, shall be entitled to offset any amounts payable by [the Defendants] pursuant to this Section 3.3 against any funds owed from [the Debtor] to [the Defendants] and may make such offset on the Weekly Settlement Sheet. No Performance Compensation or Servicing Compensation shall be paid to [the Defendants] for any Non-Performing Contract.**

146.     Paragraph 7 of the Servicing Agreement (Exhibit C) provides in part that:

**[The Defendants] agree(s) that [the Debtor] may offset any amount owed by [the Debtor] to [the Defendants] against any amounts owed by [the Defendants] to [the Debtor], regardless of whether the amounts owed by [the Debtor] to [the Defendants] or by [the Defendants] to [the Debtor] are owed pursuant to this Agreement or any other agreement between [the Debtor] and [the Defendants], including, without limitation, the PPA or the Floorplan.**

147.     Paragraph 19(d) of the Floorplan (Exhibit B) provides:

**...[the Debtor] shall have the right, immediately and without notice or other action, to set off amounts owed by [the Debtor]  to [McCoy LLC] against any of [McCoy LLC's] liabilities to [the Debtor], whether or not due;...**

148.     Even if the Defendants were entitled to GAP refunds, any such refund has been assigned to the Debtor or serves as collateral for the Defendant's debt to the Debtor.

149.     The Debtor has a contractual right to any GAP premium refunds. Paragraph 2.2 of the PPA provides that the Defendants shall designate the Debtor as the "sole loss payee and/or first beneficiary on..."all rights to premiums that may be received upon termination of such policies…".

150.     To the extent the Defendants do have any claim to GAP premium refunds, such refunds are an asset of the Defendants which constitute collateral for the $1,207,915.53 currently owed to the Debtor by the Defendants (not including accrued interest, default interest at the annual rate of eighteen percent (18%), costs, penalties, legal fees or other charges allowed by law).

### J.   The Debtor has legally repossessed certain vehicles from the Defendants which are collateral of the Debtor

151.     North Carolina General Statute § 25-9-609 ("Secured party's right to take possession after default") provides:

**(a) Possession; rendering equipment unusable; disposition on debtor's premises. – After default, a secured party:**
    **(1) May take possession of the collateral; and**
    **(2) Without removal, may render equipment unusable and dispose of collateral on a debtor's premises under G.S. 25-9-610.**
**(b) Judicial and nonjudicial process. – A secured party may proceed under subsection (a) of this section:**
    **(1) Pursuant to judicial process; or**
    **(2) Without judicial process, if it proceeds without breach of the peace**.

152.    In accordance with its rights under the Agreements and applicable law, on May 30, 2018, the Debtor repossessed 23 vehicles from the Defendants (the "Recovered Vehicles", see list, Exhibit U).

153.    The Defendants have not provided the Debtor with the keys to the vehicles.

154.    The Debtor subcontracted the repossessions to "Car Masters", an unrelated third party. McCoy has alleged that Car Masters broke a lock in connection with the repossession of the vehicles. Representatives of the Debtor were not present at the time the lock was allegedly broken, and the Debtor has no knowledge of whether any lock was broken. The Debtor specifically advised Car Masters that it was required to comply with all law in connection with the repossession.

155.    Even if there were evidence that a lock was broken, in the context of a commercial repossession taking place at an uninhabited used car lot at night, such would not constitute a breach of the peace. Furthermore, the Debtor's security interest on all of the Defendants' assets would also extend to the lock, so the Defendants could only contend that the Debtor damaged its own collateral.

156.    Paragraph 35 of the PPA (Exhibit A) provides in part

**…[the] Debtor shall not be liable for…ANY DAMAGE TO ANY COLLATERAL INCURRED IN REPOSSESSION OF THE COLLATERAL OR IN THE EXERCISE OF ANY OTHER REMEDY WHICH [THE DEBTOR] MAY HAVE, EXCEPT TO THE EXTENT [THE DEBTOR] SHALL HAVE BEEN GROSSLY NEGLIGENT IN THE EXERCISE OF SUCH REMEDIES….**

**K.    The Defendants' filing of a criminal complaint against the Debtor, based on the Debtor's lawful repossession of the Debtor's collateral**

157.    Upon information and belief, McCoy filed a criminal complaint for stolen vehicles with York County Sheriff or some other law enforcement agency, alleging that the Debtor, Algood and/or Milestone had "stolen" the Repossessed Vehicles.

158.    McCoy sent the Debtor an email which states in part that "…you and your company

25

we believe you violated NCGS 20-106, lastly your agent crossed state lines and it looks like that may turn it into a federal case. So not only did they break in they took some vehicles we have the clear title to…".

159.    The filing of a criminal complaint against the Debtor and/or the Debtor's employees necessarily requires the state law enforcement agency to make determinations which would be "core proceedings" under 28 U.S.C. Section 157, including but not limited to: i) turn over of property of the estate; ii) determinations of the validity, extent or priority of liens; iii) proceedings affecting the liquidation of the assets of the estate; and iv) the determination of what is property of the bankruptcy estate.

160.    The Defendants filed the criminal complaint, instituting a criminal proceeding, in bad faith, without probable cause and with malice.

161.    The Defendants' filing of the criminal complaint constitutes malicious prosecution.

**L.    Defendant MCoy LLC's filing of state court lawsuits against the Debtor's agent in connection with the lawful repossession of the Debtor's collateral**

162.    On June 7, 2018, McCoy LLC filed four separate lawsuits in the Gaston County District Court against Car Masters (the "Gaston County litigation"), which was acting as an agent for the Debtor in connection with the repossession of collateral from the Defendants.

163.    McCoy Motors, LLC v. Car Masters, which is pending File No. 18 CVM 2617. Titled "Complaint For Money Owed", the Complaint alleges in part that

> **The defendant owes me the amount listed for the following reason: DAMAGE TO MULTIPLE VEHICLES AFTER AGENTS FOR THE COMPANY BROKE INTO LOCKED GATED AREA AND HIT OTHER CARS WHILE TOWING OTHERS. ALSO CAUSING MECHANICAL ISSUES.**

164.    The Complaint further alleges "conversion" of a Ford Fusion, Jeep Compass, and two Jeep Cherokees, and that McCoy LLC suffered damages in the amount of $9,817.00. A trial is scheduled for June 28, 2018.

165.    McCoy Motors, LLC v. Car Masters, which is pending as File No. 18 CVM 2618. Titled "Complaint to Recover Possession of Personal Property", the Complaint alleges in part that

> **The defendant has in his/her possession the personal property described below which belongs to me. I am entitled to immediate possession of the property, but the defendant has refused on demand to deliver it to me. The defendant has unlawfully kept possession of this property since the date listed below and**

26

**has therefore deprived me of its use. The damage due me for the loss of use and physical damage to the property is set out below. I demand recovery of this property and damages in the total amount set out below, plus interest and reimbursement for court costs.**

166.    The Complaint further alleges that Car Masters "wrongfully took or kept" a 2008 Acura RDX (the "Acura"), which McCoy LLC values at $9,500.00. A trial is scheduled for June 28, 2018.

167.    The Debtor has a security interest in, and properly repossessed, the Acura.

168.    McCoy Motors, LLC v. Car Masters, which is pending as File No. 18 CVM 2619. Titled "Complaint to Recover Possession of Personal Property", the Complaint alleges in part that

**The defendant has in his/her possession the personal property described below which belongs to me. I am entitled to immediate possession of the property, but the defendant has refused on demand to deliver it to me. The defendant has unlawfully kept possession of this property since the date listed below and has therefore deprived me of its use. The damage due me for the loss of use and physical damage to the property is set out below. I demand recovery of this property and damages in the total amount set out below, plus interest and reimbursement for court costs.**

169.    The Complaint further alleges that Car Masters "wrongfully took or kept" a 2010 Ford Edge (the "Ford"), which McCoy LLC values at $9,500.00. A trial is scheduled for June 28, 2018.

170.    The Debtor has a security interest in, and properly repossessed, the Ford.

171.    McCoy Motors, LLC v. Car Masters, which is pending as File No. 18 CVM 2620. Captioned "Complaint to Recover Possession of Personal Property", the Complaint alleges in part that

**The defendant has in his/her possession the personal property described below which belongs to me. I am entitled to immediate possession of the property, but the defendant has refused on demand to deliver it to me. The defendant has unlawfully kept possession of this property since the date listed below and has therefore deprived me of its use. The damage due me for the loss of use and physical damage to the property is set out below. I demand recovery of this property and damages in the total amount set out below, plus interest and reimbursement for court costs.**

172.    The Complaint further alleges that Car Masters "wrongfully took or kept" a

2006 Nissan Murano (the "Nissan"), which McCoy LLC values at $9,500.00. A trial is scheduled for June 28, 2018.

173.    The Debtor has a security interest in, and properly repossessed, the Nissan.

174.    The Gaston County Litigation constitutes bad faith, vexatious litigation by the Defendants. It is nothing more than an attempt by the Defendants to do an "end run" around this Court's jurisdiction over proceedings "arising under", "arising in", or "related to a Chapter 11 case (per 28 U.S.C. Section 157 and 1334), and specifically over the issues raised in the Gaston County Litigation, by suing the Debtor's agent.

175.    In essence, the automobiles that McCoy LLC is attempting to recover are part of McCoy LLC's vehicle inventory, which is subject to the Debtor's perfected security interest. The Debtor intends to liquidate the collateral in this bankruptcy proceeding for the benefit of its creditors.

176.    The damages which are sought by McCoy LLC in case number 18 CVM 2617, if legitimate (which the Debtor disputes), would be damages to the vehicles in the inventory of McCoy LLC, all of which are subject to the security interest of the Debtor.

177.    Paragraph 35 of the PPA (Exhibit A) provides in part that "**…[the] Debtor shall not be liable for…ANY DAMAGE TO ANY COLLATERAL INCURRED IN REPOSSESSION OF THE COLLATERAL OR IN THE EXERCISE OF ANY OTHER REMEDY WHICH [THE DEBTOR] MAY HAVE, EXCEPT TO THE EXTENT [THE DEBTOR] SHALL HAVE BEEN GROSSLY NEGLIGENT IN THE EXERCISE OF SUCH REMEDIES.**"

178.    There was no negligence or gross negligence on the part of the Debtor in connection with the repossession of its collateral from the Defendants.

179.    If the Gaston County Litigation is allowed to continue, the Gaston County District Court will be determining issues which are core proceedings under 28 U.S.C. Section 157, including but not limited to i) the allowance or disallowance of claims against the estate; ii) orders to turn over property of the estate; iii) determinations of the validity, extent or priority of liens; iv) proceedings affecting the liquidation of the assets of the estate; and v) the determination of what is property of the bankruptcy estate.

180.    It would be appropriate for the Court to exercise its equitable powers under 11 U.S.C. 105(a) and enjoin McCoy LLC or the other Defendants from proceeding with the Gaston County Litigation.

**M.    The Defendants and/or associated individuals have made and are making defamatory statements concerning the Debtor and its employees**

181.    On or about April 20, 2018, the Defendants and/or individuals associated with the

Defendants started a "Community Organization" on Facebook entitled "Does Your Bank Help Cheaters?" (the "Facebook Page").

182.    The first post on the Facebook page was made two days after the Meeting of Creditors held in this case (which was attended by McCoy). On that same day McCoy, sent an email to his attorney and several other parties (including the attorney for Hamilton State Bank), which said in part:

**Dear Mr. Badger,**

**I can't see how it's in my best interest to continue to retain you. I asked you twice to reach out to Hamilton and propose a buyout[7] (according to Ashley Edwards she has not heard of any proposals from you)…..**

**I also have produced numerous amounts of information that I think Hamilton did not hold up their end of the Fiduciary Obligation, that I think they had to both their Shareholders & the Dealers and anyone else that may have had a financial interest because of their loan.**

**I've tried to present my findings in a manner that came across as "Honey" but since I'm being ignored maybe "Vinegar" is the best route. A friend of mine use to be the press secretary for a local governor so I will be reaching out to him this weekend to find the best way to get the most attention on this matter & let the chips fall where they may.**

**Ace has done nothing but continue to harass me & my customers asking for items that they have never asked for in the past, they literally just sent a man to my dealership to audit me (which I fully complied with), this man has never been to my dealership before. I feel they will continue to harass me until they can find a way to steal my deals.**

**Basically, I feel these guys are crooks & Hamilton was a for lack of better term was an accessory due to their negligence. And if the press spins this the way I believe, I think it will be "Katie Bar the door" for all parties.**

183.    The Defendants' "Vinegar" route commenced on April 21, 2018, when a photograph of Algood's residence was posted on the Facebook page. Also posted was the following comment:

**So how does a guy with this much of a troubled past get to live a life that most only dream of? In our opinion because of Banks Like Hamilton State Bank. You see his new company Ace Motor Acceptance borrowed over $10 Million Dollars from Hamilton State Bank, and guess what happened on March 15th 2018? Ace filed Bankruptcy, potentially screwing others out of millions of**

---

[7] Hamilton does not own the Contracts with the Defendants, the Debtor does. Hamilton is not the proper party to sell the Contracts.

**dollars.**

184.    As of June 11, 2018, 51 people had reacted to the photograph, and it had been shared 17 times.

185.    On April 21, 2018, the following comment was posted on the Facebook page

**The CEO of Hamilton State Bank, Bob Oliver needs to be told to stop bailing out cheaters like Russ Algood. Hamilton State Bank Phone # 770-967-5090**

186.    On April 21, 2018, a photo was posted on the Facebook page with the following language superimposed:

**Call 770-967-5090**
**Ask Hamilton State Bank**
**Why Would You Loan Over $10 Million**
**To a Man Whose Previous Company**
**Was Used to Steal Money from GM?**
**That Money Was Supposed to Help Police Debts Buy Cars At A Lower Cost**

The caption of the picture states "**The Company they loaned the money to is Ace Motor Acceptance & CEO Russ Algood, the CEO of Hamilton State Bank is Robert (Bob) Oliver.**"

187.    As of June 11, 2018, 923 people had reacted to the photograph, and it had been shared 146 times.

188.    On or about May 8, 2018, approximately two weeks after the publication of the name and phone number of Hamilton's CEO, Hamilton began deducting funds from the Debtor's account which reflected that it had chosen to increase the Debtor's 9% contract interest rate to the 14% default rate.

189.    On June 2, 2018 (two days after the Debtor repossessed twenty-three automobiles from the Defendants), two photographs of the Debtor's employee Robin Milestone were posted on the Facebook page, with the comment **"[i]s this guy (Robin Milestone) now helping Russ Algood steal cars?"** See Exhibit V attached.

190.    As of June 11, 2018, 74 people had reacted to the photograph, and it had been shared 11 times.

191.    On or about June 3, 2018, the following comment appeared on the Facebook page:

**Just to sum up a few things, it's not slander if it's true. We have it on good authority this man and his boss authorized the taking of several vehicles they do not own or have the title to. That is theft. 2nd this man tried to defend**

30

**himself because he goes to church, really well so did Jim Baker. 3rd this man is called the #2 person in the company, yet that company has been driven into bankruptcy, their actions causing many employees to not get paid and be completely out of a job. 3rd How's that foreclosure working out? We hope to be able to release the police reports[8] as soon as the detectives are done with their investigation, as we expect several people could go to prison because of their illegal actions. It could also move to a federal case since they took the stolen cars across state lines. Btw don't assume who's running this page.**

192.    As of June 11, 2018, the Facebook page had 155 followers, and it shows "Ride Fast" (the Defendants' automobile dealership) as a "Related Page".

193.    In the statement "[i]s this guy (Robin Milestone) now helping Russ Algood steal cars?", the word "Algood" refers to Russ Algood in his capacity as President of the Debtor.

194.    The statement is not an opinion and it implies that the Debtor steals cars.

195.    A reasonable recipient of the information on the Facebook page would understand that the statements referred to the Debtor.

196.    The statements were communicated by, or at the direction of, the Defendants to third parties who understood the defamatory meaning of the statement and their application to the Debtor.

197.    The statements on the Facebook page charge the Debtor and one of its employees with the theft of automobiles.

198.    The Defendants have told at least one Vehicle Buyer that Ace "…is a scam to get money from…" the Vehicle Buyer.

199.    Neither the Debtor nor any of its employees have stolen any automobiles.

200.    The statement that the Debtor and one of its employees have stolen automobiles is false.

201.    The Debtor is not operating "a scam".

202.    The statement that the Debtor is operating a scam is false.

---

[8] Defendant McCoy called one or more law enforcement agencies and reported that the Debtor had "stolen" automobiles from the Defendants. This constitutes malicious prosecution and defamation, as the Defendants signed enforceable agreements giving the Debtor a security interest in **"all of Borrower's assets, including, without limitation, any and all vehicle inventory; vehicle titles…".** (Floorplan, Exhibit B, Paragraph 4). Upon default, the Debtor exercised its rights under the Uniform Commercial Code to take possession of some of its collateral.

203.    The statements that the Debtor and one of its employees have stolen automobiles, and that the Debtor is operating "a scam", tend to subject the Debtor and its employees to ridicule, contempt or disgrace.

204.    The statements that the Debtor and one of its employees have stolen automobiles, and that the Debtor is operating "a scam", tends to impeach the Debtor in its trade.

205.    The statements that the Debtor and one of its employees have stolen automobiles, and that the Debtor is operating "a scam",  reasonably tended to impeach or injure the Debtor in its trade.

206.    The statements that the Debtor and one of its employees have stolen automobiles and were operating "a scam" were made maliciously and in reckless disregard of the statement's truth.

## N.    *The Debtor's objection to the fraudulent proof of claim filed by McCoy LLC*

207.    On May 24, 2018, McCoy LLC filed a secured Proof of Claim in the amount of $1,431,867.32 (Exhibit W attached). The basis of the claim is shown as "% of payments due, Unpaid Claims, Amortization of Interest". The Proof of Claim states that the claim is secured by motor vehicles having a value of $2,041,006.30. Significantly, the Proof of Claim was signed only by McCoy, and not by the attorney of record for McCoy LLC.

208.    The McCoy proof of claim states that the basis for the claim is "% of payments due, Unpaid Claims, Amortization of Interest".

209.    The is no agreement of any kind which provides any of the Defendants with a security interest in any assets which belong to the Debtor.

210.    Attached to the McCoy proof of claim are documents entitled "Originations" (page 4 of 15), "Outstandings" (page 5 of 15), "Servicing" (page 6 of 15), "Amortization" (pages 7-10 of 15), and "Gap Cancellation" (pages 11-13 of 15). These documents do not demonstrate and provide any basis for a claim by McCoy LLC against the Debtor.

211.    The Proof of Claim does not show how McCoy LLC arrived at the amount of its claim.

212.    It is believed that the Defendants' claims for "% of payments due" is referred to as "Performance Compensation in the Agreements.

213.    As a result of the Defendants' multiple (and intentional) defaults, all Contracts have been declared by the Debtor as Non-Performing Contracts.  As a result, McCoy LLC (nor any of the other Defendants) does not have a claim against the Debtor for Performance Compensation.

214.    Section 3.2 of the PPA (Exhibit A) provides in part that

**No Performance Compensation shall be paid to the Seller with regard to payments received related to any "Non-Performing Contract"...or related to any Contracts repurchased from Purchaser or to any Seller who, in the preceding ninety-day (90) period, failed to timely post or turn over, to Purchaser, any amounts noted in this paragraph.**

215. McCoy LCC, as set forth herein, is not entitled to any credits or payments from the Debtor for GAP protection refunds.

216. "Amortization" is a payment method, not relevant to the facts in this case, and it is not a term that serves as the basis for a claim.

217. The Defendants have released all claims and/or causes of action against the Debtor that arose on or prior to January 29, 2018. See Paragraph 20 of the PPA (Exhibit A).

218. The Defendants have waived the alleged claims against the Debtor. Section 24 of the PPA provides in part that

**In the event that [the Defendants] believe the Weekly Settlement Sheet contains any misstatement, miscalculation, omission or other error, [the Defendants have] a period of thirty (30) calendar days from the date of such Weekly Settlement Sheet to provide written notice[9] of such misstatement, miscalculation, omission or other error to [the Debtor]. To be effective, such written notice must include a description of the misstatement, miscalculation, omission or other error in reasonable detail to enable [the Debtor] to verify whether any misstatement, miscalculation, omission or other error has occurred. In the event that [the Defendants do] not provide any such written notice to [the Debtor] within such thirty (30) calendar day period, [the Defendants] shall be conclusively deemed to agree and acknowledge that such Weekly Settlement Sheet is correct, final and binding upon [the Defendants] and [the Defendants] will waive any and all rights to claims for any such misstatements, miscalculations, omissions or other errors.**

219. The Defendants have not provided the requisite notice of their objections to the Weekly Settlement Sheets, thus they have waived any claims set forth in the Proof of Claim.

220. Alternatively, the objection to the Proof of Claim should be sustained because the Defendants have agreed to limit any liability of the Debtor. Paragraph 34 of the PPA provides in part that

**[I]N NO EVENT SHALL THE TOTAL LIABILITY OF [THE DEBTOR] TO [THE DEFENDANTS] ARISING OUT OF OR IN CONNECTION**

---

[9] Per Paragraph 18 of the PPA, any notices were required to be sent by the Defendants via certified or registered mail, return receipt requested. No such notices were received by the Debtor.

**WITH THIS AGREEMENT...EXCEED THE TOTAL PERFORMANCE
COMPENSATION PAID BY [THE DEBTOR] TO [THE DEFENDANTS]
PURSUANT TO THIS AGREEMENT DURING THE THREE (D)
CONSECUTIVE CALENDAR MONTH PERIOD PRIOR TO THE
DETERMINATION OF SUCH LIABILITY.**

221.    The facts herein demonstrate that McCoy LLC and McCoy are abusing the proof of claim process.

222.    In order to safeguard the integrity of the proof of claim process, the Court has the authority to impose sanctions against parties pursuant to 11 U.S.C. Sections 105(a) and 502, and Bankruptcy Rule 3001. *See In re Varona*, 388 B.R. 705, 717 (Bankr. E.D. Va. 2008) ("[Section] 105 may be used to sanction the filing of a proof of claim violative of the Bankruptcy Code . . . . The filing of a false or fraudulent claim would unquestionably constitute an abuse of the claims process as well as an attempted fraud upon the court").

223.    The Court should impose sanctions on the Defendants for their abuse of the claims process.

**O.    Defendants McCoy and Misty McCoy are personally liable for all damage claims in this matter**

224.    As set forth above, McCoy and Misty McCoy executed personal guarantees in connection with the Agreements.

225.    McCoy and Misty McCoy are personally liable for all damages under the Agreement, and such other damages as may be proven at a trial of this matter.

226.    The McCoy Guarantee and the Misty McCoy Guarantee provide in part that

**As security for the liabilities and obligations of Guarantor hereunder, Guarantor hereby transfers and conveys to AMAC any and all balances, credits, deposits, accounts, items and monies of Guarantor now or hereafter in the possession or control of AMAC, and AMAC is hereby given a lien and security interest in all property of Guarantor of every kind and description now or hereafter in the possession or control of AMAC for any reason, including all dividends and distributions on or other rights in connection therewith.**

See Exhibit A, pp 26-33.

**CLAIMS FOR RELIEF**

**First Claim for Relief**
**(Emergency Motion for Preliminary Injunction, 11 U.S.C. Section 105, Bankruptcy Rule 7065)**

34

227.    The Debtor re-alleges all preceding paragraphs of this Verified Complaint and incorporates them herein.

228.    There is a substantial likelihood of success on the merits of Debtor's claims, given the clarity of the Agreements and the breach of the Agreements by the Defendants.

229.    The Debtor and the bankruptcy estate will be irreparably harmed if the Court fails to issue an injunction, including the likely transfer of funds by the Defendants, and the improper disposal of automobiles, cash and other collateral. A moving party can show irreparable injury where, as here, assets may be dissipated to avoid the satisfaction of a judgment. See, *e.g. Merch. Transaction Sys. v. Necela, Inc.*, 2010 U.S. Dist. LEXIS 12602, 8-9 (D. Ariz. Jan. 21, 2010)(citations omitted). Indeed, "money damages will be an inadequate remedy due to impending insolvency of the defendant or that defendant has engaged in a pattern of secreting or dissipating assets to avoid judgment." *Id.* at 15 (citation omitted).

230.    The injury to the Debtor and the bankruptcy estate outweighs whatever damage the proposed injunction may cause the Defendants.

231.    If issued, the injunction would not be adverse to the public interest. In this case, the public interest strongly favors the issuance of an immediate injunction for multiple reasons. In the first instance, "public policy undoubtedly favors the enforceability of judgments. Were it otherwise, lawsuits seeking monetary damages would be rendered ineffective." Merch. Transaction Sys, 2010 U.S.Dist. LEXIS at 16. Further, the public interest strongly favors maximizing the return to creditors in bankruptcy cases and the issuance of an injunction prohibiting the Defendants from transferring, dissipating or concealing assets will make it substantially more likely that the Debtor will be able to recover funds to make a meaningful distribution in this case.

232.    This Court's power to issue injunctions is grounded in its equitable authority. Courts generally have the "power to issue a preliminary injunction to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies." *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988). Moreover, 11 U.S.C. § 105(a) provides explicit authority for the granting of injunctive relief in bankruptcy matters. "In the exercise of its authority under § 105, the Bankruptcy Court may use its injunctive authority 'to protect the integrity of a bankrupt's estate and the Bankruptcy Court's custody thereof' and to preserve to that Court the ability to exercise the authority delegated to it by Congress.'" *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1003 (4th Cir. 1986) (*quoting In re Johns-Manville Corp.*, 40 B.R. 219, 226 (S.D.N.Y. 1984)).

233.    The Debtor is entitled to preliminary and permanent injunctive relief.

234.    The Debtor asks this Court to order Defendants to:

(a) stop collecting any payments from the Debtor's customers with regard to automobiles and Contracts that constitute collateral under the Agreements (i.e. those listed in Exhibit Q), cease taking

any actions whatsoever to exercise serving rights under the Agreements, and notify all customers that payments must be made to the Debtor;

(b) direct the Debtor's customers with automobiles that constitute collateral under the Agreements to make all payments directly to The Debtor;

(c) pay over any cash or other monies to the Debtor received from the Debtor's customers that are subject to the terms of the Agreements);

(d) tum over any vehicles to the Debtor (including those that have been repossessed) that constitute collateral under the Agreements (including Defendants' inventory), including all titles, accounting records, payment records of Vehicle Buyers, or other documentation associated with each vehicle;

(e) cease communicating with the Debtor's customers and stop interfering with the Debtor's efforts to collect on its accounts;

(f) provide copies of all documents, accounting records and bank statements to Debtor, which are relevant to the location, use and disposition of the Debtor's assets;

(g) Turn over any refunds for GAP protection which has been cancelled;

(h) Cease and/or rescind any requests for GAP refunds to any party;

(i)execute any documents necessary to remove liens of any of the Defendants from any vehicles, and to allow the Debtor to have first priority liens on funded vehicles (see footnote 6);

(j)Cease transferring, dissipating, concealing, moving, secreting or otherwise disposing of any assets of the Debtor or the Defendants, or assets which are collateral of the Debtor, including the sale of any motor vehicle in Defendants' inventory or possession, or the transfer of any funds by any of the Defendants, pending further Order of the Court.

(k) turn over all keys to any vehicles which are in their control or possession (which will mitigate losses for the Debtor in preparing for the sale of the vehicles).

(l) immediately provide the Debtor with, or do what is necessary to provide the Debtor with, full and exclusive use of all GPS devices on all vehicles related to the Contracts and in the Defendants' inventory.

(m) disclose the location of all of the Debtor's property or collateral of the Debtor. This is an important protection for the Debtor and its bankruptcy estate because the Defendants will typically attempt to resell repossessed automobiles. If the Defendants are allowed to sell a repossessed automobile to a bona fide purchaser, the South Carolina Department of Motor Vehicles will require the Debtor to turn over the title, which results in the loss of collateral.

36

(n) take down the "Does Your Bank Help Cheaters?" Facebook page.

235.    The Debtor further asks the Court treat this Verified Complaint as an affidavit, and to set its application for a permanent injunction for hearing at the earliest possible date, and upon hearing, issue a permanent injunction against Defendants in terms consistent with the evidence.

### Second Claim for Relief
### (Emergency Motion for Turnover of Property of the Estate Pursuant to 11 U.S.C. § 542; Bankruptcy Rule 7064; Attachment)

236.    The Debtor reasserts and incorporates the preceding paragraphs as if fully set forth herein.

237.    **Turn Over**. The Debtor is the owner of, or has a valid first priority security interest in, the assets which are the subject of this Complaint.

238.    The Defendants are in possession of assets of the Debtor and the bankruptcy estate, as well as assets subject to the Debtor's security interest.

239.    Under the Agreements, the Debtor has a right to immediate possession of Debtor's assets as well as the collateral, which right is higher and greater than any right Defendants' may have in the collateral.

240.    Under Section 1115 of Title 11 of the United States Code, the Debtor is entitled to possession of all property of the estate.

241.    The Defendants have willfully and intentionally refused and failed to turn over the property of the estate to the Debtor as required by Sections 362(a)(3) and 542 of Title 11 of the United States Code.

242.    Defendants have refused to allow the Debtor to take possession of the collateral.

243.    The Collateral of the Debtor for the Defendants' obligations is property of the Debtor's estate and which should be used to pay creditors in the Debtor's bankruptcy case.

244.    The claims against the Defendants are not of inconsequential value or benefit to the estate.

245.    As a result, the Defendants should be required to turn over the Collateral to the Debtor pursuant to 11 U.S.C. § 542.

246.    **Order of Attachment.** The Court should enter an Order of Attachment pursuant to N.C.G.S. Section 1-440.0 *et seq.* because McCoy LLC is a foreign corporation, which is secreting and disposing of property of the Debtor, or is about to secrete and dispose of property of the Debtor.

247.    Bankruptcy Rules 9014 and 7064 incorporate Federal Rule of Civil Procedure 64 in contested matters.  Pursuant to Rule 64, "…every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a).

248.    In particular, Rule 64(b) authorizes a potential judgment creditor to employ the remedies of attachment and garnishment as provided in the state where the court is located.

249.    Grounds for attachment exist under North Carolina law where, among other things, the defendant is "a nonresident," "a foreign corporation," or "[a] person or domestic corporation which, with intent to defraud his or its creditors… [h]as assigned, disposed of, or secreted, or is about to assign, dispose of, or secrete, property."  N.C.G.S.  § 1-440.3. Each of these grounds is independently sufficient to support the issuance of an order of attachment.

250.    The Debtor is not required to post a bond to secure injunctive and related relief in bankruptcy cases. *See, e.g.*, Fed. R. Bankr. P. 7065 (stating a "temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c).").

251.    Accordingly, the Court should treat this Verified Complaint as an affidavit and enter an Order of attachment in this case as to McCoy LLC.

### Third Claim for Relief
### (Emergency Motion for Injunction of Defendants from Pursuing Car Masters Litigation)

252.    Debtor realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

253.    The trials of the Car Masters Litigation are set for June 28, 2018 in the Gaston County District Court.

254.    The Car Masters Litigation is an attempt by the Defendants to have the Gaston County District Court determine issues which are core proceedings under 28 U.S.C. Section 157, including but not limited to i) the allowance or disallowance of claims against the estate; ii) orders to turn over property of the estate; iii) determinations of the validity, extent or priority of liens; iv) proceedings affecting the liquidation of the assets of the estate; and v) the determination of what is property of the bankruptcy estate.

255.    The Debtor further asks the Court treat this Verified Complaint as an affidavit.

256.    The Court should exercise its equitable powers under 11 U.S.C. 105(a) and enjoin McCoy LLC or the other Defendants from proceeding with the Gaston County Litigation.

**Fourth Claim for Relief**
**(Emergency Motion for Injunction of Defendants from Pursuing Criminal Complaint)**

257.    Debtor realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

258.    The filing of a criminal complaint against the Debtor and/or the Debtor's employees necessarily requires the state law enforcement agency to make determinations which would be "core proceedings" under 28 U.S.C. Section 157, including but not limited to: i) turn over of property of the estate; ii) determinations of the validity, extent or priority of liens; iii) proceedings affecting the liquidation of the assets of the estate; and iv) the determination of what is property of the bankruptcy estate.

259.    The Debtor further asks the Court treat this Verified Complaint as an affidavit.

260.    The Court should exercise its equitable powers under 11 U.S.C. 105(a) and enjoin McCoy LLC or the other Defendants from proceeding with the Gaston County Litigation.

**Fifth Claim for Relief**
**(Accounting)**

261.    Debtor realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

262.    The Defendants should be required to provide the Debtor with any and all documents and accurate accountings of the assets which are the subject of this Complaint.

**Sixth Claim for Relief**
**(Conversion)**

263.    The Debtor realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

264.    The assets which are the subject of this Complaint are property of the Debtor's estate, and the estate is the lawful owner of such assets.

265.    The Defendants are not authorized to assume or exercise any rights ownership of such assets.

266.    The Defendants are exercising control of the Debtor's assets, to the exclusion of the

39

Debtor's rights.

267.    The Defendants have intentionally and unlawfully converted the assets to their sole use and benefit and to the exclusion of the Debtor's rights to the assets.

268.    The Defendants' conversion of the estate's property is the proximate cause of injury to the Debtor's bankruptcy estate, in an exact amount to be proved during this Adversary Proceeding

## Seventh Claim for Relief
## (Emergency Motion for Imposition of Constructive Trust)

269.    The Debtor realleges all paragraphs of this complaint and incorporates them as if fully set forth herein.

270.    The Assets which are the subject of this Complaint are property of the Debtor's estate.

271.    The Defendants currently possess Assets in contravention to their duties to turnover property of the Debtor's estate to the Debtor.

272.    The Defendants obtained the Assets through conversion of the estate's property.

273.    It would be inequitable for the Defendants, rather than the estate, to retain the Assets since the Assets are collateral for the debt owed to the Debtor. If the Defendants do not turn over the Debtor's collateral, the Debtor's creditors will be harmed. The Defendants' retention of the collateral violates the basic priority scheme of the Bankruptcy Code.

274.    To remedy this inequity, the Court should impose a constructive trust, such that the Defendants hold all collateral and the proceeds, profits and product of same in constructive trust for the benefit of the estate and its creditors.

275.    To the extent that proceeds of the Debtor's collateral has been used to fund the payment of a retainer to an attorney by any of the Defendants, the constructive trust should also be imposed on such retainer.

## Eighth Claim for Relief
## (Breach of Fiduciary Duty)

276.    The Debtor realleges all paragraphs of this complaint and incorporates them as if fully set forth herein.

277.    The Agreements and Contracts establish certain fiduciary duties which the Defendants owed to the Debtor, including the duty to remit payments being collected from Vehicle Buyers to the Debtor.

278.     The Agreements and Contracts create a relationship of trust and confidence between the Defendants and the Debtor.

279.     The Defendants' have breached, and continue to breach, the fiduciary duties which they have to the Debtor.

280.     As a result of the Defendants' breach, the Debtor has been damaged in an amount to be determined at trial.

## Ninth Claim for Relief
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

281.     The Debtor realleges all paragraphs of this complaint and incorporates them as if fully set forth herein.

282.     The Defendants' actions set forth herein constitute a breach of the implied covenant of good faith and fair dealing with the Debtor.

283.     As a result of the Defendants' breach, the Debtor has been damaged in an amount to be determined at trial.

## Tenth Claim for Relief
### (Constructive Fraud)

284.     The Debtor realleges all paragraphs of this complaint and incorporates them as if fully set forth herein.

285.     A breach of fiduciary duty amounts to constructive fraud.

286.     As a result of the Defendants' constructive fraud, the Debtor has been damaged in an amount to be determined at trial.

## Eleventh Claim for Relief
### (Fraud and Fraud in the Inducement)

287.     The Debtor realleges all paragraphs of this complaint and incorporates them as if fully set forth herein.

288.     The Defendants have made false representations to, and have concealed material facts from, Vehicle Buyers.

289.     The false representations and concealment of material facts by the Defendants are reasonably calculated to deceive the Vehicle Buyers.

41

290.    The false representations were made, material facts were concealed by, the Defendants with the intent to deceive.

291.    Vehicle Buyers have in fact been deceived by the Defendants false representations and concealment of material facts.

292.    The false representations and concealment of material facts have resulted in damage to the Debtor.

## Twelfth Claim for Relief
### (Intentional and Tortious Interference with Economic Relationship)

293.    Plaintiff realleges all paragraphs of this complaint and incorporates them as if fully set forth herein.

294.    The Defendants intentionally interfered with an economic relationship between the Debtor and Hamilton State Bank, which was an economic benefit to the Debtor.

295.    The Defendants knew of the Debtor's relationship with Hamilton State Bank;

296.    The Defendants intended to disrupt the relationship between the Debtor and Hamilton State Bank;

297.    The Defendants engaged in wrongful conduct as set forth above;

298.    The relationship between the Debtor and Hamilton State Bank was disrupted;

299.    The Debtor was harmed, including on information and belief by an increase in the Debtor's interest rate.

300.    The Defendants' wrongful conduct was a substantial factor in causing the Debtor harm.

## Thirteenth Claim for Relief
### (Malicious Prosecution)

301.    Plaintiff realleges all paragraphs of this complaint and incorporates them as if fully set forth herein.

302.    One or more of the Defendants instituted, procured, or participated in a criminal proceeding against the Debtor and/or the Debtor's employees.

303.    There was no probable cause to institute, procure or participate in a criminal

42

proceeding against the Debtor.

304.    The criminal proceeding was instituted, procured or participated in by one or more of the Defendants with malice.

305.    The criminal proceeding will be terminated in favor of the plaintiff.

306.    The Court should assess punitive damages or sanctions against the Defendants on account of the malicious prosecution.

307.    The Debtor has suffered damages in an amount to be determined at trial.

**Fourteenth Claim for Relief**
**(Unfair and Deceptive Trade Practices)**

308.    Plaintiff realleges all paragraphs of this complaint and incorporates them as if fully set forth herein.

309.    The Defendants' actions constitute a violation of N.C. Gen. Stat. § 75-1.1 as an unfair and deceptive method of competition or trade practice, and their misconduct has caused actual damage to the Debtor.

310.    As a result of the Defendants' unfair and/or deceptive methods and practices, the Debtor has been damaged and the Debtor is entitled to relief, including treble or punitive damages, for injuries caused by the Defendants' unfair and deceptive conduct, and the Debtor is further entitled, pursuant to the provisions of N.C. Gen. Stat. § 75-16.1, to recover from the Defendants.

311.    The libel per se of the Defendants as to the conduct of the Debtor's business does violate N.C.G.S. § 75-1.1 and, because the libel proximately caused the injury to the Debtor's business, it also gives rise to a cause of action under N.C. G.S. § 75-16.

312.    While a simple breach of contract does not qualify as a violation of Chapter 75, the Defendants' breach of contract combined with egregious or aggravating circumstances would cause the statute to apply in this case. The Defendants have aggravated the breach of contract with lies and the manipulation of consumer Vehicle Buyers through the course of their conduct.

313.    The Debtor has suffered damages in an amount to be determined at trial. Such damages should be trebled by the Court, or in the alternative punitive damages should be awarded.

**Fifteenth Claim for Relief**
**(Violation of Automatic Stay)**

314.    The Debtor realleges all paragraphs of this complaint and incorporates them as if fully set forth herein.

43

11 U.S. Code § 362 ("Automatic stay") provides in part that:

> **(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section (a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—**
>
> **(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;**
>
> **(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;**
>
> **(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;**
>
> **(4) any act to create, perfect, or enforce any lien against property of the estate;**
>
> **(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;**
>
> **(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;**
>
> **(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor;…**

315.    The Defendants have committed willful violations of the § 362(a)(3), (6) and (7) stay for which the Debtor is entitled to relief.

316.    The Debtor requests the entry of a judgment which sanctions the Defendants for their violations of the stay, in such amount as is determined at a trial of this adversary proceeding.

### Sixteenth Claim for Relief
### (Objection to Proof of Claim, Bankruptcy Rule 3007)

317.    The Debtor realleges all paragraphs of this complaint and incorporates them as if fully set forth herein.

318.    The Proof of Claim filed by McCoy LLC is without merit and the Debtor's objection should be sustained for the reasons set forth herein.

### Seventeenth Claim for Relief
### (Defamation)

319.    The Debtor realleges all paragraphs of this complaint and incorporates them as if fully set forth herein.

320.    The theft of automobiles is an infamous crime.

321.    The statements that the Debtor and one of its employees have stolen automobiles are libelous per se.

322.    Libel per se of the Debtor as to the conduct of its business violates N.C.G.S. § 75-1.1 and, when the libel proximately causes injury to the business, gives rise to a cause of action under N.C. G.S. § 75-16.

323.    The Debtor has suffered actual injury as a proximate result of the Defendant's deceptive statements, in an amount which will be proven at trial.

324.    The Debtor is entitled to an award of punitive damages under N.C.G.S. § 75-16.

## CLAIM FOR RELIEF
### (Payment of Legal fees and costs by Defendants)

325.    The Debtor realleges all paragraphs of this complaint and incorporates them as if fully set forth herein. The Agreements, the McCoy guarantee and the Misty McCoy guarantee contain provisions obligating the Defendants to pay attorney's fees and costs to the Debtor should the Debtor need to retain an attorney to enforce the terms of the Agreements and the Guarantees and to collect the indebtedness. Notice is hereby given to the Defendants that the provisions relating to the collection of attorney's fees and costs shall be enforced by the Debtor. Pursuant to N.C.G.S. 6-21.2, the Defendants have five days from the date of service of this Complaint to pay the outstanding balance to avoid the assessment of attorney's fees and expenses as provided in the Agreements and the guarantees.

## REFERRAL OF DEFENDANTS BY THE COURT TO UNITED STATES ATTORNEY FOR THE WESTERN DISTRICT OF NORTH CAROLINA FOR CRIMINAL PROSECUTION

The facts of this case compel the Court to refer these matters to the United States Attorney for the Western District of North Carolina for the criminal prosecution of the Defendants. The Defendants have violated several criminal statutes.

North Carolina General Statute § 14-114 ("Fraudulent disposal of personal property on which there is a security interest"), which provides:

**(a) If any person, after executing a security agreement on personal property for a lawful purpose, shall make any disposition of any property embraced in such**

45

security agreement, with intent to defeat the rights of the secured party, every person so offending and every person with a knowledge of the security interest buying any property embraced in which security agreement, and every person assisting, aiding or abetting the unlawful disposition of such property, with intent to defeat the rights of any secured party in such security agreement, shall be guilty of a Class 2 misdemeanor.

A person's refusal to turn over secured property to a secured party who is attempting to repossess the property without a judgment or order for possession shall not, by itself, be a violation of this section.

(b) Intent to commit the crime as set forth in subsection (a) may be presumed from proof of possession of the property embraced in such security agreement by the grantor thereof after execution of the security agreement, and while it is in force, the further proof of the fact that the sheriff or other officer charged with the execution of process cannot after due diligence find such property under process directed to him for its seizure, for the satisfaction of such security agreement. However, this presumption may be rebutted by evidence that the property has, through no fault of the defendant, been stolen, lost, damaged beyond repair, or otherwise disposed of by the defendant without intent to defeat the rights of the secured party

18 U.S. Code § 152 ("Concealment of assets; false oaths and claims; bribery") provides:

A person who—
(1) knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;
(2) knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11;
(3) knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11;
(4) knowingly and fraudulently presents any false claim for proof against the estate of a debtor, or uses any such claim in any case under title 11, in a personal capacity or as or through an agent, proxy, or attorney;
(5) knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11;
(6) knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11;

46

**(7) in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation;**

**(8) after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor; or**

**(9) after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor, shall be fined under this title, imprisoned not more than 5 years, or both.**

18 U.S. Code § 157 ("Bankruptcy fraud") provides that:

**A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so—**

**(1) files a petition under title 11, including a fraudulent involuntary petition under section 303 of such title;**

**(2) files a document in a proceeding under title 11; or**

**(3) makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title, shall be fined under this title, imprisoned not more than 5 years, or both.**

The Debtor's continued disregard of the rights of the Debtor and the bankruptcy estate will further be a violation of North Carolina General Statute § 14-115 ("Secreting property to hinder enforcement of lien or security interest"), which provides:

**Any person who, with intent to prevent or hinder the enforcement of a lien or security interest after a judgment or order has been issued for possession for that personal property subject to said lien or security interest, either refuses to surrender such personal property in his possession to a law enforcement officer, or removes, or exchanges, or secretes such personal property, shall be guilty of a Class 2 misdemeanor.**

**CONCLUSION**

47

Based on the foregoing, the Debtor respectfully requests that the Court:

A.  Have a hearing on the Debtor's emergency motions and grant the relief sought therein;

B.  Provide the Debtor with such other relief as the Court deems just and proper, in law and equity;

C.  That the Defendants be held in civil contempt;

D.  The Judgment be entered against the Defendants, jointly and severally, for actual damages, punitive damages, treble damages, attorney's fees, interests and costs as provided for in the Agreements, the McCoy guarantee, the Misty McCoy guarantee and any applicable statutes.

E.  Such other relief as is warranted under the circumstances.


Dated: June 18, 2018



**THE HENDERSON LAW FIRM**

 **/s/**James H. Henderson
James H. Henderson
State Bar No. 13536
1201 Harding Place
Charlotte NC 28204-2826
Telephone:       704.333.3444
Facsimile:        704.333.5003
Email:             henderson@title11.com

48

STATE OF NORTH CAROLINA

**VERIFICATION**

COUNTY OF MECKLENBURG

      Russ Algood, individually, and as the Chief Executive Officer of the Debtor, being first duly sworn, deposes and says that he has read the foregoing COMPLAINT and knows the contents thereof; that the same is true of his own knowledge except as to the matters therein stated on information and belief and, as to those matters, he believes them to be true.

      By: ____/s/ Russ Algood_____

            Russ Algood, individually and as

               Chief Executive Officer of

               the Debtor

Sworn to and subscribed before me,
this 18th day of June, 2018.

Notary Public

/s/ Virginia T. Harlan
Notary's printed or typed name

My Commission expires: 2.14.2022

49