# EXHIBIT A



BHPH Purchasing &
Performance Agreement

This BHPH Purchasing & Performance Agreement (this "**Agreement**"), is made and entered into on **01-29-2018** between **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST, ROBERT MCCOY JR., MISTY MCCOY, N/A, N/A** (hereinafter, "**Seller**"); and ACE MOTOR ACCEPTANCE CORPORATION, a North Carolina corporation (hereinafter, "**Purchaser**").

WHEREAS, Seller is engaged in the business of selling automobiles and owns certain rights to payment and other receivables from the financing of such sales (collectively, the "**Receivables**") which are evidenced by notes, automobile sales contracts, installment sales contracts, conditional sales agreements or similar instruments (collectively, the "**Evidences of Indebtedness**");

WHEREAS, Purchaser is in the business of buying Receivables and the corresponding Evidences of Indebtedness.

WHEREAS, Seller desires to sell and Purchaser desires to purchase certain of Seller's Receivables and the respective Evidences of Indebtedness upon the terms, provisions and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the promises, the mutual covenant herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   **Prior Agreements.** Except as otherwise set forth in this Section 1, this Agreement shall apply to any Receivables, Evidences of Indebtedness or Contracts (as defined below) acquired by Purchaser at any time before or after the date listed above. To the extent any Receivables, Evidences of Indebtedness or Contracts were acquired by Purchaser before the date listed above (a "**Prior Purchase**") under a prior "Legal Agreement - BHPH Purchasing & Performance," "Legal Agreement - BHPH Contract Servicing Agreement," "Legal Agreement - BHPH Purchasing & Service Agreement" or other agreement with Purchaser (a "**Prior Agreement**"), Purchaser may, at its sole discretion, provide a written addendum to this Agreement with regard to certain terms and conditions of the Prior Agreement which may continue to apply to such Prior Purchase.

2.   **Purchase and Sale.**

   2.1.   Sale of Receivables and Evidence of Indebtedness. Subject to the terms and conditions contained in this Agreement, from time to time while this Agreement remains in effect, Seller may propose the sale, assignment, and transfer to Purchaser of certain of Seller's Receivables and the corresponding Evidences of Indebtedness (collectively, a Receivable and its corresponding Evidence of Indebtedness shall be referred to as a "**Contract**"), and the Purchaser may, in Purchaser's sole discretion, purchase any such Contracts from Seller. Nothing contained in this Agreement shall be deemed to require Seller to sell or Purchaser to buy any Contract now or in the future. Any sale of Contracts may, at Purchaser's discretion, involve due diligence and verification efforts prior to purchase; provided, however, that Purchaser may rely upon representations and warranties made by Seller in purchasing a Contract. Each purchase of a Contract by Purchaser shall be deemed to be made in reliance upon representations and warranties made by Seller with regard to such Contract. The purchase price to be paid by Purchaser to Seller for the purchase and sale of a Contract shall be as set forth in Section 3 hereof.

   2.2.   Assignment of Security Documents and Insurance Policies. Upon the sale of each Contract, Seller shall assign, transfer, convey and deliver to Purchaser (or have said items assigned to Purchaser by any third party), all of Seller's (or such third party's) right, title, and interest in and to the Contract including, but not limited to, any and all of the following related to the Contract: credit or installment sales applications, account cards, records, forms, papers, security agreements, financing statements, the Evidences of Indebtedness, certificates of title and other forms of security for such Contract (collectively, the "**Security Documents**") held by Seller. Additionally, Seller (or the assigning third party) shall name and designate Purchaser as the sole loss payee and/or first beneficiary on all life,

Initials

**EXHIBIT**

A



disability, credit, collateral, property damage or loss insurance policies, and other insurance policies issued in connection with or relating to the Contract with respect to which a Seller is designated as a beneficiary or co-insured and/or the premiums on such policies were financed under the Contract, together with any and all rights to premiums that may be received upon termination of such policies (collectively the "**Insurance Policies**"). Once Purchaser has been named the sole loss payee and/or first beneficiary under the Insurance Policies, no change to the loss payee and/or beneficiaries of the Insurance Policies shall be made without the written consent of Purchaser. In addition, upon Purchaser's request, Seller will transfer ownership of any of the Insurance Policies to Purchaser or Purchaser's designee. Seller shall deliver simultaneously with the sale of each Contract the true complete and correct originals of and any amendments to all Security Documents and Insurance Policies.

2.3.　　Payments under Contracts. Seller shall turn over, remit and deliver to Purchaser 100% of any and all payments received by Seller which relate to amounts due pursuant to any Contract purchased by Purchaser within one (1) business day of Seller's receipt of the same. In addition, if so authorized by Purchaser, Seller shall post such payments to Purchaser's electronic "Contract Receivable System." Purchaser may also use the Weekly Settlement Sheet (as defined in Section 2.4 hereof) to reflect payments received by Seller in lieu of Seller being required to remit such payment to Purchaser, in Purchaser's sole discretion. Any/All insurance proceeds not applied toward repair of the vehicle shall be posted to the Vehicle Buyer's account as a principal reduction. Seller, its agents, servants and employees agree and acknowledge that it/he/she is not a collection agent for Purchaser, and any actions taken by any of them in such a respect are solely on its/his/her own behalf and volition unless otherwise specifically authorized in writing by Purchaser. With regard to the posting of payments in Purchaser's electronic "Contract Receivable System," Seller shall always post such payments using the date the actual payment was made by the Vehicle Buyer.

2.4.　　Weekly Settlement Sheet. Purchaser will provide Seller, via e-mail or other means determined by Purchaser, on a weekly basis a listing of all monies owed by Seller to Purchaser under this Agreement or any other agreement(s) between Purchaser and Seller including, without limitation, any Agreement for Line of Credit/Floorplan (a "**Floorplan**") and any BHPH Contract Servicing Agreement ("**Servicing Agreement**") (with such listing being referred to as a "**Weekly Settlement Sheet**"). The Weekly Settlement Sheet shall include a statement of monies due by Purchaser to Seller for the purchase of Contracts or otherwise pursuant to this Agreement or any other agreements between Purchaser and Seller less payments related to Contracts received by Seller, payments for Contracts required to be repurchased by Seller pursuant to this Agreement and any other amounts due by Seller to Purchaser pursuant to this Agreement, a Floorplan and any other agreement, including, without limitation any Performance Compensation, curtailment payments, advance fees or compensation pursuant to any Servicing Agreement ("**Servicing Compensation**").

If the Weekly Settlement Sheet indicates that Seller owes monies to Purchaser, Seller authorizes Purchaser to initiate an ACH or electronic withdrawal from Seller's bank account(s) for the payment of such amount due. In the event Seller blocks, refuses or otherwise interferes with such ACH or electronic withdrawal or transfer or should such electronic withdrawal or transfer not be honored by Seller's bank or otherwise fail, in whole or part, for any reason including, but not limited to, insufficient funds, such event shall be an "Event of Default" and Purchaser shall be entitled to exercise any remedy made available to Purchaser pursuant to this Agreement. In the event that any weekly ACH or electronic withdrawal from Seller's bank account(s) is not made in "good funds", Purchaser may deduct the sum of $ 200.00 from any compensation owed to Seller(s).

Initials



BHPH Purchasing &
Performance Agreement

If the Weekly Settlement Sheet indicates that Purchaser owes monies to Seller, Purchaser shall pay such amount to Seller by ACH transfer to Seller's bank account, which transfer shall be initiated within five (5) business days after the Friday of the week upon which such Weekly Settlement Sheet was issued. The failure by Purchaser to issue any Weekly Settlement Sheet or to pay any monies noted on any Weekly Settlement Sheet to Seller shall not constitute a breach of this Agreement unless Purchaser fails to cure such breach within a period of ten (10) business days after Purchaser receives written notice from Seller of such breach sent by certified mail, return receipt requested.

In the event that Seller believes the Weekly Settlement Sheet contains any misstatement, miscalculation, omission or other error, Seller has a period of thirty (30) calendar days from the date of such Weekly Settlement Sheet to provide written notice of such misstatement, miscalculation, omission or other error to Purchaser. To be effective, such written notice must include a description of the misstatement, miscalculation, omission or other error in reasonable detail to enable Purchaser to verify whether any misstatement, miscalculation, omission or other error has occurred. In the event that Seller does not provide any such written notice to Purchaser within such thirty (30) calendar day period, Seller shall be conclusively deemed to agree and acknowledge that such Weekly Settlement Sheet is correct, final and binding upon Seller and Seller will waive any and all rights to claims for any such misstatements, miscalculations, omissions or other errors.

2.5.   Non-assumption of Seller's Liabilities. Seller acknowledges and agrees that Purchaser is not assuming and shall not assume or become liable for any debt, obligation or liability of Seller by reason of any of the transactions contemplated by this Agreement, the assignment or assumption of any Contracts, by operation of law or otherwise.

2.6.   Delivery of Certain Other Documents. Seller shall, prior to the sale of a Contract to Purchaser, provide to Purchaser all deal/account documents related to such Contract (including, without limitation, any credit applications and credit bureau reports of the purchaser of the motor vehicle which is the subject of the Contract (the "**Vehicle Buyer**")) along with a purchase order or bill of sale for the motor vehicle which is the subject of such Contract (the "**Vehicle**"). Seller shall also provide Purchaser, within thirty (30) calendar days of the date of sale of such Contract to Purchaser, an original vehicle title or "Electronic Lien Title Transfer" document, satisfactory to Purchaser, denoting Purchaser as the first lien holder on each and every Vehicle where Purchaser has acquired the Contract related to such Vehicle. Seller may, at its discretion, and in writing, agree to be shown as an inferior lien holder to Purchaser on any Vehicle title. Purchaser may, in its discretion, require it to be shown as the first lien holder on a Vehicle prior to funding amounts to Seller with regard to such Vehicle.

2.7.   Starter Interruption Devices. If Seller has installed, utilized or has access to a starter interruption device, GPS unit or similar unit which has been installed or utilized on a Vehicle, then, prior to releasing said Vehicle to the Vehicle Buyer, Seller will give the required and proper disclosure of such action to each and every Vehicle Buyer. Further, such unit must be acquired from a vendor approved in writing by Purchaser. At all times Purchaser shall be provided the most current username and password to access the GPS unit's or similar unit's online portal, web, or internet access controls. If a Vehicle has a starter interruption device, GPS unit or similar unit installed on it, Seller will provide to Purchaser, any and all documents, forms or other items needed to transfer, upon an Event of Default by Seller pursuant to this Agreement or default or breach by Seller of any other agreement with Purchaser, all rights, ownership and ability to control or check on such starter interruption device, GPS unit or similar unit to Purchaser.

Initials



BHPH Purchasing &
Performance Agreement

Miscellaneous. If a service contract, GAP product or other service or product related to a Vehicle is sold by Seller to a Vehicle Buyer, Seller will submit full payment to the appropriate vendor providing such service contract, GAP product or other service or product on or prior to the tenth (10th) calendar day of the first full calendar month following the date of the sale of such contract, product or service to such Vehicle Buyer. At no time shall seller require the purchase of a service contract, Gap product, or other service or product as a condition of financing the vehicle purchase.

3. **Purchase Price of Contract.**

3.1.   Purchase Price. The purchase price of any Contracts purchased from Seller, including approved charges for any insurance, ancillary products or other services included in a Contract, shall be equal to **FIFTY** percent **(50%)** of the principal balance owed by the Vehicle Buyer pursuant to the Contract at the time of sale of such Contract to Purchaser. The purchase price may subsequently be changed with the written consent of Seller and Purchaser. For each Contract, Purchaser shall deduct from the amount due to Seller a boarding/processing fee of one hundred seventy-five dollars ($150.00) or such other amount as may be referenced in "Directives and Exclusions" (as defined in Section 30 hereof). This boarding/processing fee is to be retained by the Purchaser and shall be fully earned and non-refundable at the time of Purchaser's purchase of the Contract.

Seller shall convey to Purchaser each Contract purchased by Purchaser free and clear of all liens, charges, security interests, rights of first refusal, options, charging orders, reservations, restrictions, encumbrances and other defects in title, or other claims or rights of any third party (collectively, "**Liens**"). Moreover, prior to transferring a Contract to Purchaser, Seller shall pay off and satisfy in full any Liens or other obligations on the Vehicle(s) which are the subject of any Contract transferred to Purchaser. Purchaser may, at its sole discretion, pay off any interest of any third party in a Contract or any Vehicle which is the subject of any Contract transferred to Purchaser, and, in such event, the purchase price paid to Seller for any such Contract shall be reduced by any such amount paid to a third party by Purchaser.

3.2.   Performance Compensation. Purchaser and Seller agree that Seller's treatment of Vehicle Buyers and the reconditioning of vehicles by Seller, both prior to and subsequent to the sale of any such Contract to Purchaser, will affect the likelihood of the payment of Receivables by Vehicle Buyers. Provided (a) neither Seller nor any Guarantor is in default or breach of any provision of this Agreement or of any other agreement, current or prior, between Seller and Purchaser or Guarantor and Purchaser and (b) neither Seller nor any Guarantor has an open bankruptcy, files for bankruptcy protection, or has an involuntary petition in bankruptcy filed against it/him/her subsequent to the execution of this Agreement or any other Agreements between Seller and Purchaser or Guarantor and Purchaser, has made an assignment for the benefit of creditors or had a receiver appointed to manage its/hers/his affairs, then Purchaser shall pay to Seller **FORTY FIVE** Percent **(45%)** of the actual principal, interest and late fees owed to, paid to and received by Purchaser, in good funds, from Receivables related to Contracts (the "**Performance Compensation**"). If Seller is then using Purchaser's electronic "Contract Receivables Software" and has not failed at any time in the prior three (3) months to post any payments by the next business day following receipt, the Performance Compensation shall be paid on a weekly basis via credit to the Weekly Settlement Sheet and shall be calculated based on the actual eligible amount paid to and received by Purchaser during the preceding week, in good funds, from Receivables related to Contracts. If Seller is not then using Purchaser's electronic "Contract Receivables Software" or has failed to post payments by the next business day following receipt at any time in the prior three (3) months, the Performance Compensation may be paid on a monthly basis (on or prior to the 25th day of each following

Initials



BHPH Purchasing &
Performance Agreement

month) via credit to the Weekly Settlement Sheet and shall be calculated based on the actual principal, interest and late fees owed to, paid to and received by Purchaser, in good funds, during the preceding month from Receivables related to Contracts. No Performance Compensation shall be paid to the Seller with regard to payments received related to any "Non-Performing Contract" (as defined in Section 3.3) or related to any Contracts repurchased from Purchaser or to any Seller who, in the preceding ninety day (90) period, failed to timely post or turn over, to Purchaser, any payments noted in this paragraph.

3.3.    Repurchase of Contracts with Non-Performing Receivables. Seller agrees that as to (a) any Contract with any payment of Receivables which is fifty-three (53) or more days contractually past due; (b) any Contract where possession of any collateral for the Contract, including the Vehicle, has been obtained by Purchaser or Seller; (c) any Contract in which any Vehicle Buyer or guarantor of the Contract, in whole or in part, has filed for bankruptcy protection, had an involuntary petition in bankruptcy filed against it/him/her, or made an assignment for the benefit of creditors; (d) any Contract where the Vehicle Buyer applies for or is granted relief from the obligations, in whole or in part, of the Contract or any other contract related to the purchase of the Vehicle by the Vehicle Buyer; or (e) any Contract otherwise deemed to be a non-performing in accordance with this Agreement (with any Contract described in (a) – (e) being referred to as a "**Non-Performing Contract**"). Seller shall purchase any such Non-Performing Contract from Purchaser on the following terms. In the event that a Contract becomes a Non-Performing Contract as a result of an event described in (b) – (e) above, Seller shall immediately send written notice to Purchaser of such Contract becoming a Non-Performing Contract via e-mail to repo@acemotoracceptance.com. Non-Performing Contracts shall be repurchased via the Weekly Settlement Sheet immediately upon the Contract becoming a Non-Performing Contract. The purchase price to be paid by Seller for a Non-Performing Contract shall be equal to: (i) **FIFTY** percent (**50%**) of the total balance then owed pursuant to the Non-Performing Contract including, but not limited to, the principal unpaid balance and any accrued interest, finance charges, and costs as of the date of such payoff, all as determined by Purchaser; plus (ii) an amount equal to all fees and expenses incurred by Purchaser related to the Non-Performing Contract including, without limitation, returned check fees, repossession fees, storage fees, title fees, any fees associated with the collection of unpaid fees from the Vehicle Buyer, legal fees, and fees related to the recovery and liquidation of any collateral. In the event of any failure of Seller to purchase any such Non-Performing Contract from Purchaser as set forth in this Section 3.3, Purchaser, at its sole discretion, shall be entitled to offset any amounts payable by Seller pursuant to this Section 3.3 against any funds owed from Purchaser to Seller and may make such offset on the Weekly Settlement Sheet. No Performance Compensation or Servicing Compensation shall be paid to Seller for any Non-Performing Contract.

3.4.    Voluntary Repurchase of Contract by Seller. Provided Seller is in full compliance with all terms of this Agreement and any and all other agreements currently or previously in force between it and Purchaser, and subject to the provisions of this Section 3.4, Seller may, from time to time, purchase from Purchaser any Contract designated by Seller for a purchase price equal to the sum of: (i) **FIFTY** percent (**50%**) of the balance then owed on the Contract including, but not limited to, the principal unpaid balance and any accrued interest, finance charges, and costs as of the date of such payoff, all as determined by Purchaser; plus (ii) an amount equal to all fees and expenses incurred by Purchaser related to the Contract; plus (iii) a fee of $300.00 per Contract repurchased. No Performance Compensation shall be paid to Seller for any Contract purchased from Purchaser. In addition, for each Contract purchased from Purchaser by Seller pursuant to this Section 3.4, Purchaser may designate, at its sole discretion, one additional Contract which Seller shall be required to simultaneously purchase from Purchaser for a purchase price equal to the sum of: (i) **FIFTY** percent (**50%**) of the balance then owed on the Contract including, but not limited to the principal unpaid balance and any accrued interest, finance charges, and

Initials



BHPH Purchasing &
Performance Agreement

costs, all as determined by Purchaser; plus (ii) an amount equal to all fees and expenses incurred by Purchaser related to the Contract; plus (iii) a fee of $300.00 per Contract repurchased. The failure by Seller to simultaneously purchase the Contract designated by Purchaser pursuant to this Section 3.4 shall void Seller's right to purchase the corresponding Contract designated by Seller for purchase pursuant to this Section 3.4. Any repurchase of a Contract from insurance proceeds related to the Vehicle which is the subject of such Contract or from the proceeds of a Vehicle Buyer's early repayment shall not be deemed a "Voluntary Repurchase" subject to this Section 3.4.

3.5.  Sale of Contract by Purchaser. Purchaser shall have the right to sell or assign any and all Contracts to any third party, in its sole discretion, at any time upon fourteen (14) days prior notice by Purchaser to Seller. Upon such sale, any right of Seller to repurchase such Contract pursuant to Section 3.4 hereof shall immediately terminate. For each Contract sold by Purchaser to a third party, Seller shall receive a credit related to such Contract equal to the funds received less the price for which the seller could have repurchased such Contract pursuant to Section 3.4. When multiple contracts are sold at the same time, any all credits and shortages shall be netted prior to any credit being paid to Seller. Provided that any contracts sold to a third party required Purchaser to sign any recourse or other contingent liability the credit shall be held until such recourse and/or liability period has expired or been satisfied for all contracts that were sold. Such credit may be paid by Purchaser to Seller or held by Purchaser to be set-off against other obligations of Seller to Purchaser. In any event the amount of such credit and whether such credit will be paid to Seller or held by Purchaser will be reflected in the Weekly Settlement Sheet. Should the sale price on any Contract or group of Contracts be less than the price for which the seller could have repurchased such Contract pursuant to Section 3.4, seller shall immediately pay the difference. Seller shall be paid no Performance Compensation or Servicing Compensation with regard to any Contract sold by Purchaser. In addition, Seller shall have no obligation to repurchase or otherwise guaranty the payment or performance of such Contract pursuant to this Agreement after the expiration of the recourse period set in connection with the sale of such Contract to a third party which period shall not exceed ninety (90) calendar days from the date of such sale.

4.  **Representations and Warranties.** Seller makes the following representations and warranties to Purchaser intending that Purchaser rely upon each representation and warranty in order to induce Purchaser to enter into and complete the transactions contemplated by this Agreement. Each representation and warranty shall apply to each Contract purchased pursuant to the terms of this Agreement, shall be deemed remade in its entirety each time a Contract is purchased by Purchaser and shall survive the termination of this Agreement.

4.1.  Seller is duly organized, validly existing and in good standing under the laws of each state in which it is organized or qualified to do business.

4.2.  Compliance. Seller, its agents, servants, employees, independent contractors and related finance companies shall comply with all federal, state and local rules, regulations, statutes, laws, licensing requirements, ordinances and other governmental requirements or directives ("Laws") applicable to the servicing and collection of Contracts and the debts evidenced by Contracts including, without limitation:

(a)  Laws of each state and each jurisdiction in which any Contract was made;

(b)  Laws applicable to the sale of a Vehicle subject to any Contract;

(c)  Laws applicable to the origination, servicing, and enforcement of any Contracts including, but not limited to, Laws relating to usury, the Truth-In-Lending Act and Regulation Z, the Equal

Initials



Credit Opportunity Act and Regulation B, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, Federal Trade Commission rules (such as the "Red Flag Rules"), Consumer Finance Protection Bureau rules and any other consumer protection, equal credit opportunity, fair debt collection or similar Laws whether existing now or in the future; and

(d)     Laws regarding vehicle repossession, including any Laws regarding notices that are required prior to or after a Contract is repurchased by Seller from Purchaser.

Seller hereby represents and warrants to Purchaser that all of its employees, contractors, agents, servants and representatives have been properly trained with regard to all applicable Laws and all other requirements related to any activities of any such person pursuant to this Agreement or otherwise. Seller hereby agrees and acknowledges that it is and shall be liable to Purchaser for any and all violations of any applicable Laws by Seller or its employees, contractors, agents, servants or representatives. If, in Purchaser's sole discretion, Purchaser determines any such person is inadequately trained, Purchaser may require additional training of any or all such persons prior to any such person engaging in any activities on behalf of Seller or Purchaser pursuant to this Agreement, the PPA, a Floorplan of any other agreement between Purchaser and Seller.

Purchaser shall have the right to audit Seller upon twenty-four hours prior written notice regarding Seller's compliance with any agreement with Purchaser or with any Law.  Seller agrees to provide to Purchaser any and all access required to perform such an audit at any time.

Seller must maintain a "Customer Complaint Management System" with regard to the servicing of the Contracts which complies with all applicable laws including, but not limited to, Consumer Finance Protection Bureau rules and any other consumer protection, equal credit opportunity, fair debt collection or similar Laws whether existing now or in the future.  Seller shall provide written notification to Purchaser with regard to the status of any and all customer complaints and resolutions to those complaints as Purchaser may request in its sole discretion.  In addition, Seller shall provide written notification to Purchaser with regard to any customer complaints which are not resolved within thirty (30) calendar days of the date such complaint was received by Seller.  Seller hereby authorizes Purchaser to, and Purchaser reserves the right to, contact any and all Vehicle Buyers or other parties to a Contract at any time and for any reason.

4.3.     Seller has full power and authority to sell, transfer, deliver and convey each and every Contract to Purchaser, and all necessary actions by Seller to authorize the execution and delivery of this Agreement and to sell, transfer, deliver and convey each and every Contract to Purchaser have been duly taken. This Agreement constitutes a valid, binding and enforceable obligation of Seller.

4.4.     Seller is authorized to sell, assign, transfer and deliver each Contract to Purchaser without restriction of any kind and such sale, assignment, and transfer will not violate, contravene, conflict with, or result in a breach or default, or any event that, with the giving of notice or the passage of time or both, would constitute a breach of or default of any of the terms, conditions or provisions of: (i) any contract, agreement, loan, extension of credit, floor financing plan, other credit facility or obligation to which Seller is a party; (ii) any charter, bylaw, statute, rule, regulation, order, ordinance, decree, or judgment applicable to or binding on the Seller; or (iii) any instruments to which any of the Seller's assets or properties are subject.

Initials



BHPH Purchasing &
Performance Agreement

4.5.  Each Contract to be sold under the terms of this Agreement was originated by the Seller in the ordinary course of business.

4.6.  Seller owns and has good and valid title to each of the Contracts and the corresponding Security Documents and Insurance Policies, free and clear of all Liens with the exception of titles held by approved floorplan companies where the vehicle will be paid off within fourteen (14) calendar days of the date of sale of the vehicle.

4.7.  Each of the Contracts to be sold under the terms of this Agreement is secured by title to, security interests in, or liens on, a motor vehicle under applicable provisions of the motor vehicle code or, other similar laws of the jurisdiction in which the motor vehicle is titled and registered. Seller represents and warrants that it has a first priority security interest and lien in each Contract and Vehicle and that it will secure such first priority security interest and lien for Purchaser, within thirty (30) calendar days of the purchase of the applicable Contract by Purchaser. Purchaser reserves the right to require Purchaser's first priority security interest and lien to be secured prior to releasing funds to Seller. All financing statements required to be filed under the Uniform Commercial Code or other applicable law of any state to perfect the priority of the security interests in the Vehicle(s) subject to each Contract have been duly filed and have not expired. All filings with the registrar of motor vehicles or any other appropriate authority and all notations on any certificates of title necessary to perfect a first priority security interest in the Vehicles subject to the Contracts have been duly filed, recorded, registered and made.

4.8.  Seller is transferring to Purchaser good and valid title to each Contract and a valid and perfected first priority security interest in the Vehicle subject to each Contract.

4.9.  There has not been: (i) any event of insolvency of Seller in the past five (5) calendar years and Seller is not currently insolvent, (ii) the appointment of a receiver, trustee, custodian, conservator or liquidator or other official for any part of a property or assets of Seller, (iii) any assignment for the benefit of creditors of Seller, (iv) any filing of a petition in bankruptcy of Seller, or (v) the commencement of any proceeding under bankruptcy laws, or insolvency laws by or against the Seller or any Vehicle Buyer.

4.10.  The sale of the Contracts pursuant to the terms of this Agreement is not intended to and shall not: (a) hinder, delay, or defraud any person to which the Seller is now or shall become indebted; (b) otherwise cause a fraudulent transfer or preferential transfer under any applicable law; or (c) otherwise limit the likelihood that any of the Seller's creditors shall be paid in full. The sale of the Contracts does not and will not constitute a sale of all or substantially all of the Seller's assets or otherwise require compliance with the bulk transfer laws of Seller's state of organization, any state where Seller conducts business or the state in which the Vehicles are titled.

4.11.  Each Contract, together with the corresponding Security Documents securing the Contract, is made for full and valuable consideration. The Security Documents pertaining to each Contract constitute valid, binding and enforceable obligations and indebtedness of the respective Vehicle Buyer. Each Vehicle Buyer has possession and title to all of the property enumerated or described in the corresponding Contract and has granted to Seller a first priority security interest in the Vehicle. Each Vehicle Buyer is correctly described by name as the borrower or debtor in the respective Security Documents and financing statements.

4.12.  No Contract shall be subject to any offset, discount, counterclaim, dispute or any other defense including, without limitation, usury, unrecorded credits, lack of consideration, fraud, violations of Truth-

Initials



in-Lending or any other Federal, state, or local laws applicable to such Contract. No Contract shall contain any forgery, alteration or undisclosed agreements with persons named therein or any other third parties. All payments recorded or being credited under each Contract shall have actually been paid by the Vehicle Buyer and received by Seller.

4.13.    The ledger cards and other books, records and documents relating to each Contract fairly, accurately and completely set forth the name and last known address of the respective Vehicle buyer, the terms of the Contract, the amount initially and presently outstanding thereon, the amount of all payments made on such Contract and the dates on which payments were made, and the security, if any, for each Contract.

4.14.    There are no defaults or events which, with notice or the passage of time or both, would result in a default under any Contract, and Seller has not received notice of any claimed default or any dispute with respect to any Contract.

4.15.    To Seller's knowledge, there are no facts, events or occurrences, which may in any case impair the validity, collection or enforcement of any Contract or reduce the amount payable under any Contract.

4.16.    Seller has provided the service and/or has delivered property for which the Vehicle Buyer contracted.

4.17.    There are no set offs or counterclaims against any Contract in favor of any party other than Seller and no representations, promises, or inducement have been made or other charges imposed other than those described in the Contract.

4.18.    The consideration charged to the Vehicle Buyer represents a fair and reasonable price for the services rendered, to be rendered, or property delivered.

4.19.    The selling price to the Vehicle Buyer includes no charges which are not also imposed upon buyers whose contracts, receivables, and evidences of indebtedness are not sold to Purchaser.

4.20.    The Contract shall be conclusive evidence that said endorsement is for value received.

4.21.    Each Contract is valid and binding, enforceable in accordance with its terms, and is the sole Contract for the Vehicle which is the subject thereof. Each Contract delivered to Purchaser consists of the original documentation, duly executed by the Vehicle Buyer. The Vehicle Buyer for each Contract has legal capacity to contract and is not a minor.

4.22.    Each Vehicle which is the subject of a Contract has been delivered in good and operable condition.

4.23.    Upon the sale of each and every Contract to Purchaser, Seller represents, warrants, promises, guarantees, covenants, and agrees that Seller has either previously titled and registered the Vehicle denoting the Purchaser as the first-priority lien holder of such Vehicle or will register the Vehicle within thirty (30) calendar days of the date of Purchaser's purchase of the Contract denoting the Purchaser as the first-priority lien holder of such Vehicle.

4.24.    The purchase price of vehicle accessories, service contracts, warranties, GAP protection and similar related services and products is the fair market value of such goods and services, is not overstated or inflated in any way, and (except for GAP protection) represents the price for such goods and services received by Seller in all other sales of such goods or services. Seller has not required and will not

Initials



BHPH Purchasing &
Performance Agreement

require the purchase of ancillary products or services, and the Seller has presented all such purchases as an option rather than a condition of the sale and/or financing agreement of the Vehicle.

4.25. Each Vehicle which is the subject of a Contract has all of the equipment and accessories as represented to Purchaser on the credit application or other such documents submitted to Purchaser at the time of sale of such Contract to Purchaser.

4.26. Each credit bureau report submitted by the Seller with the credit application or other documents required to be delivered by Seller to Purchaser related to a Contract is the true and original credit bureau report as received by Seller from the credit bureau agency. Each credit bureau report accurately identifies the Vehicle Buyer and accurately sets forth the Vehicle Buyer's credit information.

4.27. Information contained in the Vehicle Buyer's application for credit is true to the best of the Seller's knowledge.

4.28. Seller has no notice or knowledge of denial of liability by the Vehicle Buyer pursuant to or regarding the Contract.

4.29. Seller will not represent and has not represented to any Vehicle Buyer that the contractual interest rate is the best or lowest rate available. Seller will not represent and has not represented to any Vehicle Buyer that Seller will arrange the best available financing or interest rate.

4.30. Seller has given all required and proper disclosure to each and every Vehicle Buyer who has purchased a Vehicle that has a starter interruption device, GPS unit or similar unit installed in such Vehicle.

4.31. All information including, but not limited to, customer payment histories and customer financial records that is submitted to Purchaser related to a Contract is true, complete and correct to the best of Seller's knowledge.

4.32. Seller warrants that all information regarding Seller and the Guarantors which is supplied to Purchaser including, but not limited to, personal and corporate financial statements, are true, complete and correct.

4.33. Seller shall not report credit information to any credit bureaus on any Customers related to any Contract that has been sold to Purchaser other than reporting that the contract was sold.

4.34. Seller shall not represent to customer that Seller or Purchaser will report credit information to any credit bureaus subsequent to sale of Contract to Purchaser.

5. **Default and Remedies.** In addition to the other events set forth in this Agreement as an "Event of Default," "default" or "breach," the occurrence of any one or more of the following events shall constitute an "Event of Default": (a) the failure of Seller or any Guarantor to comply with any provision of this Agreement; (b) the failure of Seller or any Guarantor to make any payment on the date on which such payment is due; (c) the inability of Seller or any Guarantor to pay its debts as they become due; (d) the filing of any petition for relief under any provision of Title 11 of the United States Code (entitled "Bankruptcy"), as amended, or under any similar federal or state statute by or against Seller or any Guarantor; (e) the application for the appointment of a receiver or custodian for, the making of a general assignment for the benefit of creditors by, or the insolvency of the Seller or any Guarantor; (f) the default by any Guarantor under any agreement with Purchaser or its affiliates; (g) the default by Seller under any other agreement with Purchaser or its affiliates; (h) the death, termination of existence, or dissolution of Seller or any Guarantor; (i) the failure of any representation or warranty of Seller or Guarantor to remain true, correct, complete and accurate at all times

Initials



BHPH Purchasing &
Performance Agreement

during the term of this Agreement which failure is not cured, if curable, within ten (10) days of the receipt of written notice from Purchaser; (j) the entry of a judgment for the payment of money against Seller or any Guarantor which remains unsatisfied, in whole or in part, for a period of more than ten (10) days from the date of entry; (k) the impairment of Seller's or any Guarantor's ability to repay amounts owed to Purchaser as the same become due, determined in Purchaser's sole discretion; and (l) the occurrence of any other event or circumstance which causes Purchaser to deem itself or the collateral for the Contracts or Seller's obligations hereunder insecure or at risk. In the event of any Event of Default, Purchaser shall have any and all remedies available to it at law or in equity, as well as those remedies set forth in this Agreement and the Servicing Agreement.

**Seller waives any right to notice of or presentment of any instances of default.**

In addition to those remedies available to it at law or in equity or as otherwise set forth in this Agreement, Purchaser shall have the following remedies upon an Event of Default:

> (a) Purchaser may designate the affected Contract(s) as Non-Performing Contract (and upon such designation by Purchaser, each such Contract shall be deemed to be a Non-Performing Contract) and require the same to be purchased by Seller in accordance with Section 3 hereof.

> (b) Purchaser may designate any or all Contract(s) as a Non-Performing Contract (and upon such designation by Purchaser, each such Contract shall be deemed to be a Non-Performing Contract) and require the same to be repurchased by Seller in accordance with Section 3.4 hereof.

> (c) Upon Purchaser demand, Seller shall pay to Purchaser an amount equal to all losses and expenses incurred by Purchaser as a result of the Event of Default including, but not limited to, Purchaser's reasonable attorneys' fees and costs of enforcement of this Agreement.

> (d) Purchaser shall no longer be required at its sole discretion to accrue or pay any performance compensation to Seller.

Any Event of Default hereunder shall constitute a breach and default of each and every other agreement to which Seller and Purchaser are parties, including, without limitation, any Line of Credit Agreement/Floorplan or Servicing Agreement.

6.      **Contingent Contracts.** If, with respect to any Contract, Seller is not in possession of, or is unable to deliver, the Vehicle title duly issued to the Vehicle Buyer with the Purchaser shown as the "First Lien holder" (hereinafter a "**Complete Certificate of Title**") (any such Contract for which a Complete Certificate of Title is not delivered shall hereinafter referred to as a "**Contingent Contract**"), Seller may deliver to Purchaser a certificate certifying to Purchaser that: (a) an application seeking a Complete Certificate of Title has been properly filed; (b) such application has not been rejected or denied explicitly or by implication; and (c) the unavailability of such Complete Certificate of Title is due solely to a fact that the same is being processed by motor vehicle registration authorities. The Purchaser may, at its sole election and in reliance upon Seller's certificate, consummate the purchase of the Contingent Contract provided, however, that payment of the purchase price for any such Contingent Contract shall not be required until such time as is described in this Section 6. If Seller delivers to Purchaser a Complete Certificate of Title or an Electronic Lien Title Transfer with respect to a Contingent Contract within 30 calendar days of the purchase of such Contingent Contract and all representations and warranties regarding such Contingent Contract remain true at such date, Purchaser shall purchase such Contingent Contact under the terms of this Agreement and the Purchaser shall remit the Purchase Price for the purchased Contingent Contract(s) to Seller as set forth in Sections 2 and 3 hereof for the purchase of Contracts. Upon delivery of the Complete Certificate of Title to Purchaser, all payments made on the Contingent Contract subsequent to

Initials ___



BHPH Purchasing &
Performance Agreement

the purchase of such Contingent Contract by Purchaser which are retained by Seller shall be delivered to the Purchaser and applied against such Contract's indebtedness.

7.   **Collections.**

7.1.   Seller agrees that Purchaser is to service accounts and any and all payments for monies owed under the Contracts are to be made directly to Purchaser. If the Seller is set up with Purchaser to use the Purchaser's electronic "Contract Receivables Software" to post payments, then Seller may accept payments, and one hundred percent (100%) of the amount(s) received by Seller must be posted via Purchaser's electronic "Contract Receivables Software" within one (1) business days of Seller's receipt of the same. Payments collected the last day of the calendar month must be posted that day no later than 8 o'clock pm Eastern Standard Time. Any/All insurance proceeds not applied toward repair of the vehicle shall be posted to the Vehicle Buyer's account as a principal reduction. If Seller breaches any provision of this paragraph, Seller shall direct that all payments be made to Purchaser and shall not accept any payments for monies owed pursuant to any Contract.

7.2.   Seller shall immediately notify Purchaser in writing of any dispute with respect to any Contract which may or could affect Purchaser's ability to collect payment(s) on such Contract.

7.3.   Seller shall be responsible for all insurance verification and tracking with regard to each Vehicle and is hereby authorized to act as Purchaser's agent for the purposes of such verification and adding Purchaser as a loss payee pursuant to such insurance.

7.4.   Purchaser shall have the right in its sole and absolute discretion to settle, adjust, compromise, extend, renew, discharge or release any claims under any of the Contracts and to repossess and otherwise enforce claims against the Vehicles which serve as collateral for the Contracts. Seller shall not, without Purchaser's prior written consent, settle, adjust, compromise, extend, renew, discharge or release any claims under any Contracts.

7.5.   Seller shall allow Purchaser, its agents, servants and employees, during regular business hours, full and complete access, both in person and remotely, to (a) Seller's system(s) which reflect amounts paid to, owed to or collected by Seller related to the Contracts or any contracts, receivables, or Evidences of Indebtedness offered to Purchaser by Seller and (b) to any GPS or starter interruption device (and such device's manufacturer, company, seller or servicer). Seller grants full and complete access to Purchaser to all programs, reports and identifications for any and all computer programs utilized by Seller in the handling, tracking, servicing or review of any and all Contracts, Vehicles or any related collateral. Seller shall provide to Purchaser all passwords or pass codes for any of the foregoing and hereby authorizes Purchaser's use of such passwords or pass codes. Seller shall also authorize any third parties requested by Purchaser, in Purchaser's sole discretion, including, without limitation, Seller's accountants and tax preparers, to share any information such third party may have regarding Seller including, without limitation, and inventory and floorplanning documentation and information and financial and tax-related information.

8.   **Repossession and Storage.** Seller agrees to request and receive authorization from Purchaser in writing prior to Seller repossessing of any Vehicle. Such authorization may be requested by e-mail to Purchaser at repo@acemotoracceptance.com in accordance with the notice provisions of this Agreement. After vehicle has been repossessed, Seller must notify the Purchaser immediately that the vehicle has been repossessed by e-mail to Purchaser at repo@acemotoracceptance.com and Purchaser will send the Vehicle Buyer a notice of repossession. A copy of any such notice of repossession sent by Purchaser may be requested on an individual Vehicle-by-Vehicle basis by Seller.

Initials



BHPH Purchasing &
Performance Agreement

Seller may charge reasonable and customary storage and repossession fees (for up to five (5) calendar days) to any Vehicle Buyer. Purchaser shall not be liable to Seller or otherwise responsible for the payment of any such fees. Further, any liens, security interests or the like which may arise with regard to the Vehicle or the Contract as a result of such fees shall be subordinate to the interests of Purchaser in such Vehicle and Contract, and such fees shall not be paid to Seller unless and until Purchaser is paid in full in accordance with the terms of this Agreement and the Contract. Any repossession or storage, without the prior written permission or consent of Purchaser, shall be an unpermitted act and be at the full legal liability of Seller, its agents, servants or employees.

9.      **Further Assurances.** Seller agrees to execute and deliver to Purchaser such instruments of assignment, transfer, financing statements and instruments of further assurances which are reasonable and to take such other actions as Purchaser may require including, without limitation, (i) executing and filing with the registrar, motor vehicles or any other authority responsible for issuing certificates of title and noting security interests thereon, an application or other document requesting the notation or other indication of the security interest on such certificate of title and delivering to the Purchaser copies of all such applications or other documents filed and copies of all certificates of title indicating the security interest, and (ii) executing and filing such financing, continuation statements, or amendments thereto, or termination statements, and such other instruments or notices as the Purchaser may reasonably deem necessary or desirable, in order to perfect and preserve the interest in the Contracts assigned to Purchaser and the security interests granted to Purchaser.

10.     **Indemnification.** Seller shall indemnify, defend, reimburse, and hold Purchaser, its officers, directors, employees, agents, servants and representatives harmless from, against, and with respect to any damage, liability, claim, loss, deficiency, penalty, obligation, cost, fine, amount paid in settlement, and any expense, including reasonable attorneys' fees, disbursements and other costs including costs, fees and expenses for any proceeding (whether mediation, arbitration or civil or criminal litigation) at the trial and appellate levels, and for collection or enforcement of any judgment award or other relief granted, and those arising from the enforcement of this Agreement occasioned by, arising out of, or resulting from, either directly or indirectly: (i) any and all claims against and liabilities of Seller of every kind, nature and description, absolute and contingent, including, without limitation, those arising from or in any way connected with the business and operations of Seller; (ii) any and all claims against Seller by any Vehicle Buyer; (iii) any breach of this Agreement by Seller, including, without limitation, any breach of any representation, warranty, or covenant of Seller contained in this Agreement; (iv) a breach of any of the Seller's servicing and collection obligations; (v) a breach of any of the obligations of the Guarantor of this Agreement or any guaranty related to this Agreement; (vi) any Event of Default; or (vii) any actions or omissions of Seller related to collection of amounts owed from a Vehicle Buyer or realization upon any collateral for any Contract.

11.     **Duty to Remit Payments.** In the event that Seller shall come into possession of any payments received with respect to any Contract or payment under any insurance policies related to any Contract or collateral securing any Contract, it shall within one (1) business days of receipt of the same post to Purchaser's electronic "Contract Receivable System" or otherwise turn over, remit and deliver to Purchaser all of such funds received without deduction or offset. Seller may NEVER render its own payment to Purchaser, on behalf of any retail customer or consumer under any circumstance. Seller, its agents, servants and employees acknowledge and agree that it/he/she is not a collection agent for Purchaser and any actions taken in such a respect are solely on its/her/his own behalf.

12.     **Payment of Certain Taxes.** Seller shall be solely responsible for any and all taxes, fees and other charges which shall become due or shall have accrued (i) on account of the operation and conduct of the Seller's business or (ii) on account of the consummation of the transactions contemplated by this Agreement and the sale, assignment, or purchase of any Contract. Nothing herein shall be construed to require the Seller to be responsible for any taxes due and payable by the Purchaser.

Initials ____



BHPH Purchasing &
Performance Agreement

**13.** <u>Recourse of Seller.</u> It is understood and agreed that all Contracts purchased by Purchaser pursuant to this Agreement are assigned, transferred and conveyed to Purchaser with recourse. In the event that a Vehicle Buyer defaults under or breaches a Contract, Purchaser may designate such Contract as a Non-Performing Contract (and upon such designation by Purchaser, each such Contract shall be deemed to be a Non-Performing Contract) and require the same to be purchased by Seller in accordance with <u>Section 2.3.</u> If Seller fails to purchase any Non-Performing Contract within ten (10) calendar days after Purchaser provides notification of such failure, Seller shall pay the full amount due by the Vehicle Buyer pursuant to such Contract to the Purchaser immediately and with no exceptions.

**14.** <u>Power of Attorney.</u> Seller shall provide a power of attorney appointing Purchaser, its officers, agents, representatives, successors and assigns, as the true and lawful attorney-in-fact and agent of Seller, pursuant to the terms and conditions of Purchaser's power of attorney form.

**15.** <u>Rights of Inspection.</u> During the term of this Agreement, the Floorplan and the Servicing Agreement, if any,: (a) Purchaser shall have the right, both in person and remotely, to inspect the books and records of Seller during normal business hours upon reasonable notice to determine Seller's full compliance with the terms of the Agreement; (b) Purchaser, or its designated third parties, shall have the right to inspect all vehicles on Seller's premises at any time without prior notice; (c) Seller shall provide to Purchaser copies of its income statement and balance sheet upon Purchasers request; (d) each year, Seller shall provide to Purchaser copies of Seller's filed Federal Income Tax Return, including all schedules and exhibits thereto, as soon as such return is filed with the Internal Revenue Service, alternatively at Purchasers sole discretion, may require Seller to provide form 4506-T "Request for Transcript of Tax Return" (e) Seller shall provide to Purchaser such other information concerning Seller or the Contracts as Purchaser shall reasonably request (f) Seller shall have the right to use electronic Bluetooth devices to monitor the inventory of Seller and the location of any vehicle whose contract was sold under this agreement and (g) should any customer/consumer allow his/her insurance to lapse, Seller, upon notice from Purchaser, shall make direct contact with the customer/consumer to reinstate the insurance and to update AMAC, of the same, on a daily basis.. Seller hereby authorizes all third parties including, without limitation, Seller's accountants and tax preparers, to share any information requested by Purchaser which such third party may have regarding Seller including, without limitation, any inventory and floorplanning documentation and information and financial and tax-related information.

**16.** <u>Remedies Cumulative.</u> All remedies of Purchaser provided in this Agreement, or at law or in equity, shall be deemed to be cumulative and not exclusive, and the exercise or enforcement of any one or more remedies shall not preclude the exercise or enforcement of that remedy or any other remedy or remedies. Purchaser's remedies may be exercised singularly, cumulatively, and/or successively.

**17.** <u>Brokers.</u> Seller represents and warrants that it has not employed or utilized the services of any broker or other third party in connection with this Agreement or transactions contemplated hereby. Seller agrees to indemnify, reimburse, defend and save Purchaser harmless from and against the claims of any broker or other third party claiming to have acted on behalf of any party to this Agreement.

**18.** <u>Notices.</u> Any and all notices, elections or demands permitted or required to be made under this Agreement shall be in writing, signed by the party giving such notice, election or demand, and shall be deemed received by the other party at the earlier of (a) actual receipt if personally delivered; (b) the next business day after such notice is sent if sent via overnight courier; (c) the date such notice is faxed provided the sender's fax confirmation sheet shows completed transmission of such fax; (d) the date such notice is sent via e-mail; or (e) the date deposit in the United States mail, sent certified or registered mail, return receipt requested, postage prepaid and addressed as set forth below (or to such other address as may be designated by written notice to the other party):

Initials



BHPH Purchasing &
Performance Agreement

If to Seller:
**MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST**
**3606 HWY 51**
**FORT MILL, SC 29715**

Tax ID number: **26-2965015**
Fax: (- ) -2752
Email: **mccoymotors@live.com**

If to Purchaser:
Ace Motor Acceptance Corp.
111 Cupped Oak Drive, Suite F
Matthews, NC 28104

Notwithstanding the foregoing, all notices by Seller must be sent by United States mail, certified or registered mail, return receipt requested, postage prepaid and addressed to Purchaser unless the specific provision of this Agreement permits notice to be provided by Seller in another method. Such restriction shall not apply to Purchaser. However, Purchaser shall send any notices of a default of this Agreement by Seller to Seller by United States mail, certified or registered mail, return receipt requested, postage prepaid and addressed to Seller.

19.    **Headings.** The section and other headings contained in this Agreement are solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

20.    **Release.** Seller, each Guarantor, and their officers, directors, employees, agents, servants, heirs, successors, assigns, and representatives, hereby release, dismiss, remise, abandon and/or otherwise forego, Purchaser, and its affiliated companies, partnerships, collective, predecessors, successors, subsidiaries, present and former affiliates, divisions and departments, members, employees, legal representatives, heirs, assigns, agents and servants, and its past, present, and future principals, agents, servants, employees, employers, partners, assignees, heirs, and devisees (collectively, the "**Releasees**") from any and all past and present claims, demands, obligations or causes of action for compensatory or punitive damages, costs, losses, expenses, attorneys' fees, investigative expenses, and compensation, whether based on tort, contract, or other legal or equitable theories of recovery, whether known or unknown, which Seller and any Guarantors currently have or may have had against any of the Releasees related to any promises, guaranty, contractual obligations or other obligation arising from any and all dealings with any Releasees. In the event that Seller and Purchaser enter into any additional agreements including, but not limited to, a Floorplan or Servicing Agreement, the release in this Section 20 shall be deemed to have been remade by Seller and each Guarantor as of the date of such other agreement(s) as if it had been set forth in its entirety in such other agreement(s).

21.    **Waivers.** No waiver of any provision of this Agreement, in part of in whole shall be effective unless in writing, addressed and delivered to the other party and duly signed on behalf of the party against whom, the waiver is sought to be enforced. Any waiver so granted shall apply solely to the event occasioning the necessity for a waiver and with respect only to the specific provision applicable the waiver, but shall not apply to any other events or to any reoccurrence of the same or similar events nor to any other provisions hereof. The failure, by Purchaser or Seller, except by writing as specified above, to exercise any one or more of the provisions of this Agreement, on single or multiple occasions and at any time, shall not constitute a modification or waiver of the terms of this Agreement, and Purchaser or Seller may enforce any such provision at any time thereafter.

22.    **Severability.** In the event that any term or provision of this Agreement shall be determined to be superseded, invalid, illegal or otherwise unenforceable pursuant to applicable law by a court having jurisdiction, that determination

Initials



BHPH Purchasing &
Performance Agreement

shall not impair or otherwise affect the validity, legally or enforceability of the remaining terms and provisions of this Agreement.

**23.     Binding Agreement; Assignment.** This Agreement shall be binding upon the parties hereto and their successors and assigns. The Purchaser may assign this Agreement at any time without prior notice or approval of Seller. Seller may not assign its rights, duties and responsibilities under the terms of this Agreement without the prior written approval of Purchaser which shall not be unreasonably withheld.

**24.     Attorney Fees.** In the event of the institution of any proceeding based upon a breach of any of the terms or conditions of this Agreement and if Purchaser prevails, Purchaser shall be entitled to reimbursement for all reasonable attorneys' fees, court costs and other expenses incurred in connection with such enforcement or proceeding at arbitration or at the trial and/or appellate levels, as well as for all costs, fees and expenses incurred to collect or enforce any award, judgment or other relief granted. In no case shall Seller be entitled to reimbursement for any attorneys' fees, court costs or any other expenses incurred in connection with such enforcement or proceeding at arbitration or at the trial and/or appellate levels, nor for any costs, fees or expenses incurred to collect or enforce any award, judgment or other relief granted.

**25.     Contracts Inadvertently Purchased.** Should Purchaser discover within thirty (30) calendar days after purchasing a Contract that, at the time of purchase, the Vehicle Buyer was delinquent in payment, Purchaser may designate any such Contract as a Non-Performing Contract (and upon such designation by Purchaser, each such Contract shall be deemed to be a Non-Performing Contract) and require the same to be repurchased by Seller in accordance with **Section 3.3** hereof.

**26.     Consumer Finance Acts.** Seller agrees to make all records and other documents relating to the Contracts available for inspection by governmental authorities and to maintain all such records and documents for the period of time required to comply with the laws of the state in which the Contracts were made and are to be performed, and any other local, state, or federal laws which are applicable to any of the Contracts.

**27.     Offset.** Seller agrees that Purchaser may offset any amounts owed by Purchaser to Seller against any amounts owed by Seller to Purchaser, regardless of whether the amounts owed by Purchaser to Seller or by Seller to Purchaser are owed pursuant to this Agreement or any other agreement between Purchaser and Seller, including, without limitation, any Floorplan or Servicing Agreement.

**28.     Dealer Contract.** This Agreement shall constitute the "Dealer Contract" referred to in the "Seller's Assignment" provision of each Contract purchased pursuant to the terms of this Agreement, and this Agreement shall govern the terms of any such assigned Contract.

**29.     Guaranty.** **ROBERT MCCOY JR., MISTY MCCOY, N/A, N/A,** (hereinafter, and collectively, if more than one, "Guarantor"); have agreed to fully and completely personally guarantee the payment and performance of any and all obligations of Seller under this Agreement. It shall be a breach of this Agreement for any Guarantor to revoke or otherwise limit his or her guaranty of this Agreement or to allege, in any manner, that Guarantor is not fully and completely liable for all of Seller's obligations pursuant to this Agreement.

**30.     Directives and Exclusions.** Seller acknowledges that it/he/she has received a copy of the current version of Purchaser's "Directives and Exclusions." These Directives and Exclusions shall be used as a guide to determine conforming and eligible contracts and are not underwriting guidelines or a guarantee of performance. Therefore, Seller accepts full responsibility to underwrite its transactions. The Directives and Exclusions may be changed from time to time at the sole discretion of the Purchaser. Seller has sole responsibility to contact the Purchaser for updated copies of the Directives and Exclusions.

Initials



31.    **Applicable Law.** This Agreement is intended as a contract under and shall be construed and enforceable in accordance with the laws of the State of North Carolina, without reference to the conflict of law provisions thereof. Subject to the arbitration provisions hereof, Seller hereby consents to jurisdiction in the State of North Carolina in any action to enforce or collect this Agreement, and further consents to venue in the State Courts of North Carolina in Mecklenburg County, North Carolina, or, if applicable, the United States District Court for the Western District of North Carolina. This Agreement shall be deemed to have been made in North Carolina.

32.    **Insurance.** Seller shall provide Purchaser with any necessary assistance requested by Purchaser, to process and obtain payment for any and all claims, which may arise under the Insurance Policies. Purchaser may submit claims directly to the insurance carriers or require Seller to file the claim in its name. If Seller receives any payment on any Insurance Policy, Seller shall remit to Purchaser such payment within one (1) business days of Seller's receipt of the same. Upon Purchaser's request, Seller shall cause Purchaser to be named as an additional insured or loss payee under the Insurance Policies or any other insurance policy covering the Vehicles subject to a Contract.

33.    **Reserve Account.** Purchaser may elect, in its sole discretion, to purchase Contracts which do not meet all of the Directives and Exclusions (a "**Non-Conforming Contract**"). Seller agrees, as to any Non-Conforming Contract, to allow Purchaser to withhold funding from the purchase price of each Non-Conforming Contract into a reserve account on the books of Purchaser (the "**Non-Conforming Withholding**"). The balance of any Non-Conforming Withholding shall be shown on the funding report provided by Purchaser to Seller. Purchaser may, at its sole discretion, apply any Non-Conforming Withholding toward the payment of any monies owed to Purchaser by Seller on any Contracts, including, without limitation, any Contract for which the reserve funds were not initially held. Upon full payment to Purchaser of the amount owed under a Non-Conforming Contract (by the applicable Vehicle Buyer, through a purchase of the Non-conforming Contract by the Seller or otherwise), Purchaser shall credit any remainder of the Non-Conforming Withholding to Seller. Such credit may be paid by Purchaser to Seller or held by Purchaser to be offset against other obligations of Seller to Purchaser. In any event the amount of such credit and whether such credit will be paid to Seller or held by Purchaser will be reflected in the Weekly Settlement Sheet. Notwithstanding the foregoing, nothing in this Agreement shall require the Seller to sell a Non-Conforming Contract to Purchaser.

34.    **LIMITATION ON LIABILITY.** IN NO EVENT SHALL PURCHASER BE LIABLE FOR: (a) THIRD PARTY CLAIMS OR LIABILITIES; OR (b) ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OR DAMAGE TO DATA, INACCURACY OF DATA, LOSS OF ANTICIPATED REVENUE OR PROFITS, WORK STOPPAGE OR IMPAIRMENT OF OTHER ASSETS OR LOSS OF GOOD WILL, LOSS OF USE, LOSS OF BUSINESS; LOSS OF THE USE OF MONEY; LOSS OF REPUTATION; COST OF SUBSTITUTE EQUIPMENT AND PROPERTY; OR OTHER FINANCIAL LOSS, WHETHER OR NOT FORESEEABLE AND WHETHER OR NOT PURCHASER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF THE ESSENTIAL PURPOSE OF THIS AGREEMENT OR ANY LIMITED REMEDY HEREUNDER.

IN NO EVENT SHALL THE TOTAL LIABILITY OF PURCHASER TO SELLER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER AGREEMENT OR UNDERSTANDING BETWEEN PURCHASER AND SELLER, UNLESS EXPRESSLY SET FORTH IN SUCH OTHER AGREEMENT OR UNDERSTANDING, EXCEED THE TOTAL PERFORMANCE COMPENSATION PAID BY PURCHASER TO SELLER PURSUANT TO THIS AGREEMENT DURING THE THREE (3) CONSECUTIVE CALENDAR MONTH PERIOD PRIOR TO THE DETERMINATION OF SUCH LIABILITY.

THE LIMITATIONS SET FORTH IN THIS SECTION APPLY TO ALL CAUSES OF ACTION IN THE AGGREGATE, INCLUDING WITHOUT LIMITATION, BREACH OF CONTRACT, BREACH OF WARRANTY, INDEMNIFICATION, NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATION AND OTHER TORTS AND STATUTORY CLAIMS. THE FOREGOING LIMITATIONS SHALL NOT APPLY, HOWEVER, TO LIABILITIES

Initials _____



BHPH Purchasing &
Performance Agreement

BETWEEN THIRD PARTIES AND PURCHASER WHICH ARISE FROM CONTRACTS DIRECTLY BETWEEN PURCHASER AND SUCH THIRD PARTY.

SELLER ACKNOWLEDGES THAT IT UNDERSTANDS THE LEGAL AND ECONOMIC RAMIFICATIONS OF THE FOREGOING LIMITATIONS AND THAT THE FOREGOING LIMITATIONS ALLOCATE THE VARIOUS RISKS BETWEEN THE PARTIES AND FORM AN ESSENTIAL PART OF THE AGREEMENT OF THE PARTIES.

35.   **DISCLAIMERS.**  IN ADDITION AND SUBJECT TO THE LIMITATIONS SET FORTH IN SECTION 34, PURCHASER SHALL NOT BE LIABLE FOR:

    (a) ANY FAILED ACH TRANSFER OR OTHER TRANSFER OF FUNDS, EXCEPT TO THE EXTENT PURCHASER SHALL HAVE BEEN GROSSLY NEGLIGENT IN THE INITIATION OF ANY SUCH TRANSFER

    (b) ANY TITLE DEFICIENCY FOR ANY VEHICLE;

    (c) ANY AGREEMENT OR CONTRACT BETWEEN SELLER AND ANY CUSTOMER OF SELLER (OR ANY OTER THIRD PARTY) OR THE SUFFICIENCY, VALIDITY, ENFORCEABILITY, OR PROPRIETY THEREOF;

    (d) ANY DAMAGE TO ANY COLLATERAL INCURRED IN REPOSSESSION OF THE COLLATERAL OR IN THE EXERCISE OF ANY OTHER REMEDY WHICH PURCHASER MAY HAVE, EXCEPT TO THE EXTENT PURCHASER SHALL HAVE BEEN GROSSLY NEGLIGENT IN THE EXERCISE OF SUCH REMEDIES; OR

    (e) LOST OR MISPLACED TITLES.

36.   **TIME IS OF THE ESSENCE.**  TIME IS OF THE ESSENCE WITH RESPECT TO ALL TIME PERIODS IN THIS AGREEMENT.

37.   **No Required Minimums.**  This Agreement sets forth the terms and conditions of potential transactions between Seller and Purchaser. This Agreement does not, however, require the Purchaser or the Seller to enter into any minimum number of transactions or minimum volume of transactions with the other. Purchaser and Seller may choose to enter into any number of transactions, including no transactions, with the other.

38.   **Termination.**  This Agreement may be terminated by Purchaser or Seller at any time by written notice to the other in accordance with this Agreement. Upon termination, Seller shall be required to purchase all Contracts owned by Purchaser for the amount equal to the amount specified in Section 3.4 hereof. All obligations, rights and remedies of Seller and Purchaser shall survive termination of this Agreement.

39.   **Resolution of Disputes.**

    (a) Except for the Excluded Disputes (as hereafter defined), all disputes between or among any parties to this Agreement including, but not limited to, those disputes arising out of or in connection with the execution, interpretation and performance of this Agreement (including the validity, scope and enforceability of this Section 39) shall be solely and finally determined by one Arbitrator selected by the American Arbitration Association ("AAA"). The arbitration proceedings shall be held in Mecklenburg County in North Carolina, and, except as otherwise may be provided in this Agreement,

Initials



BHPH Purchasing &
Performance Agreement

the arbitration proceedings shall be conducted in accordance with the Commercial Arbitration Rules (the "AAA Rules") of the AAA. The Arbitrator shall be selected in accordance with the AAA Rules then in effect for such a selection. The arbitration shall be conducted in accordance with the process set forth in this Section 39.

(b) Any dispute where the total dollar amount in controversy is less than US $10,000.00, exclusive of costs, interest and attorneys' fees, (the "**Excluded Disputes**") shall not be subject to mandatory arbitration as set forth in this Agreement.

(c) In no circumstances shall any party to this Agreement be liable for: (1) direct or compensatory damages or (2) indirect, consequential, reliance, or special damages, with respect to *lost revenues, lost business opportunity, loss of good will, or lost profits of any kind* regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, prevention, failure of essential purpose, or otherwise, and even if advised of the likelihood of such damages. This damages limitation provision reflects the express intent of the parties and reflects a deliberate and bargained for allocation of risk pertaining to any dispute between the parties.

(d) If a party has a dispute which has not been resolved by the parties and s/he or it submits the dispute for arbitration pursuant to this Agreement, such party shall furnish the other parties to the Agreement with the dated, written statement (the "**Arbitration Notice**") indicating (i) such party's intent to commence arbitration proceedings, (ii) the nature, with reasonable detail, of the dispute and (iii) the remedy or remedies such party will seek.

(e) At any time within forty (40) days after the date of the Arbitration Notice, the party(s) commencing the arbitration (collectively, the "Petitioner") and the party(s) with whom the Petitioner has a dispute (collectively, the "**Respondent**") can make discovery requests of the other (including, but not limited to, requests for delivery of documents, production of witnesses for testimony and delivery of interrogatory responses). The recipient of a discovery request shall have ten (10) days after the receipt of such request to object to any or all portions of such request and make an application to the Arbitrator to limit the scope of such discovery request, and shall respond to any portions of such request not so objected to within twenty (20) days of the receipt of such request. All objections shall be in writing and shall indicate the reasons for such objections. Within five (5) business days after the end of the period for the submission by the requested party of an application to limit the discovery request, the Arbitrator shall grant or deny such discovery request, in whole or in part, to the extent the Arbitrator determines such discovery is or is not, as the case may be, reasonably necessary to enable the requesting party to obtain information relevant to the dispute without unreasonably burdening the requested party. The requested party shall comply with a discovery request granted within ten (10) days after such grant, or within such longer period as the Arbitrator may determine upon application of the requested party for an extension thereof for reasonable cause. Neither party shall be permitted to make more than one application for discovery to the Arbitrator. All depositions shall be taken in Charlotte, North Carolina unless otherwise agreed by the parties. The Arbitrator is not authorized to subpoena documents or perform independent investigations.

(f) Hearings must commence no later than ninety (90) days, unless otherwise designated by the Arbitrator, following the date of the Arbitration Notice and such hearing shall be conducted for no more than five business days.

(g) Each of the Petitioner and Respondent shall submit a brief, outlining such party's claim for relief or defense to such claim, to the other and to the Arbitrator on or before the tenth (10th) day following the

Initials



BHPH Purchasing &
Performance Agreement

date of the last hearing. Reply briefs must be exchanged and submitted to the Arbitrator on or before the twentieth (20th) day following the date of the last hearing. The final decision of the Arbitrator is due on or before the thirtieth (30th) day following the date of the last hearing. The Arbitrator shall choose the form of final decision that, in his or her judgment, is most consistent as supported by evidence presented by the Petitioner and Respondent in the arbitration proceeding or, if the subject matter of the dispute is not clearly addressed in or determinable, that, in their opinion, would be most fair to the Petitioner and Respondent under the arbitration.

(h) All expenses of the arbitration shall be shared by the Petitioner and Respondent in accordance with the AAA Rules in effect on the date of the Arbitration Notice.

(i) The foregoing time periods and procedural steps may be modified or extended by the Arbitrator in his or her discretion to the extent he or she deems necessary to prevent fundamental unfairness; provided, that at all times the Arbitrator shall be mindful of the parties' desire for the most expeditious possible resolution of their disputes.

(j) To the extent permissible under law, the parties to this Agreement agree that the award of the Arbitrator shall be final and shall not be subject to judicial review. Judgment on the arbitration award may be entered and enforced in any court having jurisdiction over the parties or their assets. It is the intent of the parties that the arbitration provisions hereof be enforced to the fullest extent permitted by applicable law, including the Federal Arbitration Act, 9 U.S.C. § 2.

(k) Nothing in this Section shall prevent a party from seeking injunctive relief or other equitable relief in the courts designated in the Agreement.

40.  SELLER WAIVES ANY RIGHT TO TRIAL BY JURY

41.  Seller and Guarantor(s) hereby acknowledges and stipulates that it has no claims or causes of action of any kind whatsoever against Purchaser, its affiliates, officers, shareholders, directors, employees, agents, representatives, attorneys, or consultants. Seller and Guarantor(s) hereby releases Purchaser, its affiliates, officers, shareholders, directors, employees, agents, representatives, attorneys and consultants, from any and all claims, causes of action, demands and liabilities of any kind whatsoever whether direct or indirect, fixed or contingent, liquidated or non-liquidated, disputed or undisputed, known or unknown, which Seller and Guarantor(s) now have or may have relating, in any way to any event, circumstance, action or failure to act from the beginning of time to the date of this Agreement

[Signature Pages Follows]

Initials _____



BHPH Purchasing &
Performance Agreement

IN WITNESS WHEREOF, Purchaser, Seller and Guarantor(s) have executed this Agreement through their duly authorized officers as of the date first set forth above in this Agreement.

Ace Motor Acceptance Corporation

By: _____

Printed Name & Title:   RUSSELL E ALGOOD, CEO


SELLER: (MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST)

By: _____

Printed Name & Title: Robert McCoy , Member


STATE OF NC
COUNTY OF Union

As of this 30 day of January , 2018 , personally appeared before me, the said named **SELLER** to me known to be the person described in and who executed the foregoing instrument and said person acknowledged that (s)he executed the foregoing instrument.

By: Carla J Morefield

Printed Name: Carla J Morefield

My Commission Expires: 9·22·2019

> Cabarrus County, North Carolina
> Notary Public
> Carla J Morefield
> My Commission Expires 9/22/2019


SELLER/GUARANTOR: (ROBERT MCCOY JR.)

By: _____

Printed Name: Robert McCoy , member

STATE OF NC
COUNTY OF Union

As of this 30 day of January , 2018 , personally appeared before me, the said named **SELLER/GUARANTOR** to me known to be the person described in and who executed the foregoing instrument and said person acknowledged that (s)he executed the foregoing instrument.

By: Carla J Morefield

Printed Name: Carla J Morefield

My Commission Expires: 9·22·2019

> Cabarrus County, North Carolina
> Notary Public
> Carla J Morefield
> My Commission Expires 9/22/2019

Initials ____



BHPH Purchasing &
Performance Agreement

SELLER/GUARANTOR: (**MISTY MCCOY**)

By:

Printed Name:

STATE OF NC
COUNTY OF Union

As of this 30 day of January , 2018 , personally appeared before me, the said named **SELLER/GUARANTOR** to me known to be the person described in and who executed the foregoing instrument and said person acknowledged that (s)he executed the foregoing instrument.

By: Carla J Morefield
Printed Name: Carla J Morefield
My Commission Expires: 9-22-2019

> Cabarrus County, North Carolina
> Notary Public
> Carla J Morefield
> My Commission Expires 9/22/2019

SELLER/GUARANTOR: (**N/A**)

By:

Printed Name:

STATE OF
COUNTY OF

As of this _____ day of _____, _____, personally appeared before me, the said named **SELLER/GUARANTOR** to me known to be the person described in and who executed the foregoing instrument and said person acknowledged that (s)he executed the foregoing instrument.

By:
Printed Name:
My Commission Expires:

SELLER/GUARANTOR: (**N/A**)

By:

Printed Name:

STATE OF
COUNTY OF

As of this _____ day of _____, _____, personally appeared before me, the said named **SELLER/GUARANTOR** to me known to be the person described in and who executed the foregoing instrument and said person acknowledged that (s)he executed the foregoing instrument.

By:

Printed Name:

My Commission Expires:

Initials



BHPH Purchasing &
Performance Agreement

### Seller Contractual Agreement to Comply with the Gramm-Leach-Bliley Act

Seller represents and warrants to Ace Motor Acceptance Corporation that Seller presently maintains, and will continue to maintain appropriate information security programs and measures designed to ensure the security and confidentiality of "Consumer Information" (as defined in 16CFR 314.2(b)). Such information security programs and measures shall include appropriate procedures designed to (1) protect the security and confidentiality of such information, (2) protect against anticipated threats or hazards to the security or integrity of such information, and (3) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer of Ace Motor Acceptance Corporation.

<u>MCCOY MOTORS, LLC, MCCOY MOTORS LLC</u> <u>01-29-2018</u>
<u>DBA RIDE FAST</u>
COMPANY NAME       DATE


OFFICER NAME (SIGNATURE)    <u>ROBERT MCCOY JR.</u>
            OFFICER NAME (PRINTED)

Initials



BHPH Purchasing &
Performance Agreement

## Power of Attorney

STATE OF: **SOUTH CAROLINA**

COUNTY OF: **YORK**

Pursuant to that certain BHPH Purchasing and Performance Agreement dated **01-29-2018** (the "PPA") and, if applicable, that certain Agreement for Line of Credit (Floorplan) dated **01-29-2018** (the "Floorplan"), **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST** ("Dealer/Seller") hereby irrevocably constitutes and appoints ACE MOTOR ACCEPTANCE CORPORATION, its officers, agents, representatives, successors and assigns, ("Purchaser/Lender") as the true and lawful attorney-in-fact and agent of Dealer/Seller, with full power of substitution in the name of Dealer/Seller, but on behalf of and for the benefit of Purchaser/Lender, to perform all acts and to deliver all instruments, documents, agreements, Contracts (as defined in the PPA) or other writings as Purchaser/Lender deems appropriate to protect, preserve, enforce, maintain, realize, release, satisfy, cancel, discharge and assign the Collateral (as defined in the Floorplan), Contracts, Security Documents (as defined in the PPA) and Insurance Policies (as defined in the PPA) or any of Purchaser/Lender's interest or rights in the Collateral or Contracts, including without limitation, to do any and all of the following:

1. Take possession of and endorse in the name of the Dealer/Seller any notes, checks, drafts, bills of exchange, money orders, instruments or other documents received which constitute (i) Collateral pursuant to the Floorplan or (ii) payment of or under any of the Contracts, Security Documents or in connection with any Insurance Policies;

2. Demand, collect and receive any and all of the Collateral and Contracts and to enforce any of the rights in respect thereof and to give releases or satisfactions in respect thereof;

3. Endorse or assign to Purchaser/Lender any of the Contracts or certificates of title for the Collateral in the name of Dealer/Seller;

4. Prepare and execute on behalf of Dealer/Seller any financing statement or other evidence of a security interest contemplated by the PPA or Floorplan, or any modification, refiling, renewal and/or continuation statement, and sign, execute, acknowledge, verify, deliver, file, record and publish any of the foregoing or any other similar document that in the Purchaser/Lender's opinion must be filed in order to perfect or continue the perfection of the security interest granted in the Floorplan, PPA or any other agreements between Dealer/Seller and Purchaser/Lender; and

5. Institute and prosecute in the name of the Dealer/Seller, at the expense and for the benefit of Purchaser/Lender, its successors and assigns, any and all of proceedings at law, in equity or otherwise which Purchaser/Lender or its successors or assigns may deem proper for the collection and enforcement or any claim or right or action of any kind granted, bargained, sold, assigned and transferred by or under the PPA, Floorplan or any other agreements between Dealer/Seller and Purchaser/Lender.

Initials ____



BHPH Purchasing &
Performance Agreement

## Power of Attorney

Dealer/Seller hereby agrees and acknowledges that the foregoing powers are coupled with an interest and are irrevocable by Dealer/Seller. For purposes of clarity, in connection with the foregoing, Purchaser/Lender may act in any way which Dealer/Seller could if Dealer/Seller were present or capable with respect to the foregoing matters to the extent that Dealer/Seller is permitted by law to act through an agent.

DEALER/SELLER: (MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST)

By: _____

Printed Name & Title: _Robert McCoy, member_

STATE OF _NC_

COUNTY OF _Union_

As of this _30_ day of _January_, _2018_, personally appeared before me, _Robert McCoy Jr_, who acknowledged (s) he is the duly authorized _Member/Owner_ (title) of **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST** and that s(he) executed the foregoing instrument as duly authorized by **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST.**

By: _Carla J Morefield_

Printed Name: _Carla J Morefield_

My Commission Expires: _9-22-2019_

Cabarrus County, North Carolina
Notary Public
Carla J Morefield
My Commission Expires 9/22/2019

Initials _____



### UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE

This Unconditional Guaranty of Payment and Performance (this "Guaranty") is given by the undersigned, **ROBERT MCCOY JR.** (hereinafter referred to as "Guarantor"), for and in consideration of the agreements by and between ACE MOTOR ACCEPTANCE CORPORATION, a North Carolina corporation (hereinafter referred to as "AMAC") and **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST** (hereinafter referred to as "Dealer/Seller"), which agreements may include a BHPH Purchasing and Performance Agreement ("PPA"), BHPH Contract Servicing Agreement ("Servicing Agreement"), BHPH Purchasing & Service Agreement, and Agreement for Line of Credit (Floorplan) ("Floorplan") and other good and valuable consideration. This Guaranty, the PPA, the Servicing Agreement, the BHPH Purchasing & Service Agreement, the Floorplan and any other agreements between Dealer/Seller and AMAC including, but not limited to, any documents or instruments now or hereafter evidencing, securing, or otherwise relating to any indebtedness owed to AMAC, as applicable, are referred to herein individually as an "Agreement" and collectively as the "Agreements." Guarantor hereby acknowledges the receipt and sufficiency of such consideration and that the Guarantor is executing this Guaranty for the purpose of seeking to induce AMAC to enter into the Agreements with Dealer/Seller which will be to the direct interest and advantage of Guarantor. Guarantor further acknowledges that the execution of this Guaranty is a condition of AMAC's agreeing to the Agreements and that without this Guaranty AMAC would be unwilling to enter into the Agreements with Dealer/Seller.

In consideration of the foregoing, Guarantor does hereby unconditionally guarantee to AMAC and its successors, successors in title and assigns (a) the full and prompt payment when due, with such interest, fees and other charges as may accrue thereon, either before or after maturity thereof, of any and all amounts due to AMAC pursuant to the Agreements or otherwise due to AMAC by Dealer/Seller for any reason whatsoever and (b) the full and prompt payment and performance of any and all other obligations of Dealer/Seller to AMAC pursuant to the Agreements. References herein to the "Agreements" shall mean and refer to such documents and any renewals, modifications, consolidations and extensions thereof including any and all increases in borrowings.

Guarantor further agrees to pay AMAC all costs and expenses (including reasonable attorneys' fees) paid or incurred by AMAC in connection with the enforcement of Dealer/Seller's or Guarantor's obligations pursuant to any Agreement or otherwise as a result of Dealer/Seller's or Guarantor's breach or default of any Agreement.

No action which AMAC shall take or fail to take in connection with the Agreements, or any of them, or any security for the payment of any indebtedness of Dealer/Seller to AMAC or for the performance of any obligations or undertakings of Dealer/Seller, nor any course of dealing with Dealer/Seller or any other person, shall release Guarantor's obligations hereunder, affect this Guaranty in any way or afford Guarantor any recourse against AMAC. The provisions of this Guaranty shall extend and be applicable to all renewals, amendments, extensions, consolidations and modifications of the Agreements and any and all references herein to the Agreements shall be deemed to include any such renewals, extensions, amendments, consolidations or modifications thereof. This Guaranty unconditionally guarantees the performance of all obligations of Dealer/Seller to AMAC made on behalf of Dealer/Seller by any officer or agent of Dealer/Seller.

Guarantor hereby subordinates any and all indebtedness of Dealer/Seller now or hereafter owed to Guarantor to all indebtedness of Dealer/Seller to AMAC. Guarantor agrees that Guarantor shall not demand or accept any payment of principal or interest from Dealer/Seller, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the security described in and encumbered by any document or instrument securing any of the obligations under the Agreements. Notwithstanding the foregoing, however, if AMAC so requests, Guarantor shall enforce any such indebtedness and shall hold in trust and transfer to AMAC any funds or assets received by Guarantor as a result of such enforcement. Any such amounts transferred to AMAC shall be applied to Dealer/Seller's indebtedness and other obligations in accordance with the Agreements and shall not otherwise reduce or affect in any manner the liability of Guarantor under this Guaranty.

Initials



BHPH Purchasing &
Performance Agreement

Guarantor hereby waives and agrees not to assert or take advantage of: (a) the defense of the statute of limitations in any action hereunder or for the collection of the indebtedness or the performance of any obligation hereby guaranteed; (b) any defense that may arise by reasons of the incapacity, lack of authority, death or disability of Guarantor or any other person or entity, or the failure of AMAC to file or enforce a claim against the estate (either in administration, bankruptcy, or any other proceeding) of Dealer/Seller or any other person or entity; (c) any defense based on the failure of AMAC to give notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of any other person whomsoever, in connection with any obligation hereby guaranteed; (d) any defense based upon an election of remedies by AMAC which destroys or otherwise impairs any subrogation rights of Guarantor or the right of Guarantor to proceed against Dealer/Seller for reimbursement, or both; (e) any defense based upon failure of AMAC to commence an action against Dealer/Seller; (f) any duty on the part of AMAC to disclose to Guarantor any facts AMAC may now or hereafter know regarding Dealer/Seller; (g) acceptance or notice of acceptance of this Guaranty by AMAC; (h) notice of presentment and demand for payment of any of the indebtedness or performance of any of the obligations hereby guaranteed; (i) protest and notice of dishonor or of default to Guarantor or to any other party with respect to the indebtedness or performance of obligations hereby guaranteed; (j) any and all other notices whatsoever to which Guarantor might otherwise be entitled; (k) any defense based on lack of due diligence by AMAC in collection, protection or realization upon any collateral securing the indebtedness evidenced by the Agreements; or (l) any other legal or equitable defenses whatsoever to which Guarantor might otherwise be entitled.

This is a guaranty of payment and performance and not of collection. The liability of Guarantor under this Guaranty shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against Dealer/Seller or any other person, nor against securities or liens available to AMAC, its successors, successors in title, endorsees or assigns. Guarantor waives any right to require that an action be brought against Dealer/Seller or any other person or to require that resort be had to any security or to any balance of any deposit account or credit on the books of AMAC in favor of Dealer/Seller or any other person.

In the event of a default under the Agreements, or any of them, AMAC shall have the right to enforce its rights, powers and remedies thereunder or hereunder or under any other instrument now or hereafter evidencing, securing or otherwise relating to the transactions contemplated by the Agreements in any order. All rights, powers and remedies available to AMAC shall be nonexclusive and cumulative of all other rights, powers and remedies provided thereunder or hereunder or by law or in equity. Guarantor hereby authorizes and empowers AMAC upon acceleration of the maturity of any indebtedness owed by Dealer/Seller to AMAC, at AMAC's sole discretion, and without notice to Guarantor, to exercise any right or remedy which AMAC may have including, but not limited to, judicial foreclosure, exercise of rights or power of sale, acceptance of a deed or assignment in lieu of foreclosures, appointment of a receiver to collect rents and profits, exercise of remedies against personal property, or enforcement of any assignment of leases as to any security, whether real, personal or intangible. If the indebtedness guaranteed hereby is partially paid for any reason, this Guaranty shall nevertheless remain in full force and effect, and Guarantor shall remain liable for the entire balance of the indebtedness guaranteed hereby even though any rights which Guarantor may have against Dealer/Seller may be destroyed or diminished by the exercise of any remedy by the AMAC. Until all of the obligations of Dealer/Seller to AMAC have been paid and performed in full, Guarantor shall have no right of subrogation to AMAC against Dealer/Seller. Guarantor hereby waives any rights to enforce any remedy which AMAC may have against Dealer/Seller and any rights to participate in any security held by AMAC. Guarantor hereby authorizes AMAC, without notice to Guarantor, to apply all payments and credits received from Dealer/Seller or from Guarantor or realized from any security to the indebtedness, obligations and undertakings which are the subject of this Guaranty in such manner and in such priority as AMAC in its sole judgment shall see fit.

The books and records of AMAC showing the accounts between AMAC and Dealer/Seller shall be admissible in evidence in any action or proceeding hereon as prima facie proof of the items set forth therein.

Initials



BHPH Purchasing &
Performance Agreement

This Guaranty is intended as a contract under and shall be construed and enforceable in accordance with the laws of the State of North Carolina, without reference to the conflict of law provisions thereof. This Guaranty shall be deemed to have been made in North Carolina.

Guarantor hereby (a) submits to personal jurisdiction in the State of North Carolina for the enforcement of this Guaranty with venue in the North Carolina state courts located in Mecklenburg County or, if it has or can acquire jurisdiction, the United States District Court for the Western District of North Carolina, and (b) waives any and all rights to object to jurisdiction within the State of North Carolina for the purposes of litigation to enforce this Guaranty. Guarantor further agrees that service of any complaint in any litigation brought for the purpose, in whole or in part, of enforcing this Guaranty may be perfected by mailing a copy of the summons and complaint to Guarantor by certified mail in the manner hereinafter provided for notice and service and shall be deemed perfected on the date of such mailing. Nothing contained herein, however, shall prevent AMAC from bringing any action or exercising any rights against any security and against Guarantor personally, and against any property of Guarantor, within any other state. Initiating such proceeding or taking such action in any other state shall in no event constitute a waiver of the agreement contained herein that the law of the State of North Carolina shall govern the rights and obligations of Guarantor and AMAC hereunder or of the submission herein made by Guarantor to personal jurisdiction within the State of North Carolina. The aforesaid means of obtaining personal jurisdiction and perfecting service of process are not intended to be exclusive but are cumulative and in addition to all other means of obtaining personal jurisdiction and perfecting service of process now or hereafter provided by the law of the State of North Carolina.

Guarantor represents and warrants to AMAC that any and all financial statements delivered by him or her, either prior to or after the execution of this Guaranty, to AMAC are accurate, true, correct, and complete in all respects as of the date thereof.

As security for the liabilities and obligations of Guarantor hereunder, Guarantor hereby transfers and conveys to AMAC any and all balances, credits, deposits, accounts, items and monies of Guarantor now or hereafter in the possession or control of AMAC, and AMAC is hereby given a lien upon and security interest in all property of Guarantor of every kind and description now or hereafter in the possession or control of AMAC for any reason, including all dividends and distributions on or other rights in connection therewith. AMAC may, without demand or notice of any kind, at any time, or from time to time, when any amount shall be due and payable hereunder by such Guarantor, appropriate and apply toward the payment of such amount, and in such order of application as AMAC may from time to time elect, any property, balances, credits, deposits, accounts, items or monies of any Guarantor in the possession or control of AMAC for any purpose.

In the event any or all of the obligations and indebtednesses evidenced, secured or supported by the Agreements are guaranteed by any other person, now or hereafter, AMAC may discharge, release, compromise or otherwise modify any agreements with any such guarantor without affecting the liability of Guarantor in any way. The liability of Guarantor pursuant to this Guaranty shall be joint and several with any other guarantor.

This Guaranty may not be changed orally, and no obligation of Guarantor can be released or waived by AMAC or any officer or agent of AMAC, except by a writing signed by a duly authorized officer of AMAC. This Guaranty shall be irrevocable by Guarantor until all indebtedness guaranteed hereby has been completely repaid and all obligations and undertakings of Dealer/Seller under, by reason of, or pursuant to the Agreements have been completely performed.

Any and all notices, elections or demands permitted or required to be made under this Guaranty shall be in writing, signed by the party giving such notice, election or demand, and shall be deemed received by the other party at the earlier of (a) actual receipt if personally delivered; (b) the next business day after such notice is sent if sent via overnight courier; (c) the date such notice is faxed provided the sender's fax confirmation sheet shows completed transmission of such fax; (d) the date such notice is sent via e-mail; or (e) deposit in the United States mail, sent certified or registered mail, return receipt requested, postage prepaid and addressed as set forth below (or to such other address as may be designated by written notice to the other party):

Initials _____



**BHPH Purchasing &
Performance Agreement**

The address of AMAC is:
Ace Motor Acceptance Corp.
111 Cupped Oak Dr., Suite F
Matthews, NC 28104

The address and other contact information of Guarantor is set forth below Guarantor's signature to this Guaranty.

The provisions of the Guaranty shall be binding upon each Guarantor and his successors, successors in title, heirs, legal representatives and assigns and shall inure to the benefit of AMAC, its successors, successors in title, legal representatives, and assigns. This Guaranty shall in no event be impaired by any change which may arise by reason of the death of Dealer/Seller or Guarantor, if individuals, or by reason of the dissolution of Dealer/Seller or Guarantor, if Dealer/Seller or Guarantor is an entity.

This Guaranty is assignable by AMAC, and any assignment hereof or any transfer or assignment of any rights or remedies of AMAC pursuant to any Agreement or portions thereof by AMAC shall operate to vest in any such assignee all rights and powers herein conferred upon and granted to AMAC. This Guaranty is not assignable, in whole or in part, by Guarantor

IN WITNESS WHEREOF, the undersigned has executed this Guaranty under seal as of **01-29-2018.**

**ROBERT MCCOY JR.**
GUARANTOR NAME

GUARANTOR SIGNATURE

Social Security # _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_

Personal Address:

_11915 John K. Hall Way_

_Charlotte, NC 28277_

Phone Number: _803-577 - 9779_

Fax Number: _803- 547 - 2496_

E-mail address: _mccoymotors@live.com_

*Please attach a copy of driver's license*

STATE OF _NC_
COUNTY OF _Union_

As of this _30_ day of _January_ , _2018_ , personally appeared before me, the said named **GUARANTOR** to me known to be the person described in and who executed the foregoing instrument and said person acknowledged that (s)he executed the foregoing instrument.

By: _Carla J Morefield_

Printed Name: _Carla J Morefield_

My Commission Expires: _9-22-2019_

> Cabarrus County, North Carolina
> Notary Public
> Carla J Morefield
> My Commission Expires 9/22/2019

Initials



BHPH Purchasing &
Performance Agreement

## UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE

This Unconditional Guaranty of Payment and Performance (this "Guaranty") is given by the undersigned, **MISTY MCCOY** (hereinafter referred to as "Guarantor"), for and in consideration of the agreements by and between ACE MOTOR ACCEPTANCE CORPORATION, a North Carolina corporation (hereinafter referred to as "AMAC") and **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST** (hereinafter referred to as "Dealer/Seller"), which agreements may include a BHPH Purchasing and Performance Agreement ("PPA"), BHPH Contract Servicing Agreement ("Servicing Agreement"), BHPH Purchasing & Service Agreement, and Agreement for Line of Credit (Floorplan) ("Floorplan") and other good and valuable consideration. This Guaranty, the PPA, the Servicing Agreement, the BHPH Purchasing & Service Agreement, the Floorplan and any other agreements between Dealer/Seller and AMAC including, but not limited to, any documents or instruments now or hereafter evidencing, securing, or otherwise relating to any indebtedness owed to AMAC, as applicable, are referred to herein individually as an "Agreement" and collectively as the "Agreements." Guarantor hereby acknowledges the receipt and sufficiency of such consideration and that the Guarantor is executing this Guaranty for the purpose of seeking to induce AMAC to enter into the Agreements with Dealer/Seller which will be to the direct interest and advantage of Guarantor. Guarantor further acknowledges that the execution of this Guaranty is a condition of AMAC's agreeing to the Agreements and that without this Guaranty AMAC would be unwilling to enter into the Agreements with Dealer/Seller.

In consideration of the foregoing, Guarantor does hereby unconditionally guarantee to AMAC and its successors, successors in title and assigns (a) the full and prompt payment when due, with such interest, fees and other charges as may accrue thereon, either before or after maturity thereof, of any and all amounts due to AMAC pursuant to the Agreements or otherwise due to AMAC by Dealer/Seller for any reason whatsoever and (b) the full and prompt payment and performance of any and all other obligations of Dealer/Seller to AMAC pursuant to the Agreements. References herein to the "Agreements" shall mean and refer to such documents and any renewals, modifications, consolidations and extensions thereof including any and all increases in borrowings.

Guarantor further agrees to pay AMAC all costs and expenses (including reasonable attorneys' fees) paid or incurred by AMAC in connection with the enforcement of Dealer/Seller's or Guarantor's obligations pursuant to any Agreement or otherwise as a result of Dealer/Seller's or Guarantor's breach or default of any Agreement.

No action which AMAC shall take or fail to take in connection with the Agreements, or any of them, or any security for the payment of any indebtedness of Dealer/Seller to AMAC or for the performance of any obligations or undertakings of Dealer/Seller, nor any course of dealing with Dealer/Seller or any other person, shall release Guarantor's obligations hereunder, affect this Guaranty in any way or afford Guarantor any recourse against AMAC. The provisions of this Guaranty shall extend and be applicable to all renewals, amendments, extensions, consolidations and modifications of the Agreements and any and all references herein to the Agreements shall be deemed to include any such renewals, extensions, amendments, consolidations or modifications thereof. This Guaranty unconditionally guarantees the performance of all obligations of Dealer/Seller to AMAC made on behalf of Dealer/Seller by any officer or agent of Dealer/Seller.

Guarantor hereby subordinates any and all indebtedness of Dealer/Seller now or hereafter owed to Guarantor to all indebtedness of Dealer/Seller to AMAC. Guarantor agrees that Guarantor shall not demand or accept any payment of principal or interest from Dealer/Seller, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the security described in and encumbered by any document or instrument securing any of the obligations under the Agreements. Notwithstanding the foregoing, however, if AMAC so requests, Guarantor shall enforce any such indebtedness and shall hold in trust and transfer to AMAC any funds or assets received by Guarantor as a result of such enforcement. Any such amounts transferred to AMAC shall be applied to Dealer/Seller's indebtedness and other obligations in accordance with the Agreements and shall not otherwise reduce or affect in any manner the liability of Guarantor under this Guaranty.

Initials



BHPH Purchasing &
Performance Agreement

Guarantor hereby waives and agrees not to assert or take advantage of: (a) the defense of the statute of limitations in any action hereunder or for the collection of the indebtedness or the performance of any obligation hereby guaranteed; (b) any defense that may arise by reasons of the incapacity, lack of authority, death or disability of Guarantor or any other person or entity, or the failure of AMAC to file or enforce a claim against the estate (either in administration, bankruptcy, or any other proceeding) of Dealer/Seller or any other person or entity; (c) any defense based on the failure of AMAC to give notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of any other person whomsoever, in connection with any obligation hereby guaranteed; (d) any defense based upon an election of remedies by AMAC which destroys or otherwise impairs any subrogation rights of Guarantor or the right of Guarantor to proceed against Dealer/Seller for reimbursement, or both; (e) any defense based upon failure of AMAC to commence an action against Dealer/Seller; (f) any duty on the part of AMAC to disclose to Guarantor any facts AMAC may now or hereafter know regarding Dealer/Seller; (g) acceptance or notice of acceptance of this Guaranty by AMAC; (h) notice of presentment and demand for payment of any of the indebtedness or performance of any of the obligations hereby guaranteed; (i) protest and notice of dishonor or of default to Guarantor or to any other party with respect to the indebtedness or performance of obligations hereby guaranteed; (j) any and all other notices whatsoever to which Guarantor might otherwise be entitled; (k) any defense based on lack of due diligence by AMAC in collection, protection or realization upon any collateral securing the indebtedness evidenced by the Agreements; or (l) any other legal or equitable defenses whatsoever to which Guarantor might otherwise be entitled.

This is a guaranty of payment and performance and not of collection. The liability of Guarantor under this Guaranty shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against Dealer/Seller or any other person, nor against securities or liens available to AMAC, its successors, successors in title, endorsees or assigns. Guarantor waives any right to require that an action be brought against Dealer/Seller or any other person or to require that resort be had to any security or to any balance of any deposit account or credit on the books of AMAC in favor of Dealer/Seller or any other person.

In the event of a default under the Agreements, or any of them, AMAC shall have the right to enforce its rights, powers and remedies thereunder or hereunder or under any other instrument now or hereafter evidencing, securing or otherwise relating to the transactions contemplated by the Agreements in any order. All rights, powers and remedies available to AMAC shall be nonexclusive and cumulative of all other rights, powers and remedies provided thereunder or hereunder or by law or in equity. Guarantor hereby authorizes and empowers AMAC upon acceleration of the maturity of any indebtedness owed by Dealer/Seller to AMAC, at AMAC's sole discretion, and without notice to Guarantor, to exercise any right or remedy which AMAC may have including, but not limited to, judicial foreclosure, exercise of rights or power of sale, acceptance of a deed or assignment in lieu of foreclosures, appointment of a receiver to collect rents and profits, exercise of remedies against personal property, or enforcement of any assignment of leases as to any security, whether real, personal or intangible. If the indebtedness guaranteed hereby is partially paid for any reason, this Guaranty shall nevertheless remain in full force and effect, and Guarantor shall remain liable for the entire balance of the indebtedness guaranteed hereby even though any rights which Guarantor may have against Dealer/Seller may be destroyed or diminished by the exercise of any remedy by the AMAC. Until all of the obligations of Dealer/Seller to AMAC have been paid and performed in full, Guarantor shall have no right of subrogation to AMAC against Dealer/Seller. Guarantor hereby waives any rights to enforce any remedy which AMAC may have against Dealer/Seller and any rights to participate in any security held by AMAC. Guarantor hereby authorizes AMAC, without notice to Guarantor, to apply all payments and credits received from Dealer/Seller or from Guarantor or realized from any security to the indebtedness, obligations and undertakings which are the subject of this Guaranty in such manner and in such priority as AMAC in its sole judgment shall see fit.

The books and records of AMAC showing the accounts between AMAC and Dealer/Seller shall be admissible in evidence in any action or proceeding hereon as prima facie proof of the items set forth therein.

Initials ____



BHPH Purchasing &
Performance Agreement

This Guaranty is intended as a contract under and shall be construed and enforceable in accordance with the laws of the State of North Carolina, without reference to the conflict of law provisions thereof. This Guaranty shall be deemed to have been made in North Carolina.

Guarantor hereby (a) submits to personal jurisdiction in the State of North Carolina for the enforcement of this Guaranty with venue in the North Carolina state courts located in Mecklenburg County or, if it has or can acquire jurisdiction, the United States District Court for the Western District of North Carolina, and (b) waives any and all rights to object to jurisdiction within the State of North Carolina for the purposes of litigation to enforce this Guaranty. Guarantor further agrees that service of any complaint in any litigation brought for the purpose, in whole or in part, of enforcing this Guaranty may be perfected by mailing a copy of the summons and complaint to Guarantor by certified mail in the manner hereinafter provided for notice and service and shall be deemed perfected on the date of such mailing. Nothing contained herein, however, shall prevent AMAC from bringing any action or exercising any rights against any security and against Guarantor personally, and against any property of Guarantor, within any other state. Initiating such proceeding or taking such action in any other state shall in no event constitute a waiver of the agreement contained herein that the law of the State of North Carolina shall govern the rights and obligations of Guarantor and AMAC hereunder or of the submission herein made by Guarantor to personal jurisdiction within the State of North Carolina. The aforesaid means of obtaining personal jurisdiction and perfecting service of process are not intended to be exclusive but are cumulative and in addition to all other means of obtaining personal jurisdiction and perfecting service of process now or hereafter provided by the law of the State of North Carolina.

Guarantor represents and warrants to AMAC that any and all financial statements delivered by him or her, either prior to or after the execution of this Guaranty, to AMAC are accurate, true, correct, and complete in all respects as of the date thereof.

As security for the liabilities and obligations of Guarantor hereunder, Guarantor hereby transfers and conveys to AMAC any and all balances, credits, deposits, accounts, items and monies of Guarantor now or hereafter in the possession or control of AMAC, and AMAC is hereby given a lien upon and security interest in all property of Guarantor of every kind and description now or hereafter in the possession or control of AMAC for any reason, including all dividends and distributions on or other rights in connection therewith. AMAC may, without demand or notice of any kind, at any time, or from time to time, when any amount shall be due and payable hereunder by such Guarantor, appropriate and apply toward the payment of such amount, and in such order of application as AMAC may from time to time elect, any property, balances, credits, deposits, accounts, items or monies of any Guarantor in the possession or control of AMAC for any purpose.

In the event any or all of the obligations and indebtednesses evidenced, secured or supported by the Agreements are guaranteed by any other person, now or hereafter, AMAC may discharge, release, compromise or otherwise modify any agreements with any such guarantor without affecting the liability of Guarantor in any way. The liability of Guarantor pursuant to this Guaranty shall be joint and several with any other guarantor.

This Guaranty may not be changed orally, and no obligation of Guarantor can be released or waived by AMAC or any officer or agent of AMAC, except by a writing signed by a duly authorized officer of AMAC. This Guaranty shall be irrevocable by Guarantor until all indebtedness guaranteed hereby has been completely repaid and all obligations and undertakings of Dealer/Seller under, by reason of, or pursuant to the Agreements have been completely performed.

Any and all notices, elections or demands permitted or required to be made under this Guaranty shall be in writing, signed by the party giving such notice, election or demand, and shall be deemed received by the other party at the earlier of (a) actual receipt if personally delivered; (b) the next business day after such notice is sent if sent via overnight courier; (c) the date such notice is faxed provided the sender's fax confirmation sheet shows completed transmission of such fax; (d) the date such notice is sent via e-mail; or (e) deposit in the United States mail, sent certified or registered mail, return receipt requested, postage prepaid and addressed as set forth below (or to such other address as may be designated by written notice to the other party):

Initials _____



BHPH Purchasing &
Performance Agreement

The address of AMAC is:
Ace Motor Acceptance Corp.
111 Cupped Oak Dr., Suite F
Matthews, NC 28104

The address and other contact information of Guarantor is set forth below Guarantor's signature to this Guaranty.

The provisions of the Guaranty shall be binding upon each Guarantor and his successors, successors in title, heirs, legal representatives and assigns and shall inure to the benefit of AMAC, its successors, successors in title, legal representatives, and assigns. This Guaranty shall in no event be impaired by any change which may arise by reason of the death of Dealer/Seller or Guarantor, if individuals, or by reason of the dissolution of Dealer/Seller or Guarantor, if Dealer/Seller or Guarantor is an entity.

This Guaranty is assignable by AMAC, and any assignment hereof or any transfer or assignment of any rights or remedies of AMAC pursuant to any Agreement or portions thereof by AMAC shall operate to vest in any such assignee all rights and powers herein conferred upon and granted to AMAC. This Guaranty is not assignable, in whole or in part, by Guarantor

IN WITNESS WHEREOF, the undersigned has executed this Guaranty under seal as of **01-29-2018.**

**MISTY MCCOY**
GUARANTOR NAME                                    GUARANTOR SIGNATURE

Social Security # 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

Personal Address:
1915 John K Hall Way
Charlotte, NC 28217

Phone Number: 702.515.6031

Fax Number: ___-___-___

E-mail address: mamccoy@hotmail.com

*Please attach a copy of driver's license*

STATE OF NC
COUNTY OF Union

As of this 30 day of January , 2018 , personally appeared before me, the said named **GUARANTOR** to me known to be the person described in and who executed the foregoing instrument and said person acknowledged that (s)he executed the foregoing instrument.
By: Carla J Morefield

Printed Name: Carla J Morefield

My Commission Expires: 9 22 2019

Cabarrus County, North Carolina
Notary Public
Carla J Morefield
My Commission Expires 9/22/2019

Initials

Revised Date: 11/2017     (Page 33 of 46



BHPH Purchasing &
Performance Agreement

### UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE

This Unconditional Guaranty of Payment and Performance (this "Guaranty") is given by the undersigned, **N/A** (hereinafter referred to as "Guarantor"), for and in consideration of the agreements by and between ACE MOTOR ACCEPTANCE CORPORATION, a North Carolina corporation (hereinafter referred to as "AMAC") and **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST** (hereinafter referred to as "Dealer/Seller"), which agreements may include a BHPH Purchasing and Performance Agreement ("PPA"), BHPH Contract Servicing Agreement ("Servicing Agreement"), BHPH Purchasing & Service Agreement, and Agreement for Line of Credit (Floorplan) ("Floorplan") and other good and valuable consideration. This Guaranty, the PPA, the Servicing Agreement, the BHPH Purchasing & Service Agreement, the Floorplan and any other agreements between Dealer/Seller and AMAC including, but not limited to, any documents or instruments now or hereafter evidencing, securing, or otherwise relating to any indebtedness owed to AMAC, as applicable, are referred to herein individually as an "Agreement" and collectively as the "Agreements." Guarantor hereby acknowledges the receipt and sufficiency of such consideration and that the Guarantor is executing this Guaranty for the purpose of seeking to induce AMAC to enter into the Agreements with Dealer/Seller which will be to the direct interest and advantage of Guarantor. Guarantor further acknowledges that the execution of this Guaranty is a condition of AMAC's agreeing to the Agreements and that without this Guaranty AMAC would be unwilling to enter into the Agreements with Dealer/Seller.

In consideration of the foregoing, Guarantor does hereby unconditionally guarantee to AMAC and its successors, successors in title and assigns (a) the full and prompt payment when due, with such interest, fees and other charges as may accrue thereon, either before or after maturity thereof, of any and all amounts due to AMAC pursuant to the Agreements or otherwise due to AMAC by Dealer/Seller for any reason whatsoever and (b) the full and prompt payment and performance of any and all other obligations of Dealer/Seller to AMAC pursuant to the Agreements. References herein to the "Agreements" shall mean and refer to such documents and any renewals, modifications, consolidations and extensions thereof including any and all increases in borrowings.

Guarantor further agrees to pay AMAC all costs and expenses (including reasonable attorneys' fees) paid or incurred by AMAC in connection with the enforcement of Dealer/Seller's or Guarantor's obligations pursuant to any Agreement or otherwise as a result of Dealer/Seller's or Guarantor's breach or default of any Agreement.

No action which AMAC shall take or fail to take in connection with the Agreements, or any of them, or any security for the payment of any indebtedness of Dealer/Seller to AMAC or for the performance of any obligations or undertakings of Dealer/Seller, nor any course of dealing with Dealer/Seller or any other person, shall release Guarantor's obligations hereunder, affect this Guaranty in any way or afford Guarantor any recourse against AMAC. The provisions of this Guaranty shall extend and be applicable to all renewals, amendments, extensions, consolidations and modifications of the Agreements and any and all references herein to the Agreements shall be deemed to include any such renewals, extensions, amendments, consolidations or modifications thereof. This Guaranty unconditionally guarantees the performance of all obligations of Dealer/Seller to AMAC made on behalf of Dealer/Seller by any officer or agent of Dealer/Seller.

Guarantor hereby subordinates any and all indebtedness of Dealer/Seller now or hereafter owed to Guarantor to all indebtedness of Dealer/Seller to AMAC. Guarantor agrees that Guarantor shall not demand or accept any payment of principal or interest from Dealer/Seller, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the security described in and encumbered by any document or instrument securing any of the obligations under the Agreements. Notwithstanding the foregoing, however, if AMAC so requests, Guarantor shall enforce any such indebtedness and shall hold in trust and transfer to AMAC any funds or assets received by Guarantor as a result of such enforcement. Any such amounts transferred to AMAC shall be applied to Dealer/Seller's indebtedness and other obligations in accordance with the Agreements and shall not otherwise reduce or affect in any manner the liability of Guarantor under this Guaranty.

Initials



Guarantor hereby waives and agrees not to assert or take advantage of: (a) the defense of the statute of limitations in any action hereunder or for the collection of the indebtedness or the performance of any obligation hereby guaranteed; (b) any defense that may arise by reasons of the incapacity, lack of authority, death or disability of Guarantor or any other person or entity, or the failure of AMAC to file or enforce a claim against the estate (either in administration, bankruptcy, or any other proceeding) of Dealer/Seller or any other person or entity; (c) any defense based on the failure of AMAC to give notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of any other person whomsoever, in connection with any obligation hereby guaranteed; (d) any defense based upon an election of remedies by AMAC which destroys or otherwise impairs any subrogation rights of Guarantor or the right of Guarantor to proceed against Dealer/Seller for reimbursement, or both; (e) any defense based upon failure of AMAC to commence an action against Dealer/Seller; (f) any duty on the part of AMAC to disclose to Guarantor any facts AMAC may now or hereafter know regarding Dealer/Seller; (g) acceptance or notice of acceptance of this Guaranty by AMAC; (h) notice of presentment and demand for payment of any of the indebtedness or performance of any of the obligations hereby guaranteed; (i) protest and notice of dishonor or of default to Guarantor or to any other party with respect to the indebtedness or performance of obligations hereby guaranteed; (j) any and all other notices whatsoever to which Guarantor might otherwise be entitled; (k) any defense based on lack of due diligence by AMAC in collection, protection or realization upon any collateral securing the indebtedness evidenced by the Agreements; or (l) any other legal or equitable defenses whatsoever to which Guarantor might otherwise be entitled.

This is a guaranty of payment and performance and not of collection. The liability of Guarantor under this Guaranty shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against Dealer/Seller or any other person, nor against securities or liens available to AMAC, its successors, successors in title, endorsees or assigns. Guarantor waives any right to require that an action be brought against Dealer/Seller or any other person or to require that resort be had to any security or to any balance of any deposit account or credit on the books of AMAC in favor of Dealer/Seller or any other person.

In the event of a default under the Agreements, or any of them, AMAC shall have the right to enforce its rights, powers and remedies thereunder or hereunder or under any other instrument now or hereafter evidencing, securing or otherwise relating to the transactions contemplated by the Agreements in any order. All rights, powers and remedies available to AMAC shall be nonexclusive and cumulative of all other rights, powers and remedies provided thereunder or hereunder or by law or in equity. Guarantor hereby authorizes and empowers AMAC upon acceleration of the maturity of any indebtedness owed by Dealer/Seller to AMAC, at AMAC's sole discretion, and without notice to Guarantor, to exercise any right or remedy which AMAC may have including, but not limited to, judicial foreclosure, exercise of rights or power of sale, acceptance of a deed or assignment in lieu of foreclosures, appointment of a receiver to collect rents and profits, exercise of remedies against personal property, or enforcement of any assignment of leases as to any security, whether real, personal or intangible. If the indebtedness guaranteed hereby is partially paid for any reason, this Guaranty shall nevertheless remain in full force and effect, and Guarantor shall remain liable for the entire balance of the indebtedness guaranteed hereby even though any rights which Guarantor may have against Dealer/Seller may be destroyed or diminished by the exercise of any remedy by the AMAC. Until all of the obligations of Dealer/Seller to AMAC have been paid and performed in full, Guarantor shall have no right of subrogation to AMAC against Dealer/Seller. Guarantor hereby waives any rights to enforce any remedy which AMAC may have against Dealer/Seller and any rights to participate in any security held by AMAC. Guarantor hereby authorizes AMAC, without notice to Guarantor, to apply all payments and credits received from Dealer/Seller or from Guarantor or realized from any security to the indebtedness, obligations and undertakings which are the subject of this Guaranty in such manner and in such priority as AMAC in its sole judgment shall see fit.

The books and records of AMAC showing the accounts between AMAC and Dealer/Seller shall be admissible in evidence in any action or proceeding hereon as prima facie proof of the items set forth therein.

Initials



BHPH Purchasing &
Performance Agreement

This Guaranty is intended as a contract under and shall be construed and enforceable in accordance with the laws of the State of North Carolina, without reference to the conflict of law provisions thereof. This Guaranty shall be deemed to have been made in North Carolina.

Guarantor hereby (a) submits to personal jurisdiction in the State of North Carolina for the enforcement of this Guaranty with venue in the North Carolina state courts located in Mecklenburg County or, if it has or can acquire jurisdiction, the United States District Court for the Western District of North Carolina, and (b) waives any and all rights to object to jurisdiction within the State of North Carolina for the purposes of litigation to enforce this Guaranty. Guarantor further agrees that service of any complaint in any litigation brought for the purpose, in whole or in part, of enforcing this Guaranty may be perfected by mailing a copy of the summons and complaint to Guarantor by certified mail in the manner hereinafter provided for notice and service and shall be deemed perfected on the date of such mailing. Nothing contained herein, however, shall prevent AMAC from bringing any action or exercising any rights against any security and against Guarantor personally, and against any property of Guarantor, within any other state. Initiating such proceeding or taking such action in any other state shall in no event constitute a waiver of the agreement contained herein that the law of the State of North Carolina shall govern the rights and obligations of Guarantor and AMAC hereunder or of the submission herein made by Guarantor to personal jurisdiction within the State of North Carolina. The aforesaid means of obtaining personal jurisdiction and perfecting service of process are not intended to be exclusive but are cumulative and in addition to all other means of obtaining personal jurisdiction and perfecting service of process now or hereafter provided by the law of the State of North Carolina.

Guarantor represents and warrants to AMAC that any and all financial statements delivered by him or her, either prior to or after the execution of this Guaranty, to AMAC are accurate, true, correct, and complete in all respects as of the date thereof.

As security for the liabilities and obligations of Guarantor hereunder, Guarantor hereby transfers and conveys to AMAC any and all balances, credits, deposits, accounts, items and monies of Guarantor now or hereafter in the possession or control of AMAC, and AMAC is hereby given a lien upon and security interest in all property of Guarantor of every kind and description now or hereafter in the possession or control of AMAC for any reason, including all dividends and distributions on or other rights in connection therewith. AMAC may, without demand or notice of any kind, at any time, or from time to time, when any amount shall be due and payable hereunder by such Guarantor, appropriate and apply toward the payment of such amount, and in such order of application as AMAC may from time to time elect, any property, balances, credits, deposits, accounts, items or monies of any Guarantor in the possession or control of AMAC for any purpose.

In the event any or all of the obligations and indebtednesses evidenced, secured or supported by the Agreements are guaranteed by any other person, now or hereafter, AMAC may discharge, release, compromise or otherwise modify any agreements with any such guarantor without affecting the liability of Guarantor in any way. The liability of Guarantor pursuant to this Guaranty shall be joint and several with any other guarantor.

This Guaranty may not be changed orally, and no obligation of Guarantor can be released or waived by AMAC or any officer or agent of AMAC, except by a writing signed by a duly authorized officer of AMAC. This Guaranty shall be irrevocable by Guarantor until all indebtedness guaranteed hereby has been completely repaid and all obligations and undertakings of Dealer/Seller under, by reason of, or pursuant to the Agreements have been completely performed.

Any and all notices, elections or demands permitted or required to be made under this Guaranty shall be in writing, signed by the party giving such notice, election or demand, and shall be deemed received by the other party at the earlier of (a) actual receipt if personally delivered; (b) the next business day after such notice is sent if sent via overnight courier; (c) the date such notice is faxed provided the sender's fax confirmation sheet shows completed transmission of such fax; (d) the date such notice is sent via e-mail; or (e) deposit in the United States mail, sent certified or registered mail, return receipt requested, postage prepaid and addressed as set forth below (or to such other address as may be designated by written notice to the other party):

Initials



The address of AMAC is:
Ace Motor Acceptance Corp.
111 Cupped Oak Dr., Suite F
Matthews, NC 28104

The address and other contact information of Guarantor is set forth below Guarantor's signature to this Guaranty.

The provisions of the Guaranty shall be binding upon each Guarantor and his successors, successors in title, heirs, legal representatives and assigns and shall inure to the benefit of AMAC, its successors, successors in title, legal representatives, and assigns. This Guaranty shall in no event be impaired by any change which may arise by reason of the death of Dealer/Seller or Guarantor, if individuals, or by reason of the dissolution of Dealer/Seller or Guarantor, if Dealer/Seller or Guarantor is an entity.

This Guaranty is assignable by AMAC, and any assignment hereof or any transfer or assignment of any rights or remedies of AMAC pursuant to any Agreement or portions thereof by AMAC shall operate to vest in any such assignee all rights and powers herein conferred upon and granted to AMAC. This Guaranty is not assignable, in whole or in part, by Guarantor

IN WITNESS WHEREOF, the undersigned has executed this Guaranty under seal as of **01-29-2018.**

**N/A**
GUARANTOR NAME                                    GUARANTOR SIGNATURE

Social Security # _____

Personal Address:

_____

_____

Phone Number: _____ - _____ - _____

Fax Number: _____ - _____ - _____

E-mail address: _____

*Please attach a copy of driver's license*

STATE OF _____
COUNTY OF _____

As of this _____ day of _____, _____, personally appeared before me, the said named **GUARANTOR** to me known to be the person described in and who executed the foregoing instrument and said person acknowledged that (s)he executed the foregoing instrument.
By: _____

Printed Name: _____

My Commission Expires: _____

Initials _____

Revised Date: 11/2017    (Page 37 of 46



BHPH Purchasing &
Performance Agreement

## UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE

This Unconditional Guaranty of Payment and Performance (this "Guaranty") is given by the undersigned, **N/A**(hereinafter referred to as "Guarantor"), for and in consideration of the agreements by and between ACE MOTOR ACCEPTANCE CORPORATION, a North Carolina corporation (hereinafter referred to as "AMAC") and **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST** (hereinafter referred to as "Dealer/Seller"), which agreements may include a BHPH Purchasing and Performance Agreement ("PPA"), BHPH Contract Servicing Agreement ("Servicing Agreement"), BHPH Purchasing & Service Agreement, and Agreement for Line of Credit (Floorplan) ("Floorplan") and other good and valuable consideration. This Guaranty, the PPA, the Servicing Agreement, the BHPH Purchasing & Service Agreement, the Floorplan and any other agreements between Dealer/Seller and AMAC including, but not limited to, any documents or instruments now or hereafter evidencing, securing, or otherwise relating to any indebtedness owed to AMAC, as applicable, are referred to herein individually as an "Agreement" and collectively as the "Agreements." Guarantor hereby acknowledges the receipt and sufficiency of such consideration and that the Guarantor is executing this Guaranty for the purpose of seeking to induce AMAC to enter into the Agreements with Dealer/Seller which will be to the direct interest and advantage of Guarantor. Guarantor further acknowledges that the execution of this Guaranty is a condition of AMAC's agreeing to the Agreements and that without this Guaranty AMAC would be unwilling to enter into the Agreements with Dealer/Seller.

In consideration of the foregoing, Guarantor does hereby unconditionally guarantee to AMAC and its successors, successors in title and assigns (a) the full and prompt payment when due, with such interest, fees and other charges as may accrue thereon, either before or after maturity thereof, of any and all amounts due to AMAC pursuant to the Agreements or otherwise due to AMAC by Dealer/Seller for any reason whatsoever and (b) the full and prompt payment and performance of any and all other obligations of Dealer/Seller to AMAC pursuant to the Agreements. References herein to the "Agreements" shall mean and refer to such documents and any renewals, modifications, consolidations and extensions thereof including any and all increases in borrowings.

Guarantor further agrees to pay AMAC all costs and expenses (including reasonable attorneys' fees) paid or incurred by AMAC in connection with the enforcement of Dealer/Seller's or Guarantor's obligations pursuant to any Agreement or otherwise as a result of Dealer/Seller's or Guarantor's breach or default of any Agreement.

No action which AMAC shall take or fail to take in connection with the Agreements, or any of them, or any security for the payment of any indebtedness of Dealer/Seller to AMAC or for the performance of any obligations or undertakings of Dealer/Seller, nor any course of dealing with Dealer/Seller or any other person, shall release Guarantor's obligations hereunder, affect this Guaranty in any way or afford Guarantor any recourse against AMAC. The provisions of this Guaranty shall extend and be applicable to all renewals, amendments, extensions, consolidations and modifications of the Agreements and any and all references herein to the Agreements shall be deemed to include any such renewals, extensions, amendments, consolidations or modifications thereof. This Guaranty unconditionally guarantees the performance of all obligations of Dealer/Seller to AMAC made on behalf of Dealer/Seller by any officer or agent of Dealer/Seller.

Guarantor hereby subordinates any and all indebtedness of Dealer/Seller now or hereafter owed to Guarantor to all indebtedness of Dealer/Seller to AMAC. Guarantor agrees that Guarantor shall not demand or accept any payment of principal or interest from Dealer/Seller, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the security described in and encumbered by any document or instrument securing any of the obligations under the Agreements. Notwithstanding the foregoing, however, if AMAC so requests, Guarantor shall enforce any such indebtedness and shall hold in trust and transfer to AMAC any funds or assets received by Guarantor as a result of such enforcement. Any such amounts transferred to AMAC shall be applied to Dealer/Seller's indebtedness and other obligations in accordance with the Agreements and shall not otherwise reduce or affect in any manner the liability of Guarantor under this Guaranty.

Initials



Guarantor hereby waives and agrees not to assert or take advantage of: (a) the defense of the statute of limitations in any action hereunder or for the collection of the indebtedness or the performance of any obligation hereby guaranteed; (b) any defense that may arise by reasons of the incapacity, lack of authority, death or disability of Guarantor or any other person or entity, or the failure of AMAC to file or enforce a claim against the estate (either in administration, bankruptcy, or any other proceeding) of Dealer/Seller or any other person or entity; (c) any defense based on the failure of AMAC to give notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of any other person whomsoever, in connection with any obligation hereby guaranteed; (d) any defense based upon an election of remedies by AMAC which destroys or otherwise impairs any subrogation rights of Guarantor or the right of Guarantor to proceed against Dealer/Seller for reimbursement, or both; (e) any defense based upon failure of AMAC to commence an action against Dealer/Seller; (f) any duty on the part of AMAC to disclose to Guarantor any facts AMAC may now or hereafter know regarding Dealer/Seller; (g) acceptance or notice of acceptance of this Guaranty by AMAC; (h) notice of presentment and demand for payment of any of the indebtedness or performance of any of the obligations hereby guaranteed; (i) protest and notice of dishonor or of default to Guarantor or to any other party with respect to the indebtedness or performance of obligations hereby guaranteed; (j) any and all other notices whatsoever to which Guarantor might otherwise be entitled; (k) any defense based on lack of due diligence by AMAC in collection, protection or realization upon any collateral securing the indebtedness evidenced by the Agreements; or (l) any other legal or equitable defenses whatsoever to which Guarantor might otherwise be entitled.

This is a guaranty of payment and performance and not of collection. The liability of Guarantor under this Guaranty shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against Dealer/Seller or any other person, nor against securities or liens available to AMAC, its successors, successors in title, endorsees or assigns. Guarantor waives any right to require that an action be brought against Dealer/Seller or any other person or to require that resort be had to any security or to any balance of any deposit account or credit on the books of AMAC in favor of Dealer/Seller or any other person.

In the event of a default under the Agreements, or any of them, AMAC shall have the right to enforce its rights, powers and remedies thereunder or hereunder or under any other instrument now or hereafter evidencing, securing or otherwise relating to the transactions contemplated by the Agreements in any order. All rights, powers and remedies available to AMAC shall be nonexclusive and cumulative of all other rights, powers and remedies provided thereunder or hereunder or by law or in equity. Guarantor hereby authorizes and empowers AMAC upon acceleration of the maturity of any indebtedness owed by Dealer/Seller to AMAC, at AMAC's sole discretion, and without notice to Guarantor, to exercise any right or remedy which AMAC may have including, but not limited to, judicial foreclosure, exercise of rights or power of sale, acceptance of a deed or assignment in lieu of foreclosures, appointment of a receiver to collect rents and profits, exercise of remedies against personal property, or enforcement of any assignment of leases as to any security, whether real, personal or intangible. If the indebtedness guaranteed hereby is partially paid for any reason, this Guaranty shall nevertheless remain in full force and effect, and Guarantor shall remain liable for the entire balance of the indebtedness guaranteed hereby even though any rights which Guarantor may have against Dealer/Seller may be destroyed or diminished by the exercise of any remedy by the AMAC. Until all of the obligations of Dealer/Seller to AMAC have been paid and performed in full, Guarantor shall have no right of subrogation to AMAC against Dealer/Seller. Guarantor hereby waives any rights to enforce any remedy which AMAC may have against Dealer/Seller and any rights to participate in any security held by AMAC. Guarantor hereby authorizes AMAC, without notice to Guarantor, to apply all payments and credits received from Dealer/Seller or from Guarantor or realized from any security to the indebtedness, obligations and undertakings which are the subject of this Guaranty in such manner and in such priority as AMAC in its sole judgment shall see fit.

The books and records of AMAC showing the accounts between AMAC and Dealer/Seller shall be admissible in evidence in any action or proceeding hereon as prima facie proof of the items set forth therein.

Initials /W/ (W)



BHPH Purchasing &
Performance Agreement

This Guaranty is intended as a contract under and shall be construed and enforceable in accordance with the laws of the State of North Carolina, without reference to the conflict of law provisions thereof. This Guaranty shall be deemed to have been made in North Carolina.

Guarantor hereby (a) submits to personal jurisdiction in the State of North Carolina for the enforcement of this Guaranty with venue in the North Carolina state courts located in Mecklenburg County or, if it has or can acquire jurisdiction, the United States District Court for the Western District of North Carolina, and (b) waives any and all rights to object to jurisdiction within the State of North Carolina for the purposes of litigation to enforce this Guaranty. Guarantor further agrees that service of any complaint in any litigation brought for the purpose, in whole or in part, of enforcing this Guaranty may be perfected by mailing a copy of the summons and complaint to Guarantor by certified mail in the manner hereinafter provided for notice and service and shall be deemed perfected on the date of such mailing. Nothing contained herein, however, shall prevent AMAC from bringing any action or exercising any rights against any security and against Guarantor personally, and against any property of Guarantor, within any other state. Initiating such proceeding or taking such action in any other state shall in no event constitute a waiver of the agreement contained herein that the law of the State of North Carolina shall govern the rights and obligations of Guarantor and AMAC hereunder or of the submission herein made by Guarantor to personal jurisdiction within the State of North Carolina. The aforesaid means of obtaining personal jurisdiction and perfecting service of process are not intended to be exclusive but are cumulative and in addition to all other means of obtaining personal jurisdiction and perfecting service of process now or hereafter provided by the law of the State of North Carolina.

Guarantor represents and warrants to AMAC that any and all financial statements delivered by him or her, either prior to or after the execution of this Guaranty, to AMAC are accurate, true, correct, and complete in all respects as of the date thereof.

As security for the liabilities and obligations of Guarantor hereunder, Guarantor hereby transfers and conveys to AMAC any and all balances, credits, deposits, accounts, items and monies of Guarantor now or hereafter in the possession or control of AMAC, and AMAC is hereby given a lien upon and security interest in all property of Guarantor of every kind and description now or hereafter in the possession or control of AMAC for any reason, including all dividends and distributions on or other rights in connection therewith. AMAC may, without demand or notice of any kind, at any time, or from time to time, when any amount shall be due and payable hereunder by such Guarantor, appropriate and apply toward the payment of such amount, and in such order of application as AMAC may from time to time elect, any property, balances, credits, deposits, accounts, items or monies of any Guarantor in the possession or control of AMAC for any purpose.

In the event any or all of the obligations and indebtednesses evidenced, secured or supported by the Agreements are guaranteed by any other person, now or hereafter, AMAC may discharge, release, compromise or otherwise modify any agreements with any such guarantor without affecting the liability of Guarantor in any way. The liability of Guarantor pursuant to this Guaranty shall be joint and several with any other guarantor.

This Guaranty may not be changed orally, and no obligation of Guarantor can be released or waived by AMAC or any officer or agent of AMAC, except by a writing signed by a duly authorized officer of AMAC. This Guaranty shall be irrevocable by Guarantor until all indebtedness guaranteed hereby has been completely repaid and all obligations and undertakings of Dealer/Seller under, by reason of, or pursuant to the Agreements have been completely performed.

Any and all notices, elections or demands permitted or required to be made under this Guaranty shall be in writing, signed by the party giving such notice, election or demand, and shall be deemed received by the other party at the earlier of (a) actual receipt if personally delivered; (b) the next business day after such notice is sent if sent via overnight courier; (c) the date such notice is faxed provided the sender's fax confirmation sheet shows completed transmission of such fax; (d) the date such notice is sent via e-mail; or (e) deposit in the United States mail, sent certified or registered mail, return receipt requested, postage prepaid and addressed as set forth below (or to such other address as may be designated by written notice to the other party):

Initials



**BHPH Purchasing & Performance Agreement**

The address of AMAC is:
Ace Motor Acceptance Corp.
111 Cupped Oak Dr., Suite F
Matthews, NC 28104

The address and other contact information of Guarantor is set forth below Guarantor's signature to this Guaranty.

The provisions of the Guaranty shall be binding upon each Guarantor and his successors, successors in title, heirs, legal representatives and assigns and shall inure to the benefit of AMAC, its successors, successors in title, legal representatives, and assigns. This Guaranty shall in no event be impaired by any change which may arise by reason of the death of Dealer/Seller or Guarantor, if individuals, or by reason of the dissolution of Dealer/Seller or Guarantor, if Dealer/Seller or Guarantor is an entity.

This Guaranty is assignable by AMAC, and any assignment hereof or any transfer or assignment of any rights or remedies of AMAC pursuant to any Agreement or portions thereof by AMAC shall operate to vest in any such assignee all rights and powers herein conferred upon and granted to AMAC. This Guaranty is not assignable, in whole or in part, by Guarantor

IN WITNESS WHEREOF, the undersigned has executed this Guaranty under seal as of **01-29-2018.**

**N/A**
GUARANTOR NAME                          GUARANTOR SIGNATURE

Social Security # _____

Personal Address:

_____

_____

Phone Number: ____-_____-_____

Fax Number: ____-_____-_____

E-mail address: _____

*Please attach a copy of driver's license*

STATE OF _____
COUNTY OF _____

As of this _____ day of _____, _____, personally appeared before me, the said named **GUARANTOR** to me known to be the person described in and who executed the foregoing instrument and said person acknowledged that (s)he executed the foregoing instrument.
By: _____

Printed Name: _____

My Commission Expires: _____

Initials _____



## MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST
**3606 HWY 51**
**FORT MILL, SC 29715**

**01-29-2018**

Ace Motor Acceptance Corporation
111 Cupped Oak Drive, Suite F
Matthews, NC   28104

To Whom It May Concern:

RE: Reassignment of Contracts

**MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST** reassigns its interest in all contracts purchased by Ace Motor Acceptance Corporation from **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST,** from this date forward.

Ace Motor Acceptance Corporation has all rights and liens subject to each contract purchased and therefore have all rights to sign on **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST** behalf.

Sincerely yours,

_(signature)_

**ROBERT MCCOY JR.**
Owner

Initials



BHPH Purchasing &
Performance Agreement

## ACH AMENDMENT & AUTHORIZATION

This Amendment/Authorization, dated **01-29-2018**, between **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST** and **ROBERT MCCOY JR., MISTY MCCOY, N/A, N/A** referred to in this document as Seller and/or Dealer and Ace Motor Acceptance Corporation (AMAC), referred to herein as AMAC or Purchaser hereby amends the terms of the BHPH Purchasing and Performance Agreement dated **01-29-2018** as follows.

The Amendment shall affect only the involved term(s). As to any and all other terms of the BHPH Purchasing and Performance Agreement, noted in the preceding paragraph, the terms of the preceding BHPH Purchasing and Performance Agreement, including any and all personal guarantees, shall be fully binding & will remain in full force & effect and shall apply to this ACH Amendment & Authorization.
WHEREAS, in return for good & valuable consideration, the receipt of which is hereby acknowledged, the parties agree and warrant as follows:

1.    Seller or Dealer & Guarantors agree to allow AMAC, on or after twenty four (24) hours advance notice to Seller and/or Dealer, to fully remove, from the designated bank account of the Seller and/or Dealer, 1) an amount equal to all funds owed AMAC, including, but not limited to Buybacks, Floorplan Payoffs, Floorplan Curtailments, Overage Balances, and any amount equal to the funds paid, to the Seller and/or Dealer, for any and all retail consumers for any and all accounts, Evidences or Indebtedness or Contracts sold by Seller and/or Dealer to AMAC. The amounts to be paid by or to AMAC shall be equal to the gross payment(s) made to the Seller and/or Dealer, by any and all retail consumers for any and all accounts, Evidences or Indebtedness or contracts previously sold by Seller and/or Dealer to AMAC, which have not been previously paid to AMAC.

2.    The account from which said ACH transfer(s) is/are to be made, is designated as follows:

Name of Holder of Bank Account (as is shown on bank statement)

_____

Bank Name_____

Routing Number_____

Account Number _____

3.    The failure of Seller and/or Dealer to allow transfer of the full amounts owed on Buybacks, Floorplan Payoffs, Floorplan Curtailments, Overage Balances, and any amount equal to full amounts paid by consumers for any and all accounts, Evidences or Indebtedness or Contracts sold by Seller and/or Dealer to AMAC, shall allow AMAC to enforce any and all damage provisions in the BHPH Purchasing and Performance Agreement, dated **01-29-2018** and any and all amendments. Any failure to transfer the full amount of the gross payment(s) made by each and involved consumer to Seller and/or Dealer, to AMAC shall be result in damages, to AMAC, which will consist of the unpaid balance, as determined by AMAC then owed on the Evidences of Indebtedness (as is defined in the BHPH Purchasing and Performance Agreement), plus any accrued finance charges and fees in connection with said Contract(s), plus all losses and expenses incurred by AMAC as a result thereof, including, but not limited to, reasonable attorneys' fees and costs of litigation.

4.    Seller or Dealer & Guarantors shall defend and hold AMAC, its officers, directors, employees, agents and representatives harmless from, against and with respect to any damage, liability, claim, loss, deficiency.

Initials



BHPH Purchasing &
Performance Agreement

5.      penalty, fine, or amount paid in settlement, and any expense, including attorneys' fees, disbursements and other costs including costs, fees and expenses for any proceeding (whether mediation, arbitration or civil or criminal litigation) at the trial and appellate levels, and for collection or enforcement of any judgment award or other relief granted, and those arising from the enforcement of this indemnification (collectively "damages"), occasioned by, arising out of, or resulting from, either directly or indirectly, a breach of any of any obligation or any term of this Agreement or Amendment.

6.      Any dispute, as to any amounts  paid to or withdrawn by AMAC, shall be deemed to have been waived or abandoned , unless written notice is given delivered to AMAC, within five (5) business days, following the date of each and every disputed ACH transfer.

AMENDMENT DATED THIS **01-29-2018.**

DEALER/SELLER: (MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST )

By: _____ (signature)

Printed Name & Title _Robert McCoy , member_

SUBSCRIBED AND SWORN TO BEFORE ME THIS 3 DAY OF Jan YR 2018 .

NOTARY PUBLIC Carla J Morefield COMMISSION EXPIRES 9-22-2019

Cabarrus County, North Carolina
Notary Public
Carla J Morefield
My Commission Expires 9/22/2019

INDIVIDUAL DEALER OF SELLER/GUARANTOR (**ROBERT MCCOY JR.**)

By: _____ (signature)

SUBSCRIBED AND SWORN TO BEFORE ME THIS 30 DAY OF Jan YR 2018 .

NOTARY PUBLIC Carla J Morefield COMMISSION EXPIRES 9-22-2019

Cabarrus County, North Carolina
Notary Public
Carla J Morefield
My Commission Expires 9/22/2019

INDIVIDUAL DEALER OF SELLER/GUARANTOR (**MISTY MCCOY**)

By: _____ (signature)

SUBSCRIBED AND SWORN TO BEFORE ME THIS 30 DAY OF Jan YR 2018 .

NOTARY PUBLIC Carla J Morefield COMMISSION EXPIRES 9.22.2019

Cabarrus County, North Carolina
Notary Public
Carla J Morefield
My Commission Expires 9/22/2019

INDIVIDUAL DEALER OF SELLER/GUARANTOR (**N/A**)

By: _____ (signature)

SUBSCRIBED AND SWORN TO BEFORE ME THIS ___ DAY OF _____ YR _____ .

NOTARY PUBLIC _____ COMMISSION EXPIRES _____

INDIVIDUAL DEALER OF SELLER/GUARANTOR (**N/A**)

By: _____ (signature)

SUBSCRIBED AND SWORN TO BEFORE ME THIS ___ DAY OF _____ YR: _____ .

NOTARY PUBLIC _____ COMMISSION EXPIRES _____

Initials _____



BHPH Purchasing &
Performance Agreement

## DESIGNATION OF AGENT(S)

**MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST** ("Dealer") & the individual guarantor(s) named in the BHPH Purchasing & Performance Agreement by and between Dealer and ACE Motor Acceptance Corporation ("AMAC") dated **01-29-2018,** desire to amend the BHPH Purchasing & Performance Agreement (the "Agreement"). Dealer and the individual guarantors shall be collectively referred to as "Dealer."

For purposes of performing under the Agreement, Dealer wishes to designate certain agents of Dealer. This Designation of Agent(s) hereby amends the Agreement.

Dealer designates the following individuals ("Designees") to be agents of Dealer to perform all duties set forth in the Agreement. Dealer further agrees to be responsible and liable for (fully and unconditionally) all acts, including the failure to act, of the Designees:

| | DESIGNATED AGENTS: | SIGNATURES: |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

Dealer further agrees that this responsibility and liability is joint and several (because Dealer constitutes more than one party). The Designees are agents of Dealer for all purposes under the Agreement. The authority of the Designees is effective until revoked as hereinafter provided. To revoke a Designee, the Owner/Registered Agent/Incorporator of Dealer must submit a written and notarized notice of revocation to AMAC via certified mail (or some other form of delivery that certifies the status of delivery). The revocation is effective once received by AMAC.

Notwithstanding the naming of the Designees, Dealer agrees that any person who signs an assignment of a retail installment sale contract or similar document ("Contract") to AMAC on behalf of Dealer shall be deemed to be a Designee if Dealer accepts funding of the Contract (*i.e.,* payment for purchase and assignment of the Contract), including offsets, unless such funded amount is refunded in full to AMAC within 14 calendar days of receipt of said funds.

Any assignment by AMAC of a Contract to another party shall not affect the terms and conditions of this Designation of Agent(s) or the Agreement.

This Designation of Agent(s) is hereby incorporated into and becomes part of the Agreement.    Except as modified in this Designation of Agent(s), all other terms of the Agreement are ratified and reaffirmed and remain in full force and effect.

Initials



BHPH Purchasing &
Performance Agreement

The duly authorized representative of Dealer has executed this Designation of Agent(s) with proper authority effective as of the date set forth below.

Date: **01-29-2018**

**ROBERT MCCOY JR.**
Owner's Name
**MISTY MCCOY**
Owner's Name
N/A
Owner's Name
N/A
Owner's Name

Owner's Signature

Owner's Signature

Owner's Signature

Owner's Signature

Owner/Incorporator of **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST**

Sworn to and subscribed before me

This _29 30_ day of _January_ , 20_18_.

Carla J Morefield
Notary Public Name

Carla J Morefield
Notary Signature

My Commission Expires: 9·22·2019

Cabarrus County, North Carolina
Notary Public
Carla J Morefield
My Commission Expires 9/22/2019

Initials

# EXHIBIT B



STATE OF NORTH CAROLINA,
COUNTY OF MECKLENBURG

This Agreement for Line of Credit (Floorplan) (this "**Agreement**") is made and entered into as of **01-29-2018** by and between **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST** (hereinafter, "**Borrower**"); **ROBERT MCCOY JR., MISTY MCCOY, N/A, N/A** (hereinafter, and collectively, if more than one, "**Guarantor**"); and ACE MOTOR ACCEPTANCE CORPORATION, a North Carolina corporation (hereinafter, "**Lender**"). This Agreement shall constitute a promissory note.

WHEREAS, Borrower is in the business of buying and selling used vehicles; and

WHEREAS, Borrower desires for Lender to provide inventory financing for the purchase of certain used vehicles; and

WHEREAS, Lender desires to loan to Borrower money to purchase said used vehicles on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises, the terms and conditions set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the parties hereto, intending to be legally bound, agree as follows:

**1.**     **Promise to Pay**:  Borrower hereby promises to timely pay to Lender, or order, any and all amounts owed by Borrower to Lender pursuant to this Agreement, all in accordance with the terms of this Agreement.

**2.**     **Line Of Credit**:  Subject to all of the terms and conditions set forth in this Agreement, Lender hereby makes available for Borrower's use from time to time a line of credit (the "**Line of Credit**") in an aggregate amount at any one time outstanding of up to **SEVENTY FIVE THOUSAND** and 00/100 Dollars (**$75,000**), pursuant to which Lender (provided there is not then existing an "Event of Default" (as defined in Section 18 hereof) or any event or condition which, with notice, lapse of time or the making of such loan, would constitute an Event of Default) may make loans to Borrower on a revolving credit basis. Lender shall have the sole discretion with regard to making any advances or loans to Borrower pursuant to this Agreement. The maximum amount set forth above is an indication of what Lender may be willing to loan to Borrower, but it is not a guaranteed amount that Lender will or will be required to advance or loan to Borrower. Lender may, from time to time, in its sole discretion, increase or reduce the maximum amount which Borrower may borrow pursuant to the Line of Credit. In the event the Line of Credit amount is reduced, Borrower shall repay any amounts owed to Lender in excess of such maximum amount immediately upon Lender's demand.

**3.**     **Use of Funds**:  Borrower shall be permitted to use any funds advanced by Lender on the Line of Credit only to purchase motor vehicles which are approved by Lender in accordance with the terms of this Agreement, in Lender's sole discretion.

**4.**     **Security Interest**:  Borrower hereby grants to Lender a first-priority security interest in the Collateral (as hereinafter defined) securing all amounts owed to Lender pursuant to this Agreement and all other agreements or understandings between Borrower and Lender. The Assets (as hereinafter defined), as now owned or hereafter acquired and wherever located, including all accessions to, substitutions for and all replacements of any of them together with all proceeds and products of them and including, but not limited to, retail installment contracts as a product and proceeds of insurance policies insuring any of them shall be collectively referred to herein as the "**Collateral**". The "**Assets**" shall mean and refer to all of Borrower's assets including, without limitation, any and all:  vehicle inventory; vehicle titles;

Dealer Initials

EXHIBIT
B



parts and accessories inventory; directive reserves; monies; cash; and books and records related to any of the foregoing. Lender shall have the right to make any and all filings or recordings, including, without limitation, UCC-1 financing statements, and take all other actions necessary or reasonably required to perfect its security interest in the Collateral. Borrower represents and warrants that the security interest in the Collateral granted to Lender pursuant to this Agreement shall be a first-priority security interest as to all Collateral. Borrower shall not grant or permit to exist any other liens or encumbrances against the Collateral without Lender's prior written permission.

5.      **Requirements for Lender's Consideration of Advances**: For any vehicle approved to be financed by Lender pursuant to this Agreement for which Borrower desires to receive an Advance (as defined below in Section 6) from Lender pursuant to this Agreement, Borrower shall present to the Lender: (1) an original title for such vehicle; and (2) a Bill of Sale for such vehicle (collectively, the "**Proof of Purchase Documents**"). In addition, to qualify for an Advance, the vehicle for which the Advance is proposed to be made, along with all other vehicles of the Borrower, must be ready to sell, as determined by Lender in its sole discretion. Lender, at Lender's sole discretion, may remove any vehicle determined by Lender not to be ready to sell from the Line of Credit and Borrower shall make payment to Lender of the amount set forth in Section 11 hereof. By presenting to Lender the Proof of Purchase Documents for a particular vehicle, Borrower represents and warrants that such vehicle is ready to sell and that all other vehicles of the Borrower are ready to sell.

6.      **Advances**: Upon receipt of the Proof of Purchase Documents for a particular vehicle purchased by Borrower, Lender may, in its sole discretion, advance to Borrower the purchase price (or any fraction thereof) of said vehicle paid by Borrower (each such payment being referred to herein as an "**Advance**"). In the event the Advance is made on a vehicle purchased from an auction, Lender shall pay the Advance directly to the auction house. In all other cases, the Advance shall be paid to Borrower or, in Lender's sole discretion, applied to the account of Borrower with Lender. Lender may, in its sole discretion, reduce the amount of any Advance if Lender deems the purchase price of such vehicle to exceed the fair market value of such vehicle. Borrower shall provide to Lender, and Lender shall retain possession of, the title of the vehicle for which an Advance has been made as evidence of Borrower's financial obligation and Lender's security interest therein.

7.      **Advances at Lender's Sole Discretion**: Lender has the right, in its sole discretion, to deny an Advance for any vehicle for any or no reason including, without limitation, considerations related to the type, condition or individual purchase price of a vehicle. Moreover, Lender may, in its sole discretion, deny future Advances for any or no reason including, without limitation, Borrower's payment status, Borrower's payment history, the general credit standings of Borrower, the general credit standings of any guarantor of Borrower, or the age, condition or value of any of the Collateral.

8.      **Sale of Vehicles or Removal as Collateral**: Borrower may sell or otherwise remove a vehicle from the Collateral securing the Line of Credit at any time upon paying to Lender the amounts required pursuant to Section 11 hereof. Borrower agrees that a sale or conveyance of any vehicle subject to an Advance will not be considered consummated until Lender releases such vehicle from the Collateral, as evidenced by the return of the title for such vehicle to Borrower. In addition, Lender may require that any vehicle be removed as Collateral for the Line of Credit at any time and for any reason, in the Lender's sole discretion. In the event Lender requires that any vehicle or vehicles be removed as Collateral for the Line of Credit, Borrower shall pay to Lender the amounts required pursuant to Section 11 hereof for any such vehicles.

9.      **Borrower's Floorplan Terms and Privacy Policy**: This Agreement is subject to certain policies of the Lender including, but not limited to, the "Borrower's Floorplan Terms" and Lender's privacy policy (collectively, all such policies and procedures including, but not limited to, the Borrower's Floorplan Terms and the privacy policy shall be referred to as the "**Policies and Procedures**"). The Policies and Procedures may be amended and changed by Lender

Dealer Initials



Agreement for Line of Credit
("Floorplan")

from time to time in Lender's discretion. Borrower agrees to comply with, observe and abide by the Policies and Procedures, as amended from time to time, and agrees that, in the event Borrower shall fail to do so, Lender, in its sole discretion, shall have the right to terminate this Agreement or deny future Advances. In the event of a conflict between the terms and conditions of this Agreement and the Policies and Procedures, the Policies and Procedures will control and will supersede any conflicting terms or conditions within this Agreement. Borrower may obtain a copy of the current Policies and Procedures by contacting Lender in accordance with the notice provisions of this Agreement. For the purposes hereof, the "**Borrower's Floorplan Terms**" shall mean and refer that certain document published by Lender which sets forth terms and conditions related to this Agreement and the Line of Credit.

10.    Advance Fees: Each Advance made is subject to a fee (the "**Advance Fee**"). The Advance Fee to be charged is set forth on the "Advance Schedule" as set forth in the Borrower's Floorplan Terms (hereinafter the "**Advance Fee Schedule**"). The Advance Fee Schedule is incorporated herein and made an integral part of this Agreement as if fully set forth herein. The Advance Fee Schedule may be modified from time to time by Lender with written notice to Borrower; provided, however, that Advance Fees for Advances made prior to any such change in the Advance Fee Schedule shall be based on the Advance Fee Schedule in effect at the time of such Advance. The Advance Fee Schedule contained in the Borrower's Floorplan Terms, as the same may be modified from time to time, may contain fees which are higher or lower than the fees charged to other customers of Lender.

11.    **Repayment of Advances and Payment of Fees**:

(a)  Sale of Vehicle: In the event Borrower shall agree to sell a vehicle to a third-party (a "**Third Party Purchaser**"), Borrower shall notify Lender within 24 hours after the Third Party Purchaser has executed a purchase contract, at which time Borrower shall: (1) immediately repay any Advance which has been made for the vehicle being purchased by the Third Party Purchaser; and (2) immediately pay the Advance Fee for such vehicle, as calculated by Lender. Upon receipt in good funds of the amounts described in (1) and (2), Lender shall release the title for such vehicle to Borrower. All invoices from the Lender are due upon receipt and failure to pay any invoice when due is an "Event of Default" pursuant to this Agreement.

(b)  Vehicles Removed as Collateral for Line of Credit: In the event a vehicle is removed as Collateral for the Line of Credit other than by sale to a Third Party Purchaser, Borrower shall immediately pay upon Lender demand: (1) any Advance which has been made for the vehicle which is removed as Collateral for the Line of Credit; and (2) the Advance Fee for such vehicle, as calculated by Lender. All invoices from the Lender are due upon receipt and failure to pay any invoice when due is an "Event of Default" pursuant to this Agreement.

(c)  Curtailment of Principal: Borrower has certain obligations to repay amounts due to Lender with regard to each vehicle in accordance with the Borrower's Floorplan Terms based upon the expiration of certain time periods (each, a "**Curtailment Period**"). The payment due as a result of the expiration of a Curtailment Period is referred to herein as a "**Curtailment Payment**."

The applicable Curtailment Periods and Curtailment Payments are as follows:

| Curtailment Period | Curtailment Payment |
|---|---|
| 60 calendar days after initial Advance | 10% of initial Advance plus fees and costs |
| 90 calendar days after initial Advance | 10% of initial Advance plus fees and costs |

All invoices from the Lender are due upon receipt and failure to pay any invoice when due is an "Event of Default" pursuant to this Agreement. The Lender has the right to immediately seize and take

Dealer Initials



possession of any vehicle with regard to which the Borrower has failed to pay an invoice for a Curtailment Payment within seven (7) calendar days of the date of such invoice. Such vehicle may be sold by Lender or Lender's agent. Borrower is responsible for all costs and expenses including, but not limited to, repairing said vehicle, transporting said vehicle and any losses of Lender upon sale of said vehicle.

(d) **Final Bills (Principal Due - Sale or No Sale):** In the event that a vehicle has not been sold to a Third Party Purchaser within 120 calendar days after the date of the initial Advance for such vehicle, Borrower shall immediately pay upon Lender demand: (1) any Advance which has been made for such vehicle which remains unpaid; and (2) the Advance Fee for such vehicle, as calculated by Lender. All invoices from the Lender are due upon receipt and failure to pay any invoice when due is an "Event of Default" pursuant to this Agreement.

(e) Weekly Settlement Sheet: Lender may, in its sole discretion, reflect all amounts due by Borrower in the "Weekly Settlement Sheet" (as such term is defined in that certain BHPH Purchasing & Performance Agreement between Lender and Borrower (the "**PPA**")) immediately as such amounts become due or at any time prior to payment of such amounts by Borrower.

**12.    Option to Transfer Ownership:** Lender shall have the option to, at any time, transfer ownership of any vehicle which is subject to an Advance to itself or any other entity, in Lender's sole discretion. In such event, a Power of Attorney may be employed if required or Lender or its representative may act as "agent" for Borrower. If Lender elects this option, Borrower will be notified in accordance with this Agreement. Borrower acknowledges that such change in ownership shall not alter any of Borrower's obligations pursuant to this Agreement, and any such vehicles may continue to remain on inventory status reports of Borrower despite the change in ownership. Borrower will continue to be liable for these vehicles and any and all expenses related to the disposition of any vehicles as well as all other obligations set forth in this Agreement as if such change in ownership had not occurred.

**13.    Financial Statements:** Borrower shall provide to Lender such financial statements and financial information as set forth in the PPA.

**14.    Termination:** This Agreement may be terminated by Borrower or Lender at any time by written notice to the other party in accordance with this Agreement. Upon termination, Lender shall provide Borrower a final invoice of all amounts due to Lender which shall be due and payable on a vehicle by vehicle basis in accordance with the Curtailment and Final Bill payment provisions of Sections 11(C) and 11(D). Borrower's failure to pay such invoice when due shall be an "Event of Default" pursuant to this Agreement. Upon the occurrence of any Event of Default on or after termination of this Agreement or if Borrower is in default of this Agreement upon termination of this Agreement, any amounts reflected in the final invoice which remain unpaid shall be immediately due and payable in full. Upon termination, the Line of Credit shall be terminated and no further Advances shall be made. All obligations of Borrower and all rights and remedies of Lender shall survive termination of this Agreement including, without limitation, repayment of all amounts due hereunder such as Advances and Advance Fees.

**15.    Insurance:** During the term of this Agreement, Borrower shall have and continuously maintain insurance from financially sound carriers acceptable to Lender with respect to all Collateral. Such insurance shall insure against risks of fire (including so-called extended coverage), theft, collision, flood, earthquake, "mysterious disappearance" and such other risks as Lender may require, containing such terms, in such form, for such periods and written by such companies as may be satisfactory to Lender. Borrower shall furnish Lender with certificates or other evidence satisfactory to Lender

Dealer Initials



Agreement for Line of Credit
("Floorplan")

of compliance with the foregoing insurance provisions within five (5) calendar days after Lender's request. Lender is hereby granted a power of attorney by Borrower and is appointed Borrower's attorney-in-fact (coupled with an interest) for purposes of obtaining, adjusting, settling and cancelling such insurance and endorsing any drafts in connection therewith. In the event that Borrower does not maintain such insurance, Lender may, at Borrower's expense, obtain such insurance on the Collateral, and Borrower shall reimburse Lender for all costs of Lender in obtaining and maintaining such insurance.

16.    **Maintenance**: Borrower shall keep the Collateral free from any liens, security interests or encumbrances and shall maintain the Collateral in good working and saleable order, condition and repair, and shall not waste or destroy the Collateral or any part thereof. Borrower shall keep the Collateral appropriately protected from the elements and shall furnish all required parts and servicing (including any contract service necessary to maintain the benefit of any warranty of the manufacturer) for the Collateral. Borrower shall not own or use the Collateral in violation of any statute, ordinance, law, regulation or order. Lender may examine and inspect the Collateral and any and all books and records of Borrower at any time during business hours wherever located. Such right of inspection includes the right to copy and make extracts from Borrower's books and records and to personally interview Borrower's officers, employees and agents. Borrower hereby authorizes Borrower's accountants to provide information to and answer requests of Lender. Borrower agrees to promptly complete any Lender reporting requirements including, but not limited to, inventory verification reports.

17.    **Other Services**: Borrower recognizes that there are valuable services besides the lending of money for which remuneration to Lender is reasonable, and such remuneration is included in the Advance Fees and the Advance Fee Schedule. With regard to any portion of the Advance Fee comprising interest, in no event shall the amount of interest due and payable hereunder exceed the maximum rate of interest allowed by applicable law. In the event that any payments to Lender are finally determined by a court of competent jurisdiction to be interest in excess of the maximum rate allowed by law, such payments shall be credited as a payment of the principal amount due of the Line of Credit. Any amounts paid by Borrower in excess of what is due to the Lender by Borrower shall be repaid to Borrower.

18.    **Default**: In addition to the other events set forth in this Agreement as an "Event of Default," the occurrence of any one or more of the following events shall also constitute an "Event of Default": (a) the failure of Borrower or any Guarantor to comply with any provision of this Agreement or the then-current Policies and Procedures (as the same may be modified from time to time in accordance with this Agreement); (b) the failure of Borrower or any Guarantor to make any payment pursuant to this Agreement on the date on which such payment is due; (c) the filing of any petition for relief under any provision of Title 11 of the United States Code (entitled "Bankruptcy"), as amended, or under any similar federal or state statute by or against Borrower or any Guarantor; (d) the application for the appointment of a receiver or custodian for, the making of a general assignment for the benefit of creditors by, or the insolvency of the Borrower or any Guarantor; (e) the default by Borrower or any Guarantor under any agreement with Lender or its affiliates; (f) the revocation of any guaranty by a Guarantor; (g) the death, termination of existence, or dissolution of Borrower or any Guarantor; (h) the failure of any representation or warranty of Borrower or Guarantor to remain true, correct, complete and accurate at all times during the term of this Agreement; (i) the entry of a judgment for the payment of money against Borrower or any Guarantor which remains unsatisfied, in whole or in part, for a period of more than ten (10) days; (j) the impairment of Borrower's or any Guarantor's ability to repay amounts owed to Lender as the same become due, determined in Lender's sole discretion; (k) Lender not having a first priority security interest in any of the Collateral; (l) Borrower ceases to do business as an automobile dealer for any or no reason; or (m) the occurrence of any other event or circumstance which causes Lender to deem itself or the Collateral insecure or at risk.

19.    **Remedies**: Upon the happening of any Event of Default, Lender shall provide Borrower written notice of the Event of Default. Borrower shall have ten (10) calendar days from the date of receipt of Lender's notice to cure such default. If Borrower fails to cure such default within such ten (10) day period or such default is not able to be cured, then immediately upon the expiration of such ten (10) day period or at any time thereafter: (a) Lender may accelerate

Dealer Initials



Agreement for Line of Credit
("Floorplan")

any or all liabilities and obligations of Borrower to Lender, including, but not limited to, any Advance Fees or Advances, so that such liabilities and obligations become immediately due and payable; (b) at the option of Lender, all future Advances shall cease; (c) Lender shall have and may exercise all of the rights and remedies granted to a secured party under the Uniform Commercial Code as adopted by the State of North Carolina and all of the rights and remedies under any other applicable law; (d) Lender shall have the right, immediately and without notice or other action, to set off amounts owed by Lender to Borrower against any of Borrower's liabilities to Lender, whether or not due; (e) Lender may proceed with or without judicial process or notice to Borrower to take possession of all or any part of the Collateral not already in the possession of Lender, and Borrower shall do everything necessary to make the Collateral available to Lender (including, without limitation, assembling the Collateral and making it available to Lender at a place designated by Lender which is reasonably convenient to Borrower and Lender); (f) at the option of Lender, Borrower shall assign, transfer and deliver to Lender, at Borrower's expense, all or any portion of the Collateral; (g) Lender may sell the Collateral at public or private sale, in bulk or in parcels and with or without having the Collateral at the sale or other disposition, and Borrower agrees that in case of sale or other disposition of the Collateral, or any portion thereof, Lender shall apply all proceeds from such sale first to all costs and expenses of such sale, including attorney's fees, and then to the obligations of the Borrower to Lender; (h) Lender may, in its sole discretion, retain the Collateral or any part thereof in satisfaction of any or all sums due from Borrower to Lender upon notice of such proposed election to Borrower and any other party as may be required by applicable law. In the event Lender retains any vehicles in satisfaction of sums due from Borrower, the value of such Collateral retained by Lender shall be determined by Lender in accordance with the then current North American Dealers Association published guidelines for determining the "trade in" value of such vehicle.

Upon the occurrence of an Event of Default, all outstanding Advances, all accrued Advance Fees, and all other sums due from Borrower to Lender shall bear interest until paid at the rate equal to the lesser of (i) eighteen percent (18%) per annum or (ii) the maximum interest rate permitted pursuant to applicable law.

20.    **Remedies Are Cumulative**: All remedies provided in this Agreement shall be cumulative and may be exercised singularly, successively or concurrently at Lender's option, and the exercise or enforcement of any one such right or remedy shall be neither a condition nor a bar to the exercise or enforcement of any other. Lender may exercise any one or more of such remedies in addition to any and all other remedies Lender may have under any applicable law or in equity. Moreover, the enumeration of Lender's rights and remedies set forth in this Agreement is not intended to be exhaustive. Borrower shall indemnify, reimburse and hold harmless Lender for all costs and expenses incurred by Lender, including reasonable attorneys' fees, costs incurred to prepare any Collateral for sale, and any other costs incurred by Lender in enforcing its rights under this Agreement or applicable law.

21.    **LIMITATION ON LIABILITY**: IN NO EVENT SHALL LENDER BE LIABLE FOR: (a) THIRD PARTY CLAIMS OR LIABILITIES; OR (b) ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OR DAMAGE TO DATA, INACCURACY OF DATA, LOSS OF ANTICIPATED REVENUE OR PROFITS, WORK STOPPAGE OR IMPAIRMENT OF OTHER ASSETS OR LOSS OF GOOD WILL, LOSS OF USE, LOSS OF BUSINESS; LOSS OF THE USE OF MONEY; COST OF ALTERNATIVE FINANCING; LOSS OF REPUTATION; COST OF SUBSTITUTE EQUIPMENT AND PROPERTY; OR OTHER FINANCIAL OR ECONOMIC LOSS, WHETHER OR NOT FORESEEABLE AND WHETHER OR NOT LENDER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF THE ESSENTIAL PURPOSE OF THIS AGREEMENT OR ANY LIMITED REMEDY HEREUNDER.

IN NO EVENT SHALL THE TOTAL LIABILITY OF LENDER TO BORROWER ARISING OUT OF OR IN

Dealer Initials



Agreement for Line of Credit
("Floorplan")

CONNECTION WITH THIS AGREEMENT OR ANY OTHER AGREEMENT OR UNDERSTANDING BETWEEEN LENDER AND BORROWER EXCEED THE TOTAL ADVANCE FEES PAID BY BORROWER TO LENDER PURSUANT TO THIS AGREEMENT DURING THE SIX (6) CONSECUTIVE CALENDAR MONTH PERIOD PRIOR TO THE DETERMINATION OF SUCH LIABILITY.

THE LIMITATIONS SET FORTH IN THIS SECTION 21 APPLY TO ALL CAUSES OF ACTION IN THE AGGREGATE, INCLUDING WITHOUT LIMITATION, BREACH OF CONTRACT, BREACH OF WARRANTY, INDEMNIFICATION, NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATION AND OTHER TORTS AND STATUTORY CLAIMS.

BORROWER ACKNOWLEDGES THAT IT UNDERSTANDS THE LEGAL AND ECONOMIC RAMIFICATIONS OF THE FOREGOING LIMITATIONS AND THAT THE FOREGOING LIMITATIONS ALLOCATE THE VARIOUS RISKS BETWEEN THE PARTIES AND FORM AN ESSENTIAL PART OF THE AGREEMENT OF THE PARTIES.

22.     **DISCLAIMERS**: IN ADDITION AND SUBJECT TO THE LIMITATIONS SET FORTH IN SECTION 21, LENDER SHALL NOT BE LIABLE FOR:

(a) ANY FAILED ACH TRANSFER OR OTHER TRANSFER OF FUNDS, EXCEPT TO THE EXTENT LENDER SHALL HAVE BEEN GROSSLY NEGLIGENT IN THE INITIATION OF ANY SUCH TRANSFER;

(b) ANY TITLE DEFICIENCY FOR ANY VEHICLE PURCHASED WITH AN ADVANCE OR WHICH IS OTHERWISE OWNED BY BORROWER;

(c) ANY AGREEMENT OR CONTRACT BETWEEN BORROWER AND ANY CUSTOMER OF BORROWER (OR ANY OTHER THIRD PARTY) OR THE SUFFICIENCY, VALIDITY, ENFORCEABILITY, OR PROPRIETY THEREOF;

(d) ANY DAMAGE TO ANY COLLATERAL INCURRED IN REPOSSESSION OF THE COLLATERAL OR IN THE EXERCISE OF ANY OTHER REMEDY WHICH LENDER MAY HAVE, EXCEPT TO THE EXTENT LENDER SHALL HAVE BEEN GROSSLY NEGLIGENT IN THE EXERCISE OF SUCH REMEDIES; OR

(e) LOST OR MISPLACED TITLES.

23.     **Lender's Right to Offset**: Lender shall have the right to offset amounts owed by it to Borrower against any amounts owed to Lender by Borrower or any Guarantor under this Agreement or any other agreement or understanding with Lender. Such offset may be reflected in and accounted for in Borrowers weekly settlement sheets with Lender, in Lender's sole discretion.

24.     **Vehicle Location**: All vehicles purchased by Borrower will be kept at the following location or an alternate location agreed to in writing between Borrower and Lender:

**MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST**
**3606 HWY 51**
**FORT MILL, SC 29715**

Dealer Initials



Agreement for Line of Credit
("Floorplan")

25.    **Other Conditions**: Lender, or its agent, shall have the right to inspect any of the vehicles and corresponding records on which Lender is holding title for which an Advance has been made. Lender shall assume no liability or responsibility for title imperfections nor shall Lender have any obligation to inspect such titles. Titles will be made available for inspection by Borrower. Lender has the right to make credit inquiries or request credit reports for Borrower or any Guarantor at its discretion.

Any representatives of Lender shall have authority to act as an agent for Borrower in completing any and all title work for vehicles and for the endorsement of any checks written to Borrower. Lender may apply any monies received to Borrower's account or to any fees or other amounts owed to Lender pursuant to this Agreement.

26.    **Notice**: Any notice or demand which Lender or Borrower may elect or be required to give to the other party pursuant hereto shall be given in writing and shall be deemed received by the other party at the earlier of (a) actual receipt if personally delivered; (b) the next business day after such notice is sent if sent via overnight courier; (c) the date such notice is faxed provided the sender's fax confirmation sheet shows completed transmission of such fax; (d) the date such notice is sent via e-mail; or (e) deposit in the United States mail, sent certified or registered mail, return receipt requested, postage prepaid and addressed as set forth below (or to such other address as may be designated by written notice to the other party):

If to Lender:
Ace Motor Acceptance Corp.
111 Cupped Oak Dr., Suite F
Matthews, NC 28104

If to Borrower:
**MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST**
**3606 HWY 51**
**FORT MILL, SC 29715**

Notwithstanding the foregoing, all notices by Seller must be sent by United States mail, certified or registered mail, return receipt requested, postage prepaid and addressed to Purchaser unless the specific provision of this Agreement permits notice to be provided by Seller in another method. Such restriction shall not apply to Purchaser. However, Purchaser shall send any notices of a default of this Agreement by Seller to Seller by United States mail, certified or registered mail, return receipt requested, postage prepaid and addressed to Seller.

27.    **Presentment**: Borrower and each guarantor hereby waive presentment for payment, demand, protest and notice of demand, notice of dishonor, notice of nonpayment, notice of default, and all other notices. No failure to accelerate the debt evidenced hereby by reason of default hereunder, acceptance of a past due installment, or indulgences granted from time to time shall be construed (i) as a novation of this Agreement or as a restatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Agreement, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder or by applicable law. Borrower and all Guarantors hereby expressly waive the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing. No extension of the time for payment of any amounts due hereunder shall operate to release, discharge, modify, change or affect the original liability of Borrower or any Guarantor under this Agreement, either in whole or in part unless Lender agrees otherwise in writing. This Agreement may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

Dealer Initials



Agreement for Line of Credit
("Floorplan")

28.     **Applicable Law**: This Agreement is intended as a contract under and shall be construed and enforceable in accordance with the laws of the State of North Carolina, without reference to the conflict of law provisions thereof. Subject to the arbitration provisions set forth in this Agreement, Borrower hereby consents to jurisdiction in the State of North Carolina in any action to enforce or collect this Agreement, and further consents to venue in the State Courts of North Carolina in Mecklenburg County, North Carolina, or, if applicable, the United States District Court for the Western District of North Carolina. This Agreement shall be deemed to have been made in Matthews, North Carolina.

29.     **Attorney Fees**: In the event that amounts owed to the Lender pursuant to this Agreement, or any part thereof, are collected by or through an attorney at law, Borrower agrees to pay all costs of collection including, but not limited to, reasonable attorney's fees up to the amount of fifteen percent (15%) of the indebtedness evidenced hereby.

30.     **Entire Agreement, Severability, Successors and Assigns and Waiver**: This Agreement constitutes the entire understanding between the parties; all prior or contemporaneous oral or written agreements or understandings are merged into this Agreement. If any one or more of the provisions contained in this Agreement is held to be illegal or unenforceable, such illegality or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such illegal or unenforceable provision had never been contained herein. This Agreement shall be binding on and inure to the benefit of the parties and their respective heirs, personal representatives, successors and assigns. As used herein, the terms "Borrower" and "Lender" shall be deemed to include their respective heirs, successors, legal representatives and assigns, as the case may be, whether by voluntary action of the parties or involuntary by operation of law. This Agreement and all rights and obligations hereunder shall not be assigned by Borrower without the prior express written consent of the Lender. Any waiver by any party or consent by any party to any variation from any provision of this Agreement shall be valid only if in writing and only in the specific instance in which it is given, and such waiver or consent shall not be construed as a waiver of any other provision or as a consent with respect to any similar instance or circumstance.

31.     **TIME IS OF THE ESSENCE**: TIME IS OF THE ESSENCE WITH RESPECT TO ALL TIME PERIODS IN THIS AGREEMENT.

32.     **Assignment**: Borrower acknowledges that Lender may sell or assign any and all right, title and interest it has or may have in or to this Agreement, any Advance made pursuant to this Agreement, any Advance Fees or other right to payment, and the Collateral, whether arising under this Agreement, pursuant to law, or under any agreement or instrument related to this Agreement. Borrower agrees that in the event of any such assignment, Borrower shall, upon the direction of Lender, pay directly and promptly to Lender's assignee without abatement, deduction or set-off, all amounts which have become due under the agreements and instruments assigned, and that, upon the assignment of this Agreement, Lender's assignee shall have any and all rights of Lender hereunder and shall be entitled to exercise any remedies of Lender hereunder, and all references herein to Lender shall include Lender's assignee and Borrower further covenants and agrees that it will not assert against Lender's assignee any defense or counterclaim or set-off. Borrower acknowledges that Lender may institute any legal action for which a managed or affiliated entity of Lender is the ultimate beneficiary.

33.     **Indemnification**. Borrower shall indemnify, defend, reimburse, and hold Lender, its officers, directors, employees, agents, servants and representatives harmless from, against, and with respect to any damage, liability, claim, loss, deficiency, penalty, obligation, cost, fine, amount paid in settlement, and any expense, including reasonable attorneys' fees, disbursements and other costs including costs, fees and expenses for any proceeding (whether mediation, arbitration or civil or criminal litigation) at the trial and appellate levels, and for collection or enforcement of any judgment award or other relief granted, and those arising from the enforcement of this Agreement occasioned by, arising out of, or resulting from, either directly or indirectly: (i) any and all claims against and liabilities of Borrower of every kind, nature and description, absolute and contingent, including, without limitation, those arising from or in any way

Dealer Initials



connected with the business and operations of Borrower; (ii) any and all claims against Borrower by any third party except to the extent any such claim results from the willful misconduct or gross negligence of Lender; (iii) any breach of this Agreement by Borrower or any Guarantor, including, without limitation, any breach of any representation, warranty, or covenant contained in this Agreement; (iv) a breach of any of the Borrower's obligations pursuant to this Agreement; (v) a breach of any of the obligations of the Guarantor of this Agreement or any guaranty related to this Agreement; or (vi) any Event of Default.

34.     Release. Borrower, each Guarantor, and their officers, directors, employees, agents, servants, heirs, successors, assigns, and representatives, hereby release, dismiss, remise, abandon and/or otherwise forego, Lender and its affiliated companies, partnerships, collective, interpretation and predecessors, successors, subsidiaries, present and former affiliates, divisions and departments, members, employees, legal representatives, heirs, assigns, agents and servants, and its past, present, and future principals, agents, servants, employees, employers, partners, assignees, heirs, and devisees (collectively, the "Releasees") from any and all past and present claims, demands, obligations or causes of action for compensatory or punitive damages, costs, losses, expenses, attorneys' fees, investigative expenses, and compensation, whether based on tort, contract, or other legal or equitable theories of recovery, whether known or unknown, which Borrower and any Guarantors currently have or may have had against any of the Releasees related to any promises, guaranty, contractual obligations or other obligation arising from any and all dealings with any Releasees. In the event that Borrower and Lender enter into any additional agreements, the release in this Section 34 shall be deemed to have been remade by Lender and each Guarantor as of the date of such other agreement(s) as if it had been set forth in its entirety in such other agreement(s).

35.     Resolution of Disputes.

(a) General. Except for the Excluded Disputes (as hereafter defined), all disputes between or among any parties to this Agreement including, but not limited to, those disputes arising out of or in connection with the execution, interpretation and performance of this Agreement (including the validity, scope and enforceability of this Section 35) shall be solely and finally determined by one Arbitrator selected by the American Arbitration Association ("AAA"). The arbitration proceedings shall be held in Mecklenburg County in North Carolina, and, except as otherwise may be provided in this Agreement, the arbitration proceedings shall be conducted in accordance with the Commercial Arbitration Rules (the "AAA Rules") of the AAA. The Arbitrator shall be selected in accordance with the AAA Rules then in effect for such a selection. The arbitration shall be conducted in accordance with the process set forth in this Section 35.

(b) Excluded Disputes. Any dispute where the total dollar amount in controversy is less than US $10,000.00 (the "Excluded Disputes") shall not be subject to mandatory arbitration as set forth in this Agreement.

(c) Exclusion of Certain Damages. In no circumstances shall any party to this Agreement be liable for: (1) direct or compensatory damages or (2) indirect, consequential, reliance, or special damages, with respect to *lost revenues, lost business opportunity, loss of good will, or lost profits of any kind* regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, prevention, failure of essential purpose, or otherwise, and even if advised of the likelihood of such damages. This damages limitation provision reflects the express intent of the parties and reflects a deliberate and bargained for allocation of risk pertaining to any dispute between the parties.

(d) Arbitration Notice. If a party has a dispute which has not been resolved by the parties and s/he or it submits the dispute for arbitration pursuant to this Agreement, such party shall furnish the other parties to the Agreement with the dated, written statement (the "Arbitration Notice") indicating (i) such party's

Dealer Initials



Agreement for Line of Credit
("Floorplan")

intent to commence arbitration proceedings, (ii) the nature, with reasonable detail, of the dispute and (iii) the remedy or remedies such party will seek.

(e) Discovery Requests. At any time within forty (40) days after the date of the Arbitration Notice, the party(s) commencing the arbitration (collectively, the "**Petitioner**") and the party(s) with whom the Petitioner has a dispute (collectively, the "**Respondent**") can make discovery requests of the other (including, but not limited to, requests for delivery of documents, production of witnesses for testimony and delivery of interrogatory responses). The recipient of a discovery request shall have ten (10) days after the receipt of such request to object to any or all portions of such request and make an application to the Arbitrator to limit the scope of such discovery request, and shall respond to any portions of such request not so objected to within twenty (20) days of the receipt of such request. All objections shall be in writing and shall indicate the reasons for such objections. Within five (5) business days after the end of the period for the submission by the requested party of an application to limit the discovery request, the Arbitrator shall grant or deny such discovery request, in whole or in part, to the extent the Arbitrator determines such discovery is or is not, as the case may be, reasonably necessary to enable the requesting party to obtain information relevant to the dispute without unreasonably burdening the requested party. The requested party shall comply with a discovery request granted within ten (10) days after such grant, or within such longer period as the Arbitrator may determine upon application of the requested party for an extension thereof for reasonable cause. Neither party shall be permitted to make more than one application for discovery to the Arbitrator. All depositions shall be taken in Charlotte, North Carolina unless otherwise agreed by the parties. The Arbitrator is not authorized to subpoena documents or perform independent investigations.

(f) Timing of Hearings. Hearings must commence no later than ninety (90) days following the date of the Arbitration Notice and such hearing shall be conducted for no more than five business days.

(g) Format. Each of the Petitioner and Respondent shall submit a brief, outlining such party's claim for relief or defense to such claim, to the other and to the Arbitrator on or before the tenth (10th) day following the date of the last hearing. Reply briefs must be exchanged and submitted to the Arbitrator on or before the twentieth (20th) day following the date of the last hearing. The final decision of the Arbitrator is due on or before the thirtieth (30th) day following the date of the last hearing. The Arbitrator shall choose the form of final decision that, in his or her judgment, is most consistent as supported by evidence presented by the Petitioner and Respondent in the arbitration proceeding or, if the subject matter of the dispute is not clearly addressed in or determinable, that, in their opinion, would be most fair to the Petitioner and Respondent under the arbitration.

(h) Fees and Expenses. All expenses of the arbitration shall be shared by the Petitioner and Respondent in accordance with the AAA Rules in effect on the date of the Arbitration Notice.

(i) Arbitrators Discretion. The foregoing time periods and procedural steps may be modified or extended by the Arbitrator in his or her discretion to the extent he or she deems necessary to prevent fundamental unfairness; provided, that at all times the Arbitrator shall be mindful of the parties' desire for the most expeditious possible resolution of their disputes.

(j) Enforceability. To the extent permissible under law, the parties to this Agreement agree that the award of the Arbitrator shall be final and shall not be subject to judicial review. Judgment on the arbitration award may be entered and enforced in any court having jurisdiction over the parties or their assets. It is

Dealer Initials



Agreement for Line of Credit
("Floorplan")

the intent of the parties that the arbitration provisions hereof be enforced to the fullest extent permitted by applicable law, including the Federal Arbitration Act, 9 U.S.C. § 2.

(k) Equitable Relief. Nothing in this Section shall prevent a party from seeking injunctive relief or other equitable relief in the courts designated in the Agreement.

[Signature Pages Follows]

Dealer Initials



Agreement for Line of Credit
("Floorplan")

IN WITNESS WHEREOF, the parties have executed this Agreement under seal on the date first above written.

LENDER: Ace Motor Acceptance Corp.

By: _____

Printed Name & Title: RUSSELL E. ALGOOD, CEO

BORROWER: **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST**

By: _____

Printed Name & Title  *Robert McCoy, member*

STATE OF NC
COUNTY OF Union

This 30 day of January, 2018 , personally appeared before me, Robert McCoy Jr who acknowledged that (s) he executed this Agreement and was duly authorized to do so, and, being duly sworn by me, that the statements in the foregoing instrument are true, correct and complete.

_____

PRINTED NAME: Carla J Morefield
MY COMMISSION EXPIRES: 9-22-2019

> Cabarrus County, North Carolina
> Notary Public
> Carla J Morefield
> My Commission Expires 9/22/2019

GUARANTOR: **ROBERT MCCOY JR.**

By: _____

Printed Name: *Robert McCoy*

STATE OF NC
COUNTY OF Union

This 30 day of January, 2018 , personally appeared before me, Robert McCoy Jr who acknowledged that (s) he executed this Agreement and was duly authorized to do so, and, being duly sworn by me, that the statements in the foregoing instrument are true, correct and complete.

_____

PRINTED NAME: Carla J Morefield
MY COMMISSION EXPIRES: 9-22-2019

> Cabarrus County, North Carolina
> Notary Public
> Carla J Morefield
> My Commission Expires 9/22/2019

Dealer Initials _____



Agreement for Line of Credit
("Floorplan")

GUARANTOR: **MISTY MCCOY**

By: _____

Printed Name: _____

STATE OF __NC__
COUNTY OF __Union__

This __30__ day of __January, 2018__ , personally appeared before me, __Misty McCoy__ who
acknowledged that (s) he executed this Agreement and was duly authorized to do so, and, being duly sworn by me, that the
statements in the foregoing instrument are true, correct and complete.

_Carla J Morefield_

PRINTED NAME: _Carla J Morefield_
MY COMMISSION EXPIRES: _9.22.2019_

> Cabarrus County, North Carolina
> Notary Public
> Carla J Morefield
> My Commission Expires 9/22/2019

GUARANTOR: **N/A**

By: _____

Printed Name: _____

STATE OF _____
COUNTY OF _____

This _____ day of _____, _____ , personally appeared before me, _____ who
acknowledged that (s) he executed this Agreement and was duly authorized to do so, and, being duly sworn by me, that the
statements in the foregoing instrument are true, correct and complete.

PRINTED NAME: _____
MY COMMISSION EXPIRES: _____

GUARANTOR: **N/A**

By: _____

Printed Name: _____

STATE OF _____
COUNTY OF _____

This _____ day of _____, _____ , personally appeared before me, _____ who
acknowledged that (s) he executed this Agreement and was duly authorized to do so, and, being duly sworn by me, that the
statements in the foregoing instrument are true, correct and complete.

PRINTED NAME: _____
MY COMMISSION EXPIRES: _____

Dealer Initials _____



Agreement for Line of Credit
("Floorplan")

## Borrower's Floorplan Terms as referenced in Agreement for Line of Credit ("Floorplan")

STATE OF NORTH CAROLINA,
COUNTY OF MECKLENBURG

This document constitutes the Borrower's Floorplan Terms as referenced in that certain Agreement for Line of Credit (Floorplan) (the "**Floorplan**") by and among the undersigned. The undersigned acknowledge and agree that Borrower's Floorplan Terms may be amended and changed by Lender from time to time in Lender's discretion. Notwithstanding the foregoing, the Floorplan Fee Schedule set forth herein may only be changed in a writing signed by both Borrower and Lender.

**1.**     **Financial Statements and Tax Returns**

From time to time, Lender may require that Borrower and Guarantor provide such personal/business financial statements and personal/business tax returns as Lender deems necessary or appropriate. Without limiting Lender's right to request any such financial statements or tax returns more frequently, at a minimum, Borrower and Guarantor shall provide to Lender: (i) on an annual basis, current copies of business and personal tax returns and a personal financial statement; and (ii) at the end of each calendar quarter, quarterly business financial statements.

**2.**     **Inventory**

       (a) Inventory Status Reports
            Lender may fax or e-mail to Borrower a current inventory report upon request to Lender.

       (b) Inventory Certification Reports
            From time to time, Lender may send to Borrower an inventory report form. Borrower shall complete and return to Lender (via fax or e-mail) any such inventory report form within ten (10) days of Lender's transmission thereof.

       (c) Physical Inventory Inspections
            From time to time, Lender may conduct physical inspections of Borrower's inventory. Borrower and Guarantor shall provide and facilitate access to Borrower's inventory at any time during business hours and shall cooperate fully with Lender's inspection.

**3.**     **Test Drives & Non-Verifiable Inventory**

       (a) Borrower shall not allow any "test drive" to exceed a 24 hour time period. A copy of the Demonstration Permit and each "test driver's" license will be furnished to Lender during inventory inspection.

            Lender shall have the right to verify by telephone or in person any and all "test drives" which occur and/or the existence and condition of any vehicle(s) not on Borrower's lot. An Event of Default shall be deemed to have occurred under the Floorplan in the event that Lender is not paid in full with regard to any "test drives", "service loaners" or unverifiable inventory within seven (7) days of Lender attempted verification (whether by telephone or in person), or Lender cannot otherwise call to verify its location or status.

Dealer Initials



Agreement for Line of Credit
("Floorplan")

4.   **Billing**

(a) Billing
A monthly administrative/physical inventory inspection fee of $75.00 is due and included with the first weekly settlement of the month but in no case no later than the 10th calendar day of each month.

(b) Curtailments (reductions) of Principal:
From time to time (anticipated to be at least twice monthly), Lender shall review Borrower's inventory for any vehicle which may be subject to a Curtailment Payment in accordance with the Floorplan. Curtailment bills may be invoiced
by Lender from time to time and shall be due the earlier of the next weekly settlement sheet or seven (7) calendar days of the date of such invoice.

It is the dealer's responsibility to review his inventory report for the possibility of curtailments or call Ace Motor Acceptance Corporation to find out if there are any outstanding curtailments.

(c) Advance Repayment (Final Bills):

i.   "Forced" Final Bills:  In the event that a vehicle has not been sold to a Third Party Purchaser within 120 calendar days after the date of the initial Advance for such vehicle, Borrower shall immediately pay: (1) any Advance which has been made for such vehicle which remains unpaid; and (2) the Advance Fee for such vehicle, as calculated by Lender.  All such invoices from the Lender are due the earlier of the next weekly settlement or seven (7) calendar days of the date of such invoice.

ii.  Requested Final Bills:  Borrower is required to notify Lender within 24 hours after the time a vehicle purchase contract is signed, at which time Borrower shall: (1) repay the earlier of the next weekly settlement sheet or seven (7) calendar days of the date of such invoice any Advance which has been made for the vehicle being purchased by the Third Party Purchaser; and (2) pay the earlier of the next weekly settlement sheet or seven (7) calendar days of the date of such invoice the Advance Fee for such vehicle, as calculated by Lender.

iii. Title Release
A vehicle's title will only be released after Lender has been indefeasibly paid all amounts due to Lender as specified in the Floorplan related to such vehicle.

iv.  Reserve
Borrower agrees that $100 will be added to the Final Bill for each vehicle and shall be held by Lender and noted on Lender's books and records as part of Borrower's "reserve fund".

In the event that Borrower's "reserve fund" shall exceed the greater of $10,000 or 5% of the total maximum Line of Credit (the "**Reserve Fund Threshold**") and Borrower is not in default under this or any other agreement between the parties, Borrower may utilize any amount in excess of the Reserve Fund Threshold as Borrower may determine in its discretion, provided that Borrower provides written notice to Lender. Any portion of Borrower's "reserve funds" which is less than the Reserve Fund Threshold shall be retained by Lender as Borrower's "reserve fund" unless Borrower and Lender agree differently in writing. Amounts in the Borrower's reserve fund may be

Dealer Initials



Agreement for Line of Credit
("Floorplan")

applied by Lender against any obligation or amounts owed to Lender pursuant to any agreement with Borrower.

v.  Vehicles Subject to Sale upon Event of Default:
Upon the occurrence of an Event of Default (as defined in the Floorplan), including, without limitation, failure of

Borrower to make any Curtailment Payments, pay any final bills, or to pay any Advance fees or other amounts owed pursuant to the Floorplan, Lender shall have available to it all remedies set forth in the Floorplan, including without limitation, sale of any vehicles which constitute Collateral for the Floorplan.

**Borrower and Guarantor hereby agree to be jointly and severally liable for any costs and/or losses incurred by or on behalf of Lender in Lender's sale of any vehicle. Borrower and Guarantor hereby agree to be jointly and severally liable to pay to Lender, no later than thirty (30) days after the earlier of (i) any seizure of a vehicle by Lender or (ii) Lender's disposition of such vehicle by auction or otherwise, in good funds, the difference between the amount owed by Borrower related to the Advance for such vehicle on the Floorplan and the proceeds of such vehicle actually received by Lender upon disposition (after adding to the Advance any additional expenses incurred by or on behalf of Lender (i.e. transportation, detailing, auction/sale expenses, etc.)). Furthermore, if a vehicle is disposed by Lender, Lender shall retain any and all funds received by Lender pursuant to such disposition.**

5.   **Advance Schedule**
For each Advance and/or vehicle financed with Floorplan funds Borrower will be charged:

(1) A set up fee of $50.00 per vehicle, which is added to the initial advance amount.

(2) A per diem Floorplan Fee as set forth in the schedule below.

Collectively, the fees as they relate to a particular Advance/vehicle financed with Floorplan funds shall be referred to as the **"Advance Fee"** for such vehicle. The Advance Fee for a vehicle shall be paid in accordance with the terms of the Floorplan.

Per Diem Floorplan Fee Schedule

Set forth below is the per diem Floorplan Fee applicable to each Advance under the Floorplan. The total amount of Per Diem Floorplan Fees owed by Borrower on an Advance shall be equal to the greater of: (1) $50; or (2) that certain amount which is equal to the actual number of calendar days that such Advance is on the Floorplan multiplied by the per diem rate set forth in the schedule below. All Floorplan Fees are calculated based on the unpaid Advance amount, which includes the setup fee, inclusive of any reserve funds. For purposes of determining the number of calendar days that an Advance is on the Floorplan, in the event the vehicle related to an Advance is purchased at auction, the Advance shall be deemed to be on the Floorplan as of the date on which Lender tenders a check or other funds to the auction, regardless of the date on which the auction cashes such check or receives such funds.

Dealer Initials



Agreement for Line of Credit
("Floorplan")

Per Diem Fee

0.07% of the unpaid Advance amount which includes the set up fee

### 6. Amounts to Floorplan

(a) Auction Vehicles:
Lender anticipates that it will advance to Borrower 100% of the purchase price of any vehicle which was purchased at an approved auction in the last seven (7) days.

(b) Vehicles purchased from Lender:
Lender anticipates that it will advance to Borrower the lesser 100% of the NADA loan value or the actual purchase price of any vehicle which was purchased from Lender in the last seven (7) days.

(c) Trade in and other Vehicles:
Lender anticipates that it will advance to Borrower the lesser of 80% of the NADA loan value or 80% of the purchase price of any vehicle which was purchased from another third party or from a wholesaler. Lender anticipates that it will advance to Borrower up to of 80% of the NADA loan value on trade in vehicles.

(d) Buybacks/Repos:
Lender anticipates that it will advance to Borrower the lesser of 80% of the NADA loan value or the buyback amount of the repossession.

Notwithstanding the foregoing, Lender may, in its sole discretion, Advance less than the purchase price of any vehicle or choose not to make an Advance on any vehicle.

### 7. Other

Lender has the sole discretion with regard to making (or not making) any advances or loans to Borrower pursuant to the Floorplan and may put a "hold" on Borrower's account at any time, at Lender's sole discretion.

### 8. Permitted Vehicles

(a) Type Vehicles
No recreational vehicles, watercraft, motorcycles, or specialty vehicles, including, without limitation, roll-backs, are eligible for Floorplan financing. Lender reserves its right to make exceptions to this prohibition on a vehicle-by-vehicle basis.

### 9. UCC Filing

Borrower acknowledges and agrees that Lender has a security interest in all of its assets and has the right to file any and all UCC financing statements against Borrower naming the Collateral as the collateral as Lender shall determine in the form that Lender shall determine (which may include an expansive list describing all types of Borrower's assets), in its sole discretion.

[Signature Pages Follow]

Dealer Initials



Agreement for Line of Credit
("Floorplan")

LENDER: Ace Motor Acceptance Corporation

By: _____ (signature)

Printed Name & Title: **RUSSELL E ALGOOD, CEO**

BORROWER: **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST**

By: _____ (signature)

Printed Name & Title: _Robert mccoy, member_

SUBSCRIBED AND SWORN TO ME THIS 30 DAY OF January YR 2018

NOTARY PUBLIC Carla J Morefield COMMISSION EXPIRES: 9-22-2019

> Cabarrus County, North Carolina
> Notary Public
> Carla J Morefield
> My Commission Expires 9/22/2019

GUARANTOR: **ROBERT MCCOY JR.**

By: _____ (signature)

Printed Name: _Robert mccoy_

SUBSCRIBED AND SWORN TO ME THIS 30 DAY OF January YR 2018

NOTARY PUBLIC Carla J Morefield COMMISSION EXPIRES: 9-22-2019

> Cabarrus County, North Carolina
> Notary Public
> Carla J Morefield
> My Commission Expires 9/22/2019

GUARANTOR: **MISTY MCCOY**

By: _____ (signature)

Printed Name: _Misty mccoy_

SUBSCRIBED AND SWORN TO ME THIS 30 DAY OF January YR 2018

NOTARY PUBLIC Carla J Morefield COMMISSION EXPIRES: 9-22-2019

> Cabarrus County, North Carolina
> Notary Public
> Carla J Morefield
> My Commission Expires 9/22/2019

GUARANTOR: **N/A**

By: _____ (signature)

Printed Name: _____

SUBSCRIBED AND SWORN TO ME THIS _____ DAY OF _____ YR _____

NOTARY PUBLIC _____ COMMISSION EXPIRES: _____

GUARANTOR: **N/A**

By: _____ (signature)

Printed Name: _____

SUBSCRIBED AND SWORN TO ME THIS _____ DAY OF _____ YR _____

NOTARY PUBLIC _____ COMMISSION EXPIRES: _____

Dealer Initials _____



Agreement for Line of Credit
("Floorplan")

### Privacy Policy as referenced in Agreement for Line of Credit

#### Privacy Policy

This agreement for a line of credit "floorplan" will only apply to vehicles purchased through licensed auctions or are repossessions from/by Ace Motor Acceptance Corp unless the parties, in writing, mutually agree to include any specific vehicle(s) which do not meet this criteria.

1.       During our normal business, we will send upon request a credit availability report to all the auctions with which we conduct business. This report indicates the amount of available credit that your dealership has with Ace Motor Acceptance Corp. The report also indicates if the account is on hold for any particular reason. It is impossible for us to know how this information is controlled at the auction.

We do not share your account information with any other parties unless you have listed us in a credit application.

We may conduct a credit inquiry with a credit reporting agency or any entity listed on the credit application and any auction or floorplan provider as often as we deem necessary to monitor the creditworthiness of the dealer customer and/or principals and guarantors of the Line of Credit.

2.       While we make best efforts to conceal information concerning your accounts, our office is open to "walk-in" business and various reports or invoices and/or conversations may be subject to "wandering eyes and ears" of other dealers. We fax or email out a number of these reports and invoices to our dealers, and we are subject to sending these reports or invoices to the wrong party. Thus, please consider any information pertinent to your reports or invoices subject to the knowledge of others. Notwithstanding the foregoing, it is not our intent to share this information with others.

[Signature Pages Follow]

Dealer Initials

Revised Date 10/31/2014 page 20 of 21



Agreement for Line of Credit
("Floorplan")

LENDER: Ace Motor Acceptance Corporation

By: _____ (signature)

Printed Name & Title: **RUSSELL E ALGOOD, CEO**

BORROWER: **(MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST)**

By: _____ (signature)

Printed Name & Title: Robert McCoy, member

SUBSCRIBED AND SWORN TO ME THIS 30 DAY OF January YR 2018

NOTARY PUBLIC Carla J Morefield COMMISSION EXPIRES 9-22-2019

Cabarrus County, North Carolina
Notary Public
Carla J Morefield
My Commission Expires 9/22/2019

GUARANTOR: **(ROBERT MCCOY JR.)**

By: _____ (signature)

Printed Name: Robert McCoy

SUBSCRIBED AND SWORN TO ME THIS 30 DAY OF January YR 2018

NOTARY PUBLIC Carla J Morefield COMMISSION EXPIRES 9.22.2019

Cabarrus County, North Carolina
Notary Public
Carla J Morefield
My Commission Expires 9/22/2019

GUARANTOR: **(MISTY MCCOY)**

By: _____ (signature)

Printed Name: Misty McCoy

SUBSCRIBED AND SWORN TO ME THIS 30 DAY OF January YR 2018

NOTARY PUBLIC Carla J Morefield COMMISSION EXPIRES 9.22.2019

Cabarrus County, North Carolina
Notary Public
Carla J Morefield
My Commission Expires 9/22/2019

GUARANTOR: **(N/A)**

By: _____ (signature)

Printed Name: _____

SUBSCRIBED AND SWORN TO ME THIS ____ DAY OF _____ YR ____

NOTARY PUBLIC _____ COMMISSION EXPIRES _____

GUARANTOR: **(N/A)**

By: _____ (signature)

Printed Name: _____

SUBSCRIBED AND SWORN TO ME THIS ____ DAY OF _____ YR ____

NOTARY PUBLIC _____ COMMISSION EXPIRES _____

Dealer Initials _____

# EXHIBIT C



BHPH Contract Servicing
Agreement

This BHPH Contract Servicing Agreement (this "**Agreement**"), is made and entered into on **01-29-2018** between **MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST, ROBERT MCCOY JR., MISTY MCCOY, N/A, N/A**(hereinafter, "**Seller**"); and ACE MOTOR ACCEPTANCE CORPORATION, a North Carolina corporation (hereinafter, "**Purchaser**").

This Agreement is a supplement to the BHPH Purchasing & Performance Agreement between the Seller, Guarantor, and Purchaser, dated **01-29-2018** (the "PPA"). This Agreement is not intended to change or alter the terms of the PPA except as explicitly noted herein. Otherwise, the terms of the PPA shall be fully binding and will remain in full force and effect, unmodified by this Agreement.

Capitalized terms which are not defined herein shall have those certain meanings ascribed to them in the PPA.

NOW, THEREFORE, in consideration of the promises, the mutual covenant herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **Prior Agreements.** Except as otherwise set forth in this Section 1, this Agreement shall apply to any Receivables, Evidences of Indebtedness or Contracts acquired by Purchaser at any time before or after the date listed above. To the extent any Receivables, Evidences of Indebtedness or Contracts were acquired by Purchaser before the date listed above (a "**Prior Purchase**") under a prior "Legal Agreement - BHPH Purchasing & Performance," "Legal Agreement - BHPH Contract Servicing Agreement," "Legal Agreement - BHPH Purchasing & Service Agreement" or other agreement with Purchaser other than the PPA (a "**Prior Agreement**"), Purchaser may, at its sole discretion, provide a written addendum to this Agreement with regard to certain terms and conditions of the Prior Agreement which may continue to apply to such Prior Purchase.

2.      **Collection and Posting of Payments.** Purchaser hereby authorizes Seller to collect amounts due pursuant to certain Contracts designated by Purchaser which have been purchased by Purchaser pursuant to the terms of the PPA. The Seller shall post any and all such payments received by Seller (including, without limitation, the full amount (100%) of all principal, interest, late charges, insurance and other funds received by Seller related to a Vehicle Buyer's contract) to Purchaser's electronic "Contract Receivable System" within one (1) business days of Seller's receipt of the same. Payments collected the last day of the calendar month must be posted that day no later than 8 o'clock pm Eastern Standard Time. Notwithstanding the foregoing, Purchaser may in its sole discretion, and in writing, allow posting and reconciliation of amounts due to Purchaser by Seller under the terms of the Weekly Settlement Sheet (as described in the PPA). Seller shall upon execution of this Agreement provide to Purchaser, and shall at all times during the term of this Agreement maintain, a signed and active AMAC ACH Authorization Form which authorizes Purchaser to make withdrawals from and deposits to Seller's bank accounts used in connection with Seller's business, the Contracts, the PPA, the Floorplan and this Agreement (collectively, the "**Accounts**"). Seller hereby authorizes Purchaser, on or after twenty-four (24) hours advance notice to Seller, to remove from the Accounts any portion or all of the total amounts owed by Seller to Purchaser including, but not limited to, any amounts due pursuant to the PPA, the Floorplan, this Agreement, any other agreement or understanding between Seller and Purchaser and any amounts paid to Seller with regard to any Contracts. Amounts payable to or from Seller or Purchaser pursuant to this Agreement may be reconciled on Seller's Weekly Settlement Sheet and shall be subject to the ACH transfer requirements set forth in the PPA and the Floorplan as well as this Agreement. The Seller agrees to keep full and complete accounting records on each and every Contract including, without limitation, any payments collected thereon. With regard to the posting of payments in Purchaser's electronic "Contract Receivable System," Seller shall always post such payments using the date the actual payment was made by the Vehicle Buyer

3.      **Use of Purchaser's Contract Receivable System.** The Seller shall use Purchaser's electronic Contract Receivable System, or such other software systems as approved or required by Purchaser, to maintain records of all transactions with regard to each Contract. Seller shall continually review and update such records to make certain all



information is correct, complete and current. The records which Seller must maintain and update in the electronic Contract Receivable System include Vehicle Buyer addresses and telephone numbers (work and personal), Vehicle Buyer reference contact information, Vehicle insurance information and notes and logs with regard to all Vehicle Buyer and Seller interactions, discussions, meetings, telephone calls and any other correspondence by any means. Seller shall only use notices approved by Purchaser as required by Purchaser and applicable law unless otherwise specifically approved in advance by Purchaser. All other written communications between Seller and any Vehicle Buyer or other person related to a Contract must be approved in advance by Purchaser.

If the Seller maintains records relating to the Contracts on a system other than Purchaser's electronic "Contract Receivable System," all records maintained by Seller on such other system must be in an electronic media format which allows Purchaser to access the Seller's software and hardware system(s) at any time to extract reports and all documents and data related to the Contracts including, but not limited to, Vehicle Buyer payment histories, Vehicle Buyer contact information and all notes and logs related to the Contracts and interactions with Vehicle Buyers.

4.     **Intentionally Omitted**

5.     **Events of Default.** In addition to the other events set forth in this Agreement, the Floorplan and the PPA as an "Event of Default," "default" or "breach," the occurrence of any one or more of the following events shall constitute an "Event of Default": (a) the failure of Seller or any Guarantor to comply with any provision of this Agreement, the Floorplan or the PPA; (b) the failure of Seller or any Guarantor to make any payment pursuant to this Agreement, the Floorplan or the PPA on the date on which such payment is due; (c) the inability of Seller or any Guarantor to pay its debts as they become due; (d) the filing of any petition for relief under any provision of Title 11 of the United States Code (entitled "Bankruptcy"), as amended, or under any similar federal or state statute by or against Seller or any Guarantor; (e) the application for the appointment of a receiver or custodian for, the making of a general assignment for the benefit of creditors by, or the insolvency of the Seller or any Guarantor; (f) the default by any Guarantor under any agreement with Purchaser or its affiliates; (g) the default by Seller under any other agreement with Purchaser or its affiliates; (h) the death, termination of existence, or dissolution of Seller or any Guarantor; (i) the failure of any representation or warranty of Seller or Guarantor to remain true, correct, complete and accurate at all times during the term of this Agreement; or (j) the entry of a judgment for the payment of money against Seller or any Guarantor which remains unsatisfied, in whole or in part, for a period of more than ten (10) days from the date of entry. In the event of any Event of Default, Purchaser shall have any and all remedies available to it at law or in equity, as well as those remedies set forth in this Agreement.

6.     **Remedies.** In addition to those remedies available to it at law or in equity or as otherwise set forth in this Agreement, Purchaser shall have the following remedies upon an Event of Default:

(a)   Purchaser may, in its sole discretion, at any time upon written or e-mail notice to Seller, take over all servicing rights of Seller to all Contracts;

(b)   Purchaser may, at its sole discretion, terminate this Agreement; provided, however, that no termination of this Agreement shall relieve or release Seller or any Guarantor from any obligation or liability hereunder, under the PPA, under the Floorplan or under any other agreement between Seller and Purchaser.

In the event Purchaser reclaims from Seller the servicing rights to the Contracts pursuant to subsection (a) above, within seven (7) calendar days of the written or e-mail notice to Seller described in (a), Seller shall notify all Vehicle Buyers in writing that such Vehicle Buyer must make payment of all amounts owed pursuant to their respective Contracts directly to Purchaser. Seller shall provide to Purchaser a copy of each such notification sent to Vehicle Buyers at the same time Seller provides such notification to the Vehicle Buyers.



BHPH Contract Servicing
Agreement

Exercise of any remedies pursuant to this Agreement, including, without limitation, termination of Seller's rights pursuant to this Agreement shall not relieve any of Seller's obligations or liabilities pursuant to this Agreement, the PPA, the Floorplan or any other agreements with Purchaser including, without limitation, the Floorplan. All remedies of Purchaser provided in this Agreement, the PPA, the Floorplan or any other agreements with Purchaser including, without limitation, the Floorplan. All remedies of Purchaser provided in this Agreement, or at law or in equity, shall be deemed to be cumulative and not exclusive, and the exercise or enforcement of any one or more remedies shall not preclude the exercise or enforcement of that remedy or any other remedy or remedies. Purchaser's remedies may be exercised singularly, cumulatively, and/or successively.

**Seller waives any right to notice of or presentment of any instances of default.**

7.      **Right to Offset.** Seller agrees that Purchaser may offset any amounts owed by Purchaser to Seller against any amounts owed by Seller to Purchaser, regardless of whether the amounts owed by Purchaser to Seller or by Seller to Purchaser are owed pursuant to this Agreement or any other agreement between Purchaser and Seller, including, without limitation, the PPA or the Floorplan.

8.      **Late Charges/Deferments/Extensions.** Without the written consent of Purchaser, Seller shall not waive any late charges, principle, or interest, alter or revise the aging of any payments due pursuant to a Contract or otherwise alter, modify or waive any right, obligation, liability, term or condition of any Contract. Taking any such action without the prior written consent of Purchaser shall constitute an Event of Default, and, in addition to all other remedies available to Purchaser pursuant to this Agreement, Purchaser may at its sole discretion subtract any amounts not paid by a Vehicle Buyer as a result of such action by Seller from any Performance Compensation payable to Seller or otherwise offset such amounts from any other amounts due by Purchaser to Seller pursuant to this Agreement, the PPA, the Floorplan or any other agreement between Seller and Purchaser. Seller may grant up to 2 deferments without prior written approval of up to 1 month each (or 4 weeks for weekly or bi-weekly payment schedules), during the life of a contract provided the deferment is not within the first six months of the contract and the deferment is not within four months of a previous deferment. Seller must remit an "Extension & Deferment" form (signed by Vehicle Buyer) to Purchaser within 1 business day of deferment being made. All other deferments require prior written approval from Purchaser.

9.      **Intentionally Omitted**

10.     **GPS/Starter Interrupter Program.** Seller shall allow Purchaser full and complete access, both in person and remotely, to any GPS/ Starter Interrupter programs (i.e. Passtime, Goldstar, etc) utilized by Seller. In the event Purchaser takes over all servicing of any Contracts, the Seller hereby grants Purchaser full access to and authorization to use, both in person and remotely, any and all items related to such programs including, but not limited to, reports, user ID's and passwords.

11.     **Right of Inspection.** During the term of this Agreement, the Floorplan and the PPA, Purchaser shall have the same rights of inspection pursuant to this Agreement as it has pursuant to the PPA.

12.     **Compliance.** Seller, its agents, servants, employees, independent contractors and related finance companies shall comply with all federal, state and local rules, regulations, statutes, laws, licensing requirements, ordinances and other governmental requirements or directives ("**Laws**") applicable to the servicing and collection of Contracts and the debts evidenced by Contracts including, without limitation:

          (a) Laws of each state and each jurisdiction in which any Contract was made;

          (b) Laws applicable to the sale of the Vehicle subject to any Contract;



BHPH Contract Servicing
Agreement

(c) Laws applicable to the origination, servicing, and enforcement of any Contracts including, but not limited to, Laws relating to usury, the Truth-In-Lending Act and Regulation Z, the Equal Credit Opportunity Act and Regulation B, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, Federal Trade Commission rules (such as the "Red Flag Rules"), Consumer Finance Protection Bureau rules and any other consumer protection, equal credit opportunity, fair debt collection or similar Laws whether existing now or in the future; and

(d) Laws regarding vehicle repossession, including any Laws regarding notices that are required prior to or after a Contract is repurchased by Seller from Purchaser.

Seller hereby represents and warrants to Purchaser that all of its employees, contractors, agents, servants and representatives have been properly trained with regard to all applicable Laws and all other requirements related to any activities of any such person pursuant to this Agreement or otherwise. Seller hereby agrees and acknowledges that it is and shall be liable to Purchaser for any and all violations of any applicable Laws by Seller or its employees, contractors, agents, servants or representatives. If, in Purchaser's sole discretion, Purchaser determines any such person is inadequately trained, Purchaser may require additional training of any or all such persons prior to any such person engaging in any activities on behalf of Seller or Purchaser pursuant to this Agreement, the PPA, a Floorplan of any other agreement between Purchaser and Seller.

Purchaser shall have the right to audit Seller upon twenty-four hours prior written notice regarding Seller's compliance with any agreement with Purchaser or with any Law. Seller agrees to provide to Purchaser any and all access required to perform such an audit at any time.

Seller must maintain a "Customer Complaint Management System" with regard to the servicing of the Contracts which complies with all applicable laws including, but not limited to, Consumer Finance Protection Bureau rules and any other consumer protection, equal credit opportunity, fair debt collection or similar Laws whether existing now or in the future. Seller shall provide written notification to Purchaser with regard to the status of any and all customer complaints and resolutions to those complaints as Purchaser may request in its sole discretion. In addition, Seller shall provide written notification to Purchaser with regard to any customer complaints which are not resolved within thirty (30) calendar days of the date such complaint was received by Seller. Seller hereby authorizes Purchaser to, and Purchaser reserves the right to, contact any and all Vehicle Buyers or other parties to a Contract at any time and for any reason.

13.     **Waiver.** No waiver of any provision of this Agreement, in part or in whole, shall be effective unless in writing, addressed and delivered to the other party and duly signed on behalf of the party against whom the waiver is sought to be enforced. Any waiver so granted shall apply solely to the event occasioning the necessity for a waiver and with respect only to the specific provision applicable the waiver. Such waiver shall not apply to any other events, to any recurrence of the same or similar events or to any other provisions hereof. The failure by Purchaser to exercise any one or more of its rights or remedies pursuant to this Agreement or any other agreement between Purchaser and Seller, on single or multiple occasions and at any time, shall not constitute a modification or waiver of this Agreement or any terms hereof.

14.     **Severability.** In the event that any term or provision of this Agreement shall be determined to be superseded, invalid, illegal or otherwise unenforceable pursuant to applicable law by a court having jurisdiction, that determination shall not impair or otherwise affect the validity, legally or enforceability of the remaining terms and provisions of this Agreement.

15.     **Indemnification.** Seller shall indemnify, defend, reimburse and hold Purchaser, its officers, directors, employees, agents, servants and representatives harmless from, against and with respect to any damage, liability,



claim, loss, deficiency, penalty, fine, amount paid in settlement, expense, including reasonable attorneys' fees, disbursements and other costs including costs, fees and expenses for any proceeding (whether mediation, arbitration or civil or criminal litigation) at the trial and appellate levels, for collection or enforcement of any judgment award or other relief granted, and for the enforcement of this indemnification (collectively "damages"), occasioned by, arising out of, or resulting from, either directly or indirectly: (i) any and all claims against and liabilities of Seller of every kind, nature and description, absolute and contingent, including, without limitation, those arising from or in any way connected with the business and operations of Seller; (ii) any and all claims of any Vehicle Buyer except to the extent any such claim results from the willful misconduct or gross negligence of Purchaser; (iii) any breach of any representation, warranty, covenant or other obligation of Seller contained in this Agreement; (iv) any breach of any of the Seller's servicing and collection rights; (v) a breach of any representation, warranty, covenant or other obligations of a Guarantor contained in any agreement with Purchaser; or (vi) any Event of Default.

16.     **Binding Agreement/Compliance.** This Agreement shall be binding upon the parties hereto and their successors and assigns. The Purchaser may assign this Agreement at any time without prior notice or approval of Seller. Seller may not assign its rights, duties and responsibilities under the terms of this Agreement without the prior written approval of Purchaser. No assignment by Seller shall excuse, release or constitute a waiver of any duty or obligation that Seller has hereunder unless specifically and expressly excused, released or waived in writing by Purchaser.

17.     **Applicable Law.** This Agreement is intended as a contract under and shall be construed and enforceable in accordance with the laws of the State of North Carolina, without reference to the conflict of law provisions thereof. Subject to the arbitration provisions hereof, Seller hereby consents to jurisdiction in the State of North Carolina in any action to enforce or collect this Agreement, and further consents to venue in the State Courts of North Carolina in Mecklenburg County, North Carolina, or, if applicable, the United States District Court for the Western District of North Carolina. This Agreement shall be deemed to have been made in North Carolina.

18.     **LIMITATION ON LIABILITY.** IN NO EVENT SHALL PURCHASER BE LIABLE FOR: (a) THIRD PARTY CLAIMS OR LIABILITIES; OR (b) ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OR DAMAGE TO DATA, INACCURACY OF DATA, LOSS OF ANTICIPATED REVENUE OR PROFITS, WORK STOPPAGE OR IMPAIRMENT OF OTHER ASSETS OR LOSS OF GOOD WILL, LOSS OF USE, LOSS OF BUSINESS, LOSS OF THE USE OF MONEY, LOSS OF REPUTATION, COST OF SUBSTITUTE EQUIPMENT AND PROPERTY, OR OTHER FINANCIAL LOSS, WHETHER OR NOT SUCH DAMAGES OR LOSS WAS FORESEEABLE AND WHETHER OR NOT PURCHASER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSS.

IN NO EVENT SHALL THE TOTAL LIABILITY OF PURCHASER TO SELLER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER AGREEMENT OR UNDERSTANDING BETWEEN PURCHASER AND SELLER, UNLESS EXPRESSLY SET FORTH IN SUCH OTHER AGREEMENT OR UNDERSTANDING, EXCEED 25% OF THE PERFORMANCE COMPENSATION PAID BY PURCHASER TO SELLER PURSUANT TO THE PURCHASING & PERFORMANCE AGREEMENT DURING THE THREE (3) CONSECUTIVE CALENDAR MONTH PERIOD PRIOR TO THE DETERMINATION OF SUCH LIABILITY. THE LIMITATIONS SET FORTH IN THIS SECTION APPLY TO ALL CAUSES OF ACTION IN THE AGGREGATE, INCLUDING WITHOUT LIMITATION, BREACH OF CONTRACT, BREACH OF WARRANTY, INDEMNIFICATION, NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATION AND OTHER TORTS AND STATUTORY CLAIMS. THE FOREGOING LIMITATIONS SHALL NOT APPLY, HOWEVER, TO LIABILITIES BETWEEN THIRD PARTIES AND PURCHASER WHICH ARISE FROM CONTRACTS DIRECTLY BETWEEN PURCHASER AND SUCH THIRD PARTY.

SELLER ACKNOWLEDGES THAT IT UNDERSTANDS THE LEGAL AND ECONOMIC RAMIFICATIONS OF



BHPH Contract Servicing
Agreement

THE FOREGOING LIMITATIONS AND THAT THE FOREGOING LIMITATIONS ALLOCATE THE VARIOUS RISKS BETWEEN THE PARTIES AND FORM AN ESSENTIAL PART OF THE AGREEMENT OF THE PARTIES.

19.    **DISCLAIMERS.** IN ADDITION AND SUBJECT TO THE LIMITATIONS SET FORTH HEREIN, PURCHASER SHALL NOT BE LIABLE FOR:

    (a) ANY FAILED ACH TRANSFER OR OTHER TRANSFER OF FUNDS, EXCEPT TO THE EXTENT PURCHASER SHALL HAVE BEEN GROSSLY NEGLIGENT IN THE INITIATION OF ANY SUCH TRANSFER;

    (b) ANY TITLE DEFICIENCY FOR ANY VEHICLE;

    (c) ANY AGREEMENT OR CONTRACT BETWEEN SELLER AND ANY CUSTOMER OF SELLER (OR ANY OTHER THIRD PARTY) OR THE SUFFICIENCY, VALIDITY, ENFORCEABILITY, OR PROPRIETY THEREOF;

    (d) ANY DAMAGE TO ANY COLLATERAL INCURRED IN REPOSSESSION OF THE COLLATERAL OR IN THE EXERCISE OF ANY OTHER REMEDY WHICH PURCHASER MAY HAVE, EXCEPT TO THE EXTENT PURCHASER SHALL HAVE BEEN GROSSLY NEGLIGENT IN THE EXERCISE OF SUCH REMEDIES; OR

    (e) LOST OR MISPLACED TITLES.

20.    **TIME IS OF THE ESSENCE.** TIME IS OF THE ESSENCE WITH RESPECT TO ALL TIME PERIODS IN THIS AGREEMENT.

21.    Notices. Any notices to be provided pursuant to this Agreement shall be provided in accordance with and subject to the requirements set forth in the PPA.

22.    **Resolution of Disputes.**

    (a) General. Except for the Excluded Disputes (as hereafter defined), all disputes between or among any parties to this Agreement including, but not limited to, those disputes arising out of or in connection with the execution, interpretation and performance of this Agreement (including the validity, scope and enforceability of this Section 22) shall be solely and finally determined by one Arbitrator selected by the American Arbitration Association ("AAA"). The arbitration proceedings shall be held in Mecklenburg County in North Carolina, and, except as otherwise may be provided in this Agreement, the arbitration proceedings shall be conducted in accordance with the Commercial Arbitration Rules (the "AAA Rules") of the AAA. The Arbitrator shall be selected in accordance with the AAA Rules then in effect for such a selection. The arbitration shall be conducted in accordance with the process set forth in this Section 22.

    (b) Excluded Disputes. Any dispute where the total dollar amount in controversy is less than US **$10,000.00, exclusive of costs, interest and attorney's fees.** (the **"Excluded Disputes"**) shall not be subject to mandatory arbitration as set forth in this Agreement.

    (c) Exclusion of Certain Damages. In no circumstances shall any party to this Agreement be liable for: (1) direct or compensatory damages or (2) indirect, consequential, reliance, or special damages, with respect to *lost revenues, lost business opportunity, loss of good will, or lost profits of any kind* regardless of



whether such liability is based on breach of contract, tort, strict liability, breach of warranties, prevention, failure of essential purpose, or otherwise, and even if advised of the likelihood of such damages. This damages limitation provision reflects the express intent of the parties and reflects a deliberate and bargained for allocation of risk pertaining to any dispute between the parties.

(d) Arbitration Notice. If a party has a dispute which has not been resolved by the parties and s/he or it submits the dispute for arbitration pursuant to this Agreement, such party shall furnish the other parties to the Agreement with the dated, written statement (the "**Arbitration Notice**") indicating (i) such party's intent to commence arbitration proceedings, (ii) the nature, with reasonable detail, of the dispute and (iii) the remedy or remedies such party will seek.

(e) Discovery Requests. At any time within forty (40) days after the date of the Arbitration Notice, the party(s) commencing the arbitration (collectively, the "**Petitioner**") and the party(s) with whom the Petitioner has a dispute (collectively, the "**Respondent**") can make discovery requests of the other (including, but not limited to, requests for delivery of documents, production of witnesses for testimony and delivery of interrogatory responses). The recipient of a discovery request shall have ten (10) days after the receipt of such request to object to any or all portions of such request and make an application to the Arbitrator to limit the scope of such discovery request, and shall respond to any portions of such request not so objected to within twenty (20) days of the receipt of such request. All objections shall be in writing and shall indicate the reasons for such objections. Within five (5) business days after the end of the period for the submission by the requested party of an application to limit the discovery request, the Arbitrator shall grant or deny such discovery request, in whole or in part, to the extent the Arbitrator determines such discovery is or is not, as the case may be, reasonably necessary to enable the requesting party to obtain information relevant to the dispute without unreasonably burdening the requested party. The requested party shall comply with a discovery request granted within ten (10) days after such grant, or within such longer period as the Arbitrator may determine upon application of the requested party for an extension thereof for reasonable cause. Neither party shall be permitted to make more than one application for discovery to the Arbitrator. All depositions shall be taken in Charlotte, North Carolina unless otherwise agreed by the parties. The Arbitrator is not authorized to subpoena documents or perform independent investigations.

(f) Timing of Hearings. Hearings must commence no later than ninety (90) days following the date of the Arbitration Notice, unless otherwise designated by the Arbitrator, and such hearing shall be conducted for no more than five business days.

(g) Format. Each of the Petitioner and Respondent shall submit a brief, outlining such party's claim for relief or defense to such claim, to the other and to the Arbitrator on or before the tenth (10th) day following the date of the last hearing. Reply briefs must be exchanged and submitted to the Arbitrator on or before the twentieth (20th) day following the date of the last hearing. The final decision of the Arbitrator is due on or before the thirtieth (30th) day following the date of the last hearing. The Arbitrator shall choose the form of final decision that, in his or her judgment, is most consistent as supported by evidence presented by the Petitioner and Respondent in the arbitration proceeding or, if the subject matter of the dispute is not clearly addressed in or determinable, that, in their opinion, would be most fair to the Petitioner and Respondent under the arbitration.

(h) Fees and Expenses. All expenses of the arbitration shall be shared by the Petitioner and Respondent in accordance with the AAA Rules in effect on the date of the Arbitration Notice.

(i) Arbitrators Discretion. The foregoing time periods and procedural steps may be modified or extended by the Arbitrator in his or her discretion to the extent he or she deems necessary to prevent fundamental



unfairness; provided, that at all times the Arbitrator shall be mindful of the parties' desire for the most expeditious possible resolution of their disputes.

(j) <u>Enforceability</u>. To the extent permissible under law, the parties to this Agreement agree that the award of the Arbitrator shall be final and shall not be subject to judicial review. Judgment on the arbitration award may be entered and enforced in any court having jurisdiction over the parties or their assets. It is the intent of the parties that the arbitration provisions hereof be enforced to the fullest extent permitted by applicable law, including the Federal Arbitration Act, 9 U.S.C. § 2.

(k) <u>Equitable Relief</u>. Nothing in this Section shall prevent a party from seeking injunctive relief or other equitable relief in the courts designated in the Agreement.

[Signature Pages Follows]



**BHPH Contract Servicing Agreement**

IN WITNESS WHEREOF, Purchaser, Seller and Guarantor(s) have executed this Agreement through their duly authorized officers as of the date first set forth above in this Agreement.

**Ace Motor Acceptance Corporation**

By: _____    (signature)

Printed Name & Title: RUSSELL E ALGOOD, CEO

**SELLER: (MCCOY MOTORS, LLC, MCCOY MOTORS LLC DBA RIDE FAST)**

By: _____    (signature)

Printed Name & Title: _Robert McCoy member_
SUBSCRIBED AND SWORN TO ME THIS 30 DAY OF January YR 2018
NOTARY PUBLIC Carla J Morefield    COMMISSION EXPIRES 9·22·2019

Cabarrus County, North Carolina
Notary Public
Carla J Morefield
(signature) Commission Expires 9/22/2019

**SELLER/GUARANTOR: (ROBERT MCCOY JR.)**

By: _____

Printed Name: _____
SUBSCRIBED AND SWORN TO ME THIS 30 DAY OF January YR 2018
NOTARY PUBLIC Carla J Morefield    COMMISSION EXPIRES 9·22·2019

Cabarrus County, North Carolina
Notary Public
Carla J Morefield
(signature) My Commission Expires 9/22/2019

**SELLER/GUARANTOR: (MISTY MCCOY)**

By: _____

Printed Name: _____
SUBSCRIBED AND SWORN TO ME THIS 30 DAY OF January YR 2018
NOTARY PUBLIC Carla J Morefield    COMMISSION EXPIRES 9·22·2019

Cabarrus County, North Carolina
Notary Public
Carla J Morefield
(signature) My Commission Expires 9/22/2019

**SELLER/GUARANTOR: (N/A)**

By: _____

Printed Name: _____
SUBSCRIBED AND SWORN TO ME THIS _____ DAY OF _____ YR _____
NOTARY PUBLIC _____    COMMISSION EXPIRES _____

**SELLER/GUARANTOR: (N/A)**

By: _____    (signature)

Printed Name: _____
SUBSCRIBED AND SWORN TO ME THIS _____ DAY OF _____ YR _____
NOTARY PUBLIC _____    COMMISSION EXPIRES _____

Gold Revised Date 11/2017    (Page 9 of 9)