

FILED & JUDGMENT ENTERED
Steven T. Salata

August  1  2018

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| In Re: ) | |
| ) | |
| ACE MOTOR ACCEPTANCE ) | |
| CORPORATION ) | |
| ) | |
| Debtor. ) | |
| ) | Case No. 18-30426 |
| ACE MOTOR ACCEPTANCE ) | |
| CORPORATION ) | Chapter 11 |
| ) | |
| Plaintiff, ) | Adv. Pro. No. 18-03036 |
| ) | |
| v ) | |
| ) | |
| MCCOY MOTORS, LLC d/b/a RIDE ) | |
| FAST; ROBERT MCCOY, JR.; and ) | |
| MISTY MCCOY ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION AND OTHER EMERGENCY RELIEF**

THIS MATTER came before the Court on July 18, 2018 on the Debtor/Plaintiff's ("Ace" or "Debtor") Emergency Motion for Preliminary Injunction, Emergency Motion for Turnover of Property of the Estate Pursuant to 11 U.S.C. 542, Emergency Motion for Injunction of Defendants from Pursuing Car Masters Litigation, Emergency Motion for Injunction of Defendants from Pursuing Criminal Complaint and Emergency Motion for Imposition of Constructive Trust (collectively the "Motions"). The Debtor was represented

1

by James Henderson. McCoy Motors LLC a/k/a McCoy Motors, LLC d/b/a Ride Fast ("McCoy LLC") and Misty McCoy ("Misty McCoy") were represented by Kristin Lang ("Lang"). Robert McCoy, Jr. ("Robert McCoy") appeared pro se.

The initial hearing on the Motions was held on June 21, 2018. On June 25, 2018, and with the consent of the parties, the Court entered its Order Concerning Interim Servicing of Accounts of Vehicle Buyers; and Order Setting Hearing on Preliminary Injunction (the "Interim Order"). These matters were continued until July 11, 2018 and then again to July 18, 2018 at which point an evidentiary hearing was held.

Based on the pleadings of record, including the Debtor's Verified Complaint, the testimony and evidence presented, and the arguments of the parties, the Court makes the following findings of fact, for purposes of this ruling:[1]

## FINDINGS OF FACT

1. Ace is a North Carolina corporation and a Debtor in Possession in a Chapter 11 proceeding pending before this Court. Prior to bankruptcy, Ace was in the business of providing floorplan lending services to used car dealerships.

2. Defendant McCoy LLC is a limited liability company organized under the laws of the State of South Carolina. McCoy LLC operates two used car lots in South Carolina, although the bulk of its sales are to North Carolina residents.

3. Defendant Robert McCoy is an individual who resides in Mecklenburg County, North Carolina. Robert McCoy is the sole owner/operator of McCoy LLC.

4. Defendant Misty McCoy is an individual who resides in Mecklenburg County, North Carolina. Misty McCoy is an employee and agent of McCoy LLC.

5. On or about January 28, 2018, Ace and the Defendants entered into a BHPH Purchasing and Performance Agreement ("PPA")(Exhibit A), Agreement for Line of Credit ("Floorplan")(Exhibit B); BHPH Contract Servicing Agreement ("Servicing Agreement")(Exhibit C), BHPH Purchasing and Performance Agreement Addendum ("PPA Addendum")(Exhibit D) and a BHPH Contract Servicing Agreement Addendum ("Servicing Addendum")(Exhibit E)(together, the PPA, Floorplan, Servicing Agreement, Floorplan, PPA Addendum and Servicing Addendum are referred to herein as "the Agreements"). Misty and Robert McCoy have personally guaranteed McCoy LLC's obligations to Ace under the Agreements.

6. The Defendants and Ace had a business relationship which started in 2016, and there were prior written agreements which were replaced by the Agreements.

7. The Agreements include, inter alia, provisions that, in connection with the McCoy LLC's sales of automobiles to Vehicle Buyers, Ace had the option to purchase

---

[1] In accordance with FRCB 7065 and FRCP65, this ruling is entered without prejudice to the Defendants' right to contest these findings and conclusions at a later trial or other dispositive motion hearing.

certain receivables arising from those sales and the attendant financing of, the customer purchases (the "Receivables").  The Receivables are evidenced by notes, automobile sales contracts, retail installment sales contracts or similar instruments (the "Evidence of Indebtedness").  A Receivable together with its corresponding Evidence of Indebtedness is referred to as a "Contract" in the Agreements, the Complaint and this Order.

8. Paragraph 2 of the PPA (Exhibit A) provides in part that, upon the purchase of each Contract by Ace, the Defendants

> **...shall assign, transfer, convey and deliver to [Ace]..., all of [the Defendants] right, title and interest in and to the Contract including, but not limited to, any and all of the following related to the Contract: credit or installment sales applications, account cards, records, forms, papers, security agreements, financing statements, the Evidences of Indebtedness, certificates of title and other forms of security for such Contract (collectively the  Security Documents ) held by [the Defendants].**

9. Paragraph 2.3 of the PPA (Exhibit A) provides in part that the Defendants "...shall turn over, remit and deliver to [Ace] **100% of any and all payments** received by [the Defendants] which relate to amounts due pursuant to any Contract purchased by [Ace] within one (1) business day of...receipt of the same." (emphasis added).

10. Paragraph 3.2 of the PPA (Exhibit A) provides in part:

> **Performance Compensation. ...Provided...neither [the Defendants] nor any Guarantor is in default or breach of any provision of this Agreement or of any other agreement, current or prior, between [Ace] and [the Defendants]....then [Ace] shall pay to [the Defendants] FORTY FIVE Percent (45%) of the actual principal, interest and late fees owed to, paid to and received by [Ace], in good funds, from Receivables related to Contracts (the  "Performance Compensation")....**

11. Section 3.2 of the PPA Addendum (Exhibit D) defines "performance compensation" as the percentage that Ace would pay the Defendants (absent default) "...of the actual principal, interest and late fees owed to, paid to and received by [Ace], in good funds, from Receivables related to Contracts (the 'Performance Compensation')."

12. Paragraph 5(d) of the PPA (Exhibit A) provides that, if there is an "Event of Default" which is not timely cured, the "Debtor shall no longer be required at its sole discretion to accrue or pay any performance compensation to [the Defendants]."

13. Section 3.2 of the PPA Addendum (Exhibit D) provides in part that "[n]o Performance Compensation shall be paid to the Seller with regard to payments received related to any Non-Performing Contract (as defined in Section 3.3) ...."

14. Paragraph 4.8 of the PPA (Exhibit A) provides that "[The Defendants are] transferring to Ace good and valid title to each Contract and a valid perfected first priority security interest in the Vehicle subject to each Contract."

15. On July 10, 2018, Ace filed a "FIRST SUPPLEMENTAL EXHIBIT TO COMPLAINT", to which was attached executed copies of the Contracts which were purchased by Ace from McCoy LLC, and which were assigned by McCoy LLC to Ace.

16. The Floorplan includes provisions that Ace will make available a line of credit for the Defendants to purchase certain motor vehicles. Pursuant to Paragraph 4 of the Floorplan, to secure "...all amounts owed to [Ace] pursuant to [the Floorplan] and all other agreements between [the Defendants and Ace]", the Defendants granted Ace a security interest in "...all of [the Defendants'] assets including, without limitation, any and all: vehicle inventory, vehicle titles; parts and accessories inventory; directive reserves; monies; cash; and books and records relating to any of the foregoing."

17. The Agreements, Contracts, Security Documents and other collateral for the Defendants' liability to Ace allegedly serve as collateral for a November 1, 2016 Promissory Note in the amount of $14,500,000.00 executed by Ace in favor of Hamilton State Bank.

18. Ace's security interest in the assets of McCoy LLC was perfected through the filing of that certain UCC 1 Financing Statement with the South Carolina Secretary of State on June 17, 2016, as Filing No. 160617 1508542, a true and correct copy of which is attached to the Complaint as Exhibit G.

19. The guarantees of Robert McCoy and Misty McCoy grant Ace a security interest in certain assets which are owned by Robert McCoy and Misty McCoy.

20. Ace's security interest in the collateral of Robert McCoy and Misty McCoy was perfected through the filing of that certain UCC 1 Financing Statement with the North Carolina Secretary of State on June 17, 2016, as Filing No. 20160062015E, a true and correct copy of which is attached to the Complaint as Exhibit H.

21. On March 15, 2018, Ace filed its chapter 11 case. From the first day of the case, Ace indicated an intention to liquidate its assets in Chapter 11 for the benefit of creditors, particularly for Ace's first priority lender, Hamilton State Bank. These assets consist principally of floorplan loans, including assigned accounts and floorplan inventory, which Ace hopes to sell to other lenders.

22. McCoy LLC appeared at the first day hearings held on March 28, 2018 and has been an active participant in the bankruptcy case.

23. At the filing date, the Defendants were current on their payment obligations to Ace under the Agreements. However, shortly after Ace filed Chapter 11, the Defendants went into default, principally for failing to pay monies owed to Ace. This default may well have been tactical. On April 4, 2018, Robert McCoy sent an email to then counsel David Badger, indicating that he, Robert McCoy, saw an opportunity [in Ace's this business dispute and Ace's desire to sell its loan portfolio] "…to use this to my

advantage to string this out as long as I can…unless he [Ace President] wished to make a deal now."

24. On May 16, 2018, Ace sent a Notice of Default, advising the Defendants that they were in breach of the Agreements. That notice further advised that pursuant to Section 6(a) (Remedies) of the Servicing Agreement, Ace was taking over all servicing rights of the Defendants to all Contracts. Further, notice was given that the Defendants were no longer authorized to collect amounts due pursuant to Contacts which have been purchased by Ace pursuant to the terms of the PPA. These instructions were ignored by the Defendants.

25. Instead, on May 24, 2018, Robert McCoy filed a proof of claim on behalf of McCoy LLC, averring that Ace owed its borrower a $1.4 million secured debt. That claim is also founded upon the Agreements.

26. On or about May 30, 2018, agents for Ace successfully repossessed 23 vehicles, a portion of Ace's collateral, from one of McCoy LLC's car lots. Those vehicles were still being held by Ace's agents at the time of these hearings.

27. On June 18, 2018, Ace filed the instant adversary proceeding against the Defendants, together with emergency motions and requests for injunctive relief.

28. A hearing was first conducted on these matters on June 21, 2018. Because of other hearings on the Court's docket, a full evidentiary hearing could not be held on that date. To maintain the status quo, the parties agreed to an Interim Order dated June 25, 2018, effectively a temporary restraining order. The preliminary injunction and emergency motions hearing was conducted on July 18, 2018.

29. The evidence presented at this latter hearing clearly shows that the Defendants are in default of the Agreements in numerous ways, as set forth in Paragraph 55 of the Complaint and in the written Notices of Default sent to the Defendants (Exhibits K, L, M and N) ("the "Defaults"). The testimony presented, as well as the "McCoy Motors Weekly Statement Summary" (Exhibit DD), demonstrates that as of June 20, 2018, the total monetary default of the Defendants was approximately $197,000.00.

## CONCLUSIONS OF LAW

30. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. 157 and 1334, and pursuant to the Order entered by the Judges of the United States District Court for the Western District of North Carolina on July 30, 1984 (the Referral Order), which Order was entered in accordance with the Bankruptcy Amendments and Federal Judgeship Act of 1984.

31. According to the Complaint, the statutory predicates for relief are 11 U.S.C. Sections 105, 362, 365, 522, 541, 542, 1106, and 1115 of Title 11, and 28 U.S.C. Sections 152 and 157; Rules 7001, 7065, 9013, 9014 and 9020 of the Rules of Bankruptcy Procedure; North Carolina General Statute Sections 14-114 and 1-440.3; and Rules 9013-1 of the Local Rules of Practice for the United States Bankruptcy Court for the

Western District of North Carolina. For the reasons stated below, this Court generally agrees with these assertions, although Section 522 and Section 1106, would appear inapplicable, on their face.

32. The gravamen of this Complaint is as follows: Ace alleges that it is the owner of, or the holder of a security interest in, the assets which are the subject of this Complaint, and further alleges these assets are in the possession of the Defendants. Ace contends that as the third-party customers under the retail sales contracts make payments on their obligations to the Defendants, and if upon default, their vehicles are repossessed or returned, the Defendants will continue to obtain such property going forward. Ace argues that these contract rights and the collateral held by the Defendants are property of the bankruptcy estate under 11 U.S.C. § 541. Demand for turnover having been previously made and refused by the Defendants, Ace suggests that the Defendants are in willful violation of the automatic stay of 11 U.S.C. § 362(a)(3). Ace also maintains these assets are subject to summary turnover under Section 542 of the Bankruptcy Code. Because of this, Ace concludes that these are core proceedings under 28 U.S.C. § 157(b). Defendants deny essentially all of these allegations.

33. Ace's contracts, including any Contracts which have been assigned to it, and its liens on the Defendants' property, are certainly property of the bankruptcy estate per 11 U.S.C. § 541(a). However, for the most part, this is not a turnover action under 11 U.S.C. § 542. Turnover is limited to circumstances where ownership of property is not disputed—where the property in question is clearly owned by Ace. *See The Finley Group v. Roselli (In re RedF Marketing)*, No. 12-32462, 2018 WL 3475887, at *9 (Bankr. W.D.N.C. July 5, 2018). Further, Section 542 may not be employed to resolve breach of contract disputes, where the breach is itself disputed. *Id.*

34. This action runs afoul of both turnover limitations. While styled a turnover, it is that only as to property which Ace clearly owns—essentially the assigned customer retail installment contracts. Otherwise, Ace's action is essentially a lender breach of contract action against its floorplan borrower, paired with a foreclosure against its collateral under the Uniform Commercial Code ("UCC") and other applicable state law. Because the Defendants have refused to act in accordance with the Agreements, Ace seeks judicial assistance in recovering control over its property and collateral. In short, Ace seeks the ancillary state law remedies of attachment and claim and delivery. Further, Ace seeks injunctive relief under Federal Rule of Bankruptcy Procedure 7065.

35. As such, this action presents both "core" and "related to" matters. 28 U.S.C. § 157(b)(2)(E). Ace's request for judicial assistance to recover control over the assigned accounts which are clearly property of the estate is a "core" 11 U.S.C. § 542 turnover claim.

36. Primarily, Ace's attempt to collect against the Defendants under the Agreements is a state law breach of contract claim and an action designed to augment the estate. That would weigh in favor of treating the remainder of the action as "related to" under 28 U.S.C. § 157(c)(1).

37. However, McCoy LLC has filed a $1,431,867.32 secured claim in this case. Because that claim is founded upon the same agreements and events complained of by Ace in this lawsuit, the two claims are compulsory counterclaims. This makes the present action a "core matter" under 28 U.S.C. § 157(b)(2), both as an objection to claim under subpart B and a debtor's counterclaim against a party filing a claim under subpart C.

38. Additionally, by filing a proof of claim in this case, McCoy LLC has consented to final disposition of these matters by this bankruptcy court. *Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932 (2015).

39. Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1409.

40. The Agreements are executory contracts, subject to the provisions of Sections 362 and 365 of the Bankruptcy Code.

41. Due to the Events of Default, and the failure to cure such defaults within the time provided in the Agreements and the Notices of Default, Ace is entitled to exercise its contractual and statutory rights and remedies, including but not limited to those of a secured party under the UCC as adopted by the States of North Carolina and South Carolina.

42. Because all Contracts have been declared as Non-Performing as a result of the Defendants' defaults, the Defendants have no claim against Ace for any Performance Compensation pursuant to Paragraph 5(d) of the PPA ("Exhibit A") and Section 3.2 of the PPA Addendum (Exhibit D).

43. Ace properly accelerated the liabilities of the Defendants.

44. Ace properly terminated the Servicing Rights of the Defendants pursuant to Paragraph 6 of the Servicing Agreement.

45. Ace has the exclusive right to collect any and all payments due under the Contracts from the Vehicle Buyers or any other source.

46. Ace has the right to enforce its properly perfected security interest in its collateral under the Agreements, pursuant to the Agreements and North Carolina General Statute § 25-9-101 et. seq.

## ALLEGED DEFENSES OF DEFENDANTS

47. The Defendants allege that Ace made inaccurate statements in its advertising concerning the BHPH program. These included statements such as Ace's financing program allows dealers "...to retain the equity in your business..." (McCoy LLC Exhibit I) and that a benefit of the financing program was that there was "[n]o lien on your property" (McCoy LLC Exhibit F). These advertising materials do not provide the Defendants with a valid defense to their obligations.

48. The advertising flyers in question were unexecuted, nonspecific materials. Moreover, these documents predate the Agreements that the parties executed, and legally cannot be employed to contradict the terms of the parties' signed Agreements. On the other hand, the Agreements are commercial contracts which must be enforced by

7

their terms.  The Defendants are experienced in the used car business. They were under no compulsion to sign the Agreements.  They had the opportunity to review the Agreements prior to signing them, and the freedom to not enter into the Agreements if the terms were not acceptable.  Because the Agreements are the final, written expression of the parties' agreements, they are binding and are not subject to reinterpretation based upon prior writings. *See Cable TV, Inc. v. Theatre Supply Co.*, 302 S.E.2d 458, 460 (1983) ("The parol evidence rule excludes prior or contemporaneous oral agreements which are inconsistent with a written contract if the written contract contains the complete agreement of the parties.").  Additionally, the Agreements are not subject to reinterpretation due to a particular party's contrary understanding of the arrangement. *See Wilson v. Wilson*, 714 S.E.2d 793, 796 (2011).

49.     The Defendants further allege that Ace owes McCoy LLC approximately $50,000.00 for refunds received from cancelled GAP protection, that Ace had agreed to give the Defendants a $50,000.00 credit on account of the claim, and that there was a verbal contract to give the Defendants this credit.  Ace disputes that it has any liability to the Defendants for such refunds.

50.     Because the record is not clear as to this alleged defense, the Court makes no finding as to the allegations about what was or was not promised concerning GAP. Either way, Ace was not authorized to make any binding settlement of such a claim without compliance with Bankruptcy Rule 9019 (which has not been done), and Court approval (which has not been given).  Thus, there was no binding contract about GAP and therefore no breach of any such contract by Ace.  The Court would further note that, even if a claim for a refund existed, the Defendants appear to have contractually released Ace from such claim (see Paragraph 20, PPA), or the refund claim is an asset which secures Ace's claim against the Defendants.

51.     Finally, and even if there was a binding agreement with Ace for a $50,000.00 credit, the amount of the Defendants' default significantly exceeds $50,000.00.  As such, the Defendants' claim is not a valid legal justification for the Defendants to cease making timely payments to Ace.

52.     The Defendants further allege that Ace's claims and its liens are in some way defective because some of the vehicle titles (such as Defendant's Exhibit H) show the first lien holder as AMAC (an acronym of Ace's full legal name).  McCoy testified as to his belief that the provisions of North Carolina General Statute § 25-9-503(c) applied, and that the trade name AMAC rendered the documentation defective.  This Court disagrees.

53.     In the first place, North Carolina General Statute § 25-9-503(c) does not apply to the perfection of liens on motor vehicle titles.  The statute is only relevant to financing statements filed in accordance with the UCC.

54.     Second, even if the UCC was applicable to the notation of a lender's name on vehicle titles, it would not change the outcome.  Whether a name on a financing statement is seriously misleading generally pertains to the name of the debtor, not the secured party. *See* N.C. Gen. Stat. §§ 25-9-503 and 25-9-506.  Further, whether a filed

8

financing statement is so misleading as to render the security interest unperfected is a question of perfection, not enforceability. As such it is of concern to other secured parties, not the debtor. Even an unperfected security agreement is enforceable against the grantor. N.C. Gen. Stat. § 25-9-203. The use of AMAC does not invalidate any agreements between Ace and the Defendants.

55. The Defendants also suggest that they have an ownership interest in the Contracts and that this ownership interest entitles the Defendants to collect payments from Vehicle Buyers. The Court disagrees. The Agreements clearly provide that purchased Contracts were assigned to Ace. The titles attached as a Supplemental Exhibit corroborate that fact. There was a full, not a partial or collateral, assignment of the Contracts by McCoy LLC to Ace.

56. As an absolute assignee, Ace is the owner of the Contracts. The Defendant McCoy LLC was but a licensee whose right to collect and use a portion of the payments from the Vehicle Buyers was contractual and conditional. Because the Defendants were in default of the agreements which create and govern that license, Ace was entitled to, and did, terminate McCoy LLC's servicing rights. Ace is entitled to control and collect upon the Contracts.[2]

57. Even if the assignment were only for security, the same basic result would pertain under the UCC.

58. Admittedly, the Agreements, give the Defendants a contractual right to receive Performance Compensation under certain circumstances. However, this contractual right is not equivalent to an ownership interest in the Contracts; it is a contract right which is not absolute. Under certain conditions, the Defendants' right to receive Performance Compensation can be terminated.

**CONCLUSIONS WITH RESPECT TO EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND EMERGENCY MOTION FOR TURNOVER OF PROPERTY OF THE ESTATE**

59. Ace is the owner of, or the holder of a security interest in, the assets which are the subject of this Complaint, and that these assets are in the possession and/or control of the Defendants.

60. As noted, the Defendants are in default under the Agreements. Although current as of the March 15, 2018 bankruptcy date, the Defendants were almost $200,000 in arrears as of the hearing date. They are not remitting (or through the ACHS account, permitting Ace to sweep) the underlying customer payments. Although required under the Agreements as well as the Interim Order, the Defendants have failed to account for

---

[2] Although a buyer of accounts also falls within the definition of "secured party" under N.C. Gen. Stat. § 25-9-102(a)(75)(C) and (D), to the extent Ace is an assignee, most of the limitations placed on a secured party are inapplicable. As Comment 9 to § 25-9-601 explains "[a]lthough denominated 'secured parties,' these buyers own the entire interest in the property sold and so may enforce their rights..."

the monies they have collected from customers on the assigned accounts. They also appear to be out of trust with regard to floorplanned vehicles.

61. Ace has already terminated McCoy LLC's right to collect the accounts, and under the Agreements has the right to immediate possession of the Debtor's assets. The Defendants have refused to acknowledge the termination of their servicing rights and to allow Ace the exclusive rights to collect payments due under the Contracts which are owned by Ace.

62. Further, as the third-party customers under the retail sales contracts make payments on their obligations to the Defendants, and if upon default, their vehicles are repossessed or returned, the Defendants will continue to obtain such property going forward.

63. As noted, the assigned accounts, and any related documentation are estate property, subject to turnover under Section 542 of the Bankruptcy Code. At worst, they are Ace's collateral.

64. The remainder of the property at issue consists of liens on the property of others, meaning turnover is not a viable cause. This does not mean relief is unavailable, however, as to Ace's collateral. As a secured party under the UCC and under other state law, upon default, Ace was entitled to exercise its default remedies.

65. UCC § 9-607 provides a secured party with a right to collect liquid collateral such as accounts receivable, general intangibles, chattel paper, notes, deposit accounts, and other intangible assets that oblige an underlying obligor to make payment or render performance to the debtor. *See* UCC § 9-607(a) and N.C. Gen. Stat. § 25-9-607(a). As to accounts owed to its debtor, the secured party

> "(1) [m]ay notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party; (2) [m]ay take any proceeds to which the secured party is entitled under G.S. 25-9-315; (3) [m]ay enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor or other person obligated on the collateral. N.C. Gen. Stat § 25-9-607(a)."

66. The Official Comment to this section explains that this provision "allows the assignee to liquidate collateral by collecting whatever may become due on the collateral, whether or not the method of collection contemplated by the security arrangement before default was direct...or indirect…." Official Comment 2 to N.C. Gen. Stat. § 25-9-607.

67. Thus, Ace is within its rights to seek recovery of the amounts owing by customers under the assigned retail installment accounts, aka the Contracts.

68. A secured party's UCC default rights are cumulative and may be exercised simultaneously. Thus, a secured party may bring an action against the debtor while at the same time repossessing and selling the collateral at a nonjudicial foreclosure sale. Zinnecker, *The Default Provisions of Revised Article 9*, 54 Bus Law. 1113, 1117 (1999). This is what Ace has done in this case, first by exercising self-help repossession against the vehicles on the Defendant's lot, and now by seeking recovery of its debt and access to the remainder of its collateral through this action.

69. Under the UCC, Ace is also entitled to employ any procedure available under any applicable law outside of N.C. Gen. Stat. § 25-9-601. Official Comment 6 to this section dictates that Ace, as a secured party, may reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure.

70. Among these applicable procedures is an ancillary claim and delivery remedy under North Carolina common law (and to the extent applicable, South Carolina § 15-69-10). Another is prejudgment attachment through N.C. Gen. Stat. § 1-440. These remedies are available in bankruptcy through Federal Rule of Bankruptcy Procedure 7064, entitled "Seizing a Person or Property," which adopts Federal Rule of Civil Procedure 64 in adversary proceedings. Federal Rule of Civil Procedure 64, in turn, provides that all remedies available under the law of the state where the court is located for the seizure of property to secure satisfaction of a potential judgment may be employed by the bankruptcy court. Of relevance here, these state law remedies include attachment, replevin, sequestration, and any other equivalent remedy. Claim and delivery is the modern equivalent of a replevin action.

71. Another available remedy is a preliminary injunction under Federal Rule of Bankruptcy Procedure 7065, as has been sought in this action by Ace.

72. Because it is Ace that is seeking such prejudgment remedies, no bond or other security is required. Fed. R. Bankr. Pro. 7065.

73. There is a substantial likelihood of success on the merits of Ace's claims, given the clarity of the Agreements and the payment and other breaches of the Agreements by the Defendants.

74. Ace and the bankruptcy estate will be irreparably harmed unless this Court issues an injunction, including the likely transfer of funds by the Defendants, and the improper disposal of automobiles, cash and other collateral. A moving party can show irreparable injury where, as here, assets may be dissipated to avoid the satisfaction of a judgment. *See, e.g. Merch. Transaction Sys. v. Necela, Inc.*, 2010 U.S. Dist. LEXIS 12602, 8-9 (D. Ariz. Jan. 21, 2010) (citations omitted). Indeed, money damages will be an inadequate remedy due to impending insolvency of the defendant or that defendant has engaged in a pattern of secreting or dissipating assets to avoid judgment. *Id.* at 15 (citation omitted).

75. The evidence presented at hearing, together with the prior proceedings in this case, indicates that Ace's fears about the dissipation of its property/collateral are well

founded. Apart from the payment defaults, the Defendants have evidenced a disregard for the parties' agreements and undertakings. Their previous actions suggest that they intend to do whatever necessary to prevail in this dispute with Ace. Robert McCoy terminated his prior lawyer when Robert McCoy decided that attorney was not acting as aggressively as he deemed appropriate. Robert McCoy filed a proof of claim under oath against Ace representing that McCoy LLC was owed a $1.4 million secured debt by Ace, although the evidence at hearing shows no colorable basis for such a large debt, and absolutely no basis for a secured claim against the Debtor's estate. Further, when Ace declared a default, and exercised its UCC self-help repossession remedies, Robert McCoy attempted to have Ace's officers arrested on criminal charges and caused McCoy LLC to sue Ace's repossession agency in state court. He also published potentially defamatory remarks about Ace employees on the internet. When Ace filed this action, Robert McCoy responded with a bar grievance against Ace's counsel—because in his mind, counsel violated the Fair Debt Collection Practices Act. Now after agreeing to an Interim Order designed to maintain the status quo until this hearing could be held, Robert McCoy and the other Defendants have failed to comply with its terms. The evidence presented suggests that since default was declared in March, the Defendants have continued to collect the assigned accounts, and have failed (as required by the Interim Order) to account for these monies. It is clear that absent an injunction, these monies and Ace's other collateral will be dissipated long before any trial can be held.

76. The injury to Ace and the bankruptcy estate outweighs whatever damage the proposed injunction may cause the Defendants.

77. If issued, the injunction would not be adverse to the public interest. In the first instance, public policy undoubtedly favors the enforceability of contracts and security interests in property. That public policy is, in the case of UCC security interests, clearly expressed in the default provisions of Article 9 which upon default, provide that a secured party such as Ace may realize upon its collateral. Further, the public interest strongly favors maximizing the return to creditors in bankruptcy cases and the issuance of an injunction prohibiting the Defendants from transferring, dissipating or concealing assets will make it substantially more likely that Ace will be able to recover funds to make a meaningful distribution in this case.

78. This Court's power to issue injunctions is grounded in the provisions of Federal Rules of Bankruptcy Procedure 7064 and 7065, along with the applicable state statutes and common law authorities. It is also found in this Court's equitable authority. Courts generally have the power to issue a preliminary injunction to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies. *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988). Moreover, 11 U.S.C. Section 105(a) provides explicit authority for the granting of injunctive relief in bankruptcy matters. In the exercise of its authority under 105, the Bankruptcy Court may use its injunctive authority to protect the integrity of a bankruptcy estate and the Bankruptcy Court's custody thereof and to preserve to that Court the ability to exercise the authority delegated to it by Congress. *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1003 (4th Cir. 1986) (quoting *In re Johns Manville Corp.*, 40 B.R. 219, 226 (S.D.N.Y. 1984)).

79. Good and sufficient cause has been shown for the injunctive relief sought in the Motions.

### CONCLUSIONS WITH RESPECT EMERGENCY MOTION FOR INJUNCTION OF DEFENDANTS FROM PURSUING CAR MASTERS LITIGATION AND EMERGENCY MOTION FOR INJUNCTION OF DEFENDANTS FROM PURSUING CRIMINAL COMPLAINT

80. Robert McCoy presented copies of documents showing the dismissal of the state court actions against Car Masters, and Robert McCoy testified that he had advised the York County Sheriff s Department that he did not wish to pursue his criminal complaint.

81. As such, the Emergency Motion for Injunction of Defendants from Pursuing Car Masters Litigation and the Emergency Motion for Injunction of Defendants from Pursuing Criminal Complaint are moot.

82. Ace has not waived any claims or causes of action arising from the facts relevant to the Emergency Motion for Injunction of Defendants from Pursuing Car Masters Litigation and the Emergency Motion for Injunction of Defendants from Pursuing Criminal Complaint.

### CONCLUSIONS WITH RESPECT TO INTERIM ORDER

83. From the evidence presented, none of the parties have completely complied with their obligations under the Interim Order, although there are material differences in the materiality of the parties' failures in this regard.

84. For its part, Ace did not deliver the 23 repossessed automobiles to Manheim Auto Auction in Statesville, North Carolina, although it did present testimony which sought to explain the reason for not doing so. Essentially, Ace delayed transporting the cars until the storage facility had car haulers available to move them all at one time (as opposed to driving them one at a time to Statesville). This appears to have been a sensible, and good faith effort by Ace to save money (for both sides). However, this change should have been discussed in advance with the Defendants, and a modification of the Interim Order sought from this court.

85. The violations of the Defendants are much more serious and prejudicial. It does not appear that the Defendants have made a serious attempt to comply with the provisions of the Interim Order requiring: a) the Defendants, commencing on June 21, 2018, to pay over to Lang any collections from the Vehicle Buyers on a daily basis; b) that Lang hold the daily payments from the Defendants in an escrow account (the "Lang Escrow Account") pending further order of this Court; c) that McCoy LLC account for funds received from Vehicle Buyers and in its possession as of June 21, and that it not spend such funds pending further order of the Court; and d) that written responses to the Motions be filed no later than July 9, 2018.

86. The testimony and evidence (Exhibit II) showed that an account with BB&T ("Account 0022") was opened on or about June 27, 2018. No evidence was presented showing that any deposits were made into Account 0022. Robert McCoy testified that he did not know the source of the funds which were used to open Account 0022.

87. The testimony showed that on or about July 13, 2018, Lang opened another account with BB&T ("Account 0014"). Robert McCoy testified that he did not know why Account 0014 was opened. Exhibit II includes Transaction Receipts showing deposits of $27,191.87 and $15,706.30 into Account 0014 on July 16 and July 17, 2018, respectively.

88. Other than the two Transaction Receipts in Exhibit II, there was no accounting, copy of bank statements or other evidence presented to the Court concerning Account 0022 or Account 0014. There was no evidence presented showing that the deposits made on July 16 and July 17 had cleared and constituted available funds. Robert McCoy testified that the McCoy LLC check deposited on July 17 would clear, that funds were available in the McCoy LLC account to cover the check, and that he had never written a check for insufficient funds.

89. Because there is as yet no pending contempt motion, this Court will defer ruling on the question of the parties' compliance with the Interim Order. However, these material failures by the Defendants to comply with even agreed orders demonstrates the essential need to provide preliminary injunctive relief in favor of Ace.

## Conclusions Regarding the Request for a Constructive Trust

90. Although Ace asks this Court to impose a constructive trust on all of the Defendants' assets, including proceeds, profits and product of same for its benefit and that of its bankruptcy estate, this would appear neither appropriate or necessary at this stage of the proceeding. Ace has well recognized, legally binding contract rights and security interests under the UCC and other state law. The monies which the Defendants may have collected, but not remitted, are either Ace's property or at worst, proceeds of its collateral. Ace is being permitted to exercise its rights under the Agreements to collect the assigned accounts from the third-party car purchasers, and to obtain possession of whatever has been previously collected from them by the Defendants or that which remains under their custody or control. There would appear to be no present need to create other, equitable remedies. This request is denied without prejudice to it being renewed should circumstances demonstrate a need.

## Conclusions Regarding Other Defenses

91. In their comments to the proposed Order, the Defendants have largely rehashed their arguments from the latest hearing, which this Court rejected. The reasons for that ruling are stated above and need not be repeated. The Defendants have also asserted several new arguments not found in their Answers or in the arguments made at hearing. The Court declines to address these contentions, with one exception. For the benefit of any reviewing court the jury trial argument must be addressed as it concerns this Court's power to enter this order.

92. In their comments to the draft order propounded by Ace, the Defendants have repeatedly asserted a right to jury trial, implicitly suggesting that a ruling on these emergency motions and this preliminary injunction should be delayed until a jury trial occurs. This is not a valid argument.

93. First, this is a preliminary injunction hearing under Federal Rule of Bankruptcy Procedure 7065. Such hearing is conducted when delay until a trial presents a prospect of irreparable harm. The aim is to preserve "the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). That being the case, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, *Progress Development Corp. v. Mitchell*, 286 F.2d 222, 233 (C.A.7 1961), and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. There is no right to a jury adjudication as to a preliminary injunction motion.

94. To the extent that this action involves the Debtor's property, summary turnover is provided for under 11 U.S.C. § 542. To the extent that Ace is seeking assistance in exercising its remedies as a secured party, the Defendants expressly granted the Debtor these pretrial remedies in the Agreements, including the right to terminate the license to collect payments on the assigned accounts, to reenter the Defendants' business premises and to repossess its property/collateral. The UCC contemplates these remedies prior to the filing of any action, much less a jury trial of the dispute. So do the applicable attachment and claim and delivery laws.

95. Finally, it appears that there is no jury trial right in this action, at least by McCoy LLC. By filing a proof of claim in this bankruptcy case against the Debtor, McCoy LLC has consented to the jurisdiction of this bankruptcy court and waived any right to a jury trial. *Langenkamp v. Culp*, 498 U.S. 42 (1990).

**Based upon the forgoing Findings of Fact and Conclusions of Law and the entire record in this matter, and for good and sufficient cause otherwise shown, it is hereby ORDERED, ADJUDGED and DECREED as follows:**

A. The Defendants shall immediately:

(i) stop collecting any payments from Ace's customers/Vehicle Buyers with regard to the motor vehicles and Contracts that constitute collateral under the Agreements and otherwise cease taking any actions whatsoever to exercise servicing rights under the Agreements;

(ii) direct all of Ace's customers and the Defendant's customers to make all payments directly to Ace;

(iii) turn over any cash or other monies to Ace, including but not limited to payment received from Ace's customers or third parties that are in any way subject to the terms of the Contracts or Agreements;

        (iv)    turn over any vehicles to Ace (including those that have been repossessed) that constitute collateral under the Agreements or related to the Contracts (including all motor vehicles in Defendants' inventory), as well as all titles, accounting records, payment records of Vehicle Buyers, or other documentation associated with each vehicle;

        (v)    cease communicating with Ace's customers and stop interfering with Ace's efforts to collect on its accounts under the Contracts;

        (vi)    provide copies of all documents, accounting records and bank statements to Debtor, which are relevant to the location, use and disposition of Ace's collateral;

        (vii)    turn over any refunds for GAP protection premiums paid in connection with the Contracts, which have been received or which are received in the future;

        (viii)    execute any documents necessary to remove liens of any of the Defendants from any motor vehicles that are related to the Contracts, in order to provide Ace with a first priority lien on such vehicles (or, alternatively, Ace may do so pursuant to its Power of Attorney (PPA, Pages 24-25, Exhibit A);

        (ix)    cease transferring, dissipating, concealing, moving, secreting or otherwise disposing of any assets of Ace or the Defendants, or assets which are collateral of Ace, including the sale of any motor vehicle in Defendants' inventory or possession, or the transfer of any funds or cash by any of the Defendants, pending further Order of the Court;

        (x)    turn over all keys to any vehicles which are in their control or possession;

        (xi)    cease any efforts to repossess any motor vehicles and provide Ace with any information (including access information) concerning any GPS devices on all motor vehicles related to the Contracts and/or in the Defendants' inventory;

        (xii)    disclose the location of all of Ace's property or collateral of Ace, including all assets of the Defendants;

        (xiii)    cooperate with Ace in connection with those matters set forth in Paragraph 19 of the Floorplan, Paragraph 5 of the PPA and Paragraph 6 of the Servicing Agreement; and

        (xiv)    provide Ace with current addresses of all Vehicle Buyers under the Contracts.

    B.    Any payments received, whether related to the Contracts owned by Ace or McCoy LLC shall be forwarded to Ace within no more than 24 hours of receipt.

    C.    Upon entry of this Order, Lang shall turn over to Ace the balance in the Lang Escrow Account and any and all bank records related to Account 0022 and Account 0014. If any checks which have been deposited in the Lang Escrow Account clear after the initial

balance has been turned over, Lang shall have three business days to remit the proceeds of those checks to Ace.

      D.    Ace shall establish a separate escrow account into which it shall deposit all payments made under the Contracts, as well as the liquidation proceeds from the disposition or sale of assets owned by the Defendants.  The funds in this escrow account shall not be spent or disposed of by Ace in any manner pending further order of the Court.

      E.    The Court will enter a Supplemental Order providing that all Vehicle Buyers shall hereinafter make payments under the Contracts to Ace, and the same shall be served on the Vehicle Buyers by Ace.

      F.    This Order shall be immediately effective and the provisions of Bankruptcy Rule 6004(g) staying the order for fourteen days shall not apply to this Order.

This Order has been signed electronically. The judge's signature and court's seal appear at the top of the Order.

United States Bankruptcy Court